# In the United States Court of Federal Claims

No. 24-364
(Filed: September 27, 2024)

* * * * * * * * * * * * * * * * * * * * * * * *

RODNEY L. DAVIS, et al.,

       *Plaintiffs*,

v.

THE UNITED STATES,

       *Defendant*.

* * * * * * * * * * * * * * * * * * * * * * * *

    *Kenneth T. Cuccinelli, II*, Spotsylvania, VA, for plaintiff. *Earl Mayfield, III*, Fairfax, VA, of counsel.

    *Galina I. Fomenkova*, Trial Attorney, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, DC, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *L. Misha Preheim*, Assistant Director, for defendant.

## OPINION

BRUGGINK, *Judge*.

    This is a lawsuit by current and former members of Congress protesting that they have not received a cost-of-living adjustment ("COLA") since 2009. They assert that this circumstance violates the Twenty-Seventh Amendment to the United States Constitution. An unsympathetic observer might note that this predicament is of Congress' own making; after all, Congress sets its own pay, and the fact that there has been no COLA in fifteen years is due to its intentional rejection of what would otherwise have been an automatic COLA comparable to that received by other federal employees. Indeed, as defendant points out, virtually all of the named plaintiffs have voted to cancel some or all of those annual pay raises. Nevertheless, the

government has not argued that plaintiffs have waived their right to claim entitlement to those COLAs.   Instead, it has moved to dismiss the complaint as beyond the court's subject matter jurisdiction.   The matter is fully briefed, and oral argument was heard on August 23, 2024.   For the reasons set out herein, we reject defendant's motion in part and grant it in part.

BACKGROUND

Article I, Section 6, Clause 1 of the Constitution provides that "The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States."   U.S. Const. art. I, § 6, cl. 1.   Until 1992, that provision was the only instruction the Constitution offered concerning congressional pay.   On May 7 of that year, however, Michigan's approval of the proposed Twenty-Seventh Amendment supplied the necessary 38th state to bring about ratification, officially enshrining James Madison's compensation Amendment two hundred years after he had proposed it. The Amendment provides that "No law, varying the compensation for the services of the Senators and Representatives, shall take effect, until an election of Representatives shall have intervened." U.S. Const. amend. XXVII. Because each Congress has a two-year duration, the Amendment ensures that no particular Congress can increase or decrease its own pay.   The change in compensation must await the seating of a new Congress.

In addition to these constitutional provisions, there are two pieces of legislation that control congressional pay.   The first is found at 2 U.S.C. § 4501.   In bare terms, it provides that:

(1) The annual rate of pay for [members of Congress]–

. . . .

shall be the rate determined for such positions under chapter 11 of this title, as adjusted by paragraph (2) of this section.

(2)(A) Subject to subparagraph (B), effective at the beginning of the first applicable pay period commencing on or after the first day of the month in which an adjustment takes effect under section 5303 of title 5 in the rates of pay under the General Schedule . . . as determined under section 704(a)(1) of the Ethics Reform Act of 1989.   The appropriate date under this

2

sentence is the first day of the fiscal year in which such adjustment in the rates of pay under the General Schedule takes effect.

2 U.S.C. § 4501(1), (2)(A).   Section 4501 thus ties congressional pay increases to the automatic COLA process implemented by § 704(a)(1) of the Ethics Reform Act of 1989 ("ERA"), which applies more generally to civilian employees, including members of the Judiciary.   *See* Ethics Reform Act of 1989, Pub. L. No. 101-194, § 704(a)(1), 103 Stat. 1716, 1768. Section 4501, then, dictates that each year's COLA, calculated using the formula in the ERA, shall take effect "at the beginning of the first applicable pay period commencing on or after the first day of the month in which an adjustment" of the General Schedule ("GS") rate of pay for federal employees vests.   § 4501(2)(A).   The percentage change of COLAs for members of Congress in a given year may not exceed the percentage increase in the GS pay rate for that year.[1]   § 4501(2)(B).

Annual adjustments of the GS pay rate, in turn, are set by 5 U.S.C. § 5303.   That act, in its essential terms, provides that the GS rates shall automatically increase "by the percentage (rounded to the nearest one-tenth of 1 percent) equal to one-half of 1 percentage point less than the percentage by which the ECI[2] for the base quarter of the year before the preceding calendar year exceeds the ECI for the base quarter of the second year before the preceding calendar year (if at all)." 5 U.S.C. § 5303(a).   The official table of GS rates (reflecting the changes under § 5303) is announced in an executive order in the December preceding the January in which the new rates take effect.   This increase vests on the "first day of the first applicable pay period beginning on or after January 1 of each calendar year." *Id.*   The congressional COLA thus takes effect automatically each year following the above steps unless Congress abrogates or modifies it statutorily.

---

[1] The president may modify the annual GS increase if "because of national emergency or serious economic conditions affecting the general welfare, the President should consider" the adjustment "to be inappropriate." 5 U.S.C. § 5303(b)(1).   This may affect congressional COLAs because their amount is capped by the percentage of GS increases.

[2] The ECI, or Employment Cost Index, is a measure of employee wages and benefits on a national scale.   It is reported quarterly by the Department of Labor.

The ERA was the long-sought mechanism by which it was hoped politics would be taken out of the messy process for determining pay for Congress, the Judiciary, and all civilian federal employees. The hope was that, by using an automatic, objective device for determining COLAs, there would be no occasion for salaries to trigger political debate on an annual basis. With respect to members of Congress, the law eliminated many alternative sources of income. *See* Ethics Reform Act § 601, 103 Stat. at 1760–61. The exchange was that congressional compensation would at least keep pace with inflation through virtually guaranteed COLAs. *See id.* § 704, 103 Stat. at 1768. This removed the necessity of members casting public votes to set their own salary because the ERA would automatically adjust member pay each year according to its COLA formula.

The application of the ERA to Congress was challenged in *Boehner v. Anderson*, 809 F. Supp. 138 (D.D.C. 1992). The Speaker of the House and other members of Congress questioned the law in light of the newly adopted Twenty-Seventh Amendment. They argued that the ERA went into effect before the next election of Representatives, thereby violating the Twenty-Seventh Amendment. *Id.* at 139. Judge Sporkin, after a paean to the "incredible piece of legislation" that was the ERA,[3] disposed of the challenge to the ERA on the ground that an election had, in fact, intervened. *Id.* at 142. Lawmakers also challenged the specific COLA increase for 1991. Judge Sporkin rejected that challenge as well on the ground that the annual increase was not new "legislation" within the meaning of the Twenty-Seventh Amendment. *Id.* at 143.

On appeal, after dismissing all plaintiffs except the Speaker of the House, the D.C. Circuit affirmed Judge Sporkin's conclusion that the Twenty-Seventh Amendment did not invalidate either the ERA in general or the subsequent COLA in particular. *Boehner v. Anderson*, 30 F.3d 156, 160–62 (1994). It then dealt with a new argument raised on appeal; one that is tantalizingly close to the issue before this court, namely, that the 1993 legislation cancelling the upcoming 1994 COLA violated the Twenty-Seventh Amendment. Unfortunately for us and Speaker Boehner, the D.C. Circuit declined to allow the new argument on appeal, noting that the mental gymnastics of simultaneously maintaining that a COLA raising one's salary was an injury, while also arguing that legislation voiding such a COLA was

---

[3] "The Court finds that the Ethics Reform Act of 1989 was as salutary a piece of government legislation as any enacted in modern times." 809 F. Supp. at 143.

also an injury was a bit too much.    *Id.* at 161–62.

Alas, the hope that the ERA would de-politicize the setting of Congressional pay was not to be.    Neither Judge Sporkin's encomium nor the benediction given by the D.C. Circuit to the operation of the ERA precluded what followed.    In 1993, Congress rejected for itself the COLA scheduled for 1994.    Between then and 2024, it has rejected congressional COLAs twenty-one times.    IDA A. BRUDNICK, CONG. RSCH. SERV., 97-1011, SALARIES OF MEMBERS OF CONGRESS: RECENT ACTIONS AND HISTORICAL TABLES 2 (May 10, 2024), https://sgp.fas.org/crs/misc/97-1011.pdf.    Congress has blocked members' COLAs every year since 2009, meaning that congressional pay has been frozen at $174,000 per year since then.    *Id.* at 1.    In that time, civilian federal employees have seen their pay go up twelve times, for a total of 27.8%.    *See* FED. SALARY COUNCIL, U.S. OFF. OF PERS. MGMT., LEVEL OF COMPARABILITY PAYMENTS FOR JANUARY 2025 AND OTHER MATTERS PERTAINING TO THE LOCALITY PAY PROGRAM 27–29 tbl.7 (Feb. 9, 2024), https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/federal-salary-council/recommendation25.pdf.

Congress' abrogation of its own COLAs has used different language over the years. At first, Congress often directed that the COLA be calculated as if the GS increase had not occurred (capping the COLA at zero).    *E.g.*, Treasury, Postal Service, and General Government Appropriations Act, 1995, Pub. L. No. 103–329, § 630(2), 108 Stat. 2382, 2424.    Later, it simply declared that "no adjustment shall be made."    *E.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117–328, § 6, 136 Stat. 4459, 4462.

The typical practice for abrogating COLA increases can be seen with respect to 2024.    The executive order setting the GS pay rates for 2024 was issued on December 21, 2023.    Exec. Order No. 14,113, 88 Fed. Reg. 89,259 (Dec. 21, 2023).    Next, the new pay rates contained therein took effect on January 14, 2024.    KIRAN A. AHUJA, U.S. OFF. OF PERS. MGMT., CPM 2023–20, MEMORANDUM FOR HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES—JANUARY 2024 PAY ADJUSTMENTS 1 (2023), https://chcoc.gov/sites/default/files/January-2024-Pay-Adjustment-Memo-Attachments.pdf.    Finally, Congress enacted the statute abrogating the 2024 congressional COLA on March 23, 2024.    Consolidated Appropriations Act, 2024, Pub. L. No. 118–47, § 7, 138 Stat. 460, 461.    Since 2009, the timing of the executive orders setting the GS rates and the effective date of those rates has remained relatively consistent, with the order issued in

December and the rates taking effect the following January. The timing of legislation abrogating congressional COLAs, however, has varied widely—being enacted as early as March 2009 to prevent the January 2010 COLA, for instance, or as late as March 2018 to prevent the January 2018 COLA. *See* Omnibus Appropriations Act, 2009, Pub. L. No. 111–8, 123 Stat. 524; Consolidated Appropriations Act, 2018, Pub. L. No. 115–141, 132 Stat. 348.

These congressional annulments of member COLAs form the keystone of this case. On March 7, 2024, four current and former members of Congress[4] filed the present complaint, alleging that the timing of many of these annulments violated the Twenty-Seventh Amendment because they took effect without an intervening election of representatives. The complaint consists of three separate claims. Count I asserts a failure to pay plaintiffs' correct salary. Pls.' Am. Compl. ¶¶ 48–51. Count II asserts a failure to pay retirement benefits in the correct amount. *Id.* ¶¶ 52–54. Count III asserts that plaintiffs were not credited with the correct Thrift Savings Plan ("TSP") contributions under the Federal Employees' Retirement System ("FERS"). *Id.* ¶¶ 55–57. Plaintiffs intend to seek certification of a class action.

Defendant filed a motion to dismiss under Rule of the Court of Federal Claims ("RCFC") 12(b)(1) for lack of jurisdiction, to which plaintiffs responded on July 23, 2024. Defendant filed a reply on August 9, 2024, and plaintiffs filed a sur-reply on August 14, 2024. The court held oral argument on August 23, 2024.

Defendant advances three arguments in support of its motion. First, defendant contends that this court lacks subject matter jurisdiction over the pay claims advanced in Count I. The Tucker Act requires that a complaint be based on a money-mandating source of law, and, because the Twenty-Seventh Amendment is not, according to defendant, money-mandating, we may not exercise jurisdiction. Second, defendant asserts that we lack jurisdiction over plaintiffs' Count II and III claims related to their retirement benefits and TSP employer matching because 5 U.S.C. § 8461 mandates that such cases be adjudicated by the Office of Personnel Management, the Merit Systems Protection Board, and ultimately, the U.S. Court of Appeals for the Federal Circuit. Third, defendant argues that any pay or retirement claim

---

[4] Plaintiffs amended their complaint to add one more plaintiff on June 20, 2024, but added no new substantive arguments.

that accrued before March 7, 2018, is barred by this court's six-year statute of limitations.   *See* 28 U.S.C. § 2501.

Plaintiffs insist that we may exercise jurisdiction over their case. They respond to the government's first argument by asserting that the ERA, when enforced in compliance with the Twenty-Seventh Amendment, affords a money-mandating source of law.   As to the second argument, they contend that this is the proper forum for their retirement and TSP-related claims because the agencies to which the government directs them do not have the authority to determine the substantive validity of plaintiffs' claims with respect to the Twenty-Seventh Amendment.   Finally, plaintiffs contend that the judicially-created "continuing claims doctrine" means that their salary claims, claims for retirement benefits, and entitlement to TSP contributions for the past six years should reflect, not just those COLAs improperly nullified within the past six years, but also those improperly nullified more than six years ago.

For the reasons set out below, we agree with plaintiffs that we have jurisdiction over their Count I pay claims.   We agree with defendant, however, that we lack jurisdiction over the Count II retirement benefit claims and Count III TSP contribution claims.   With respect to the limitations period, we agree with defendant that plaintiffs' pay claims cannot reflect COLAs that took effect before March 2018.

## DISCUSSION

The United States, as a sovereign, is immune from suit unless it has waived its immunity.   *Ins. Co. of the W. v. United States*, 243 F.3d 1367, 1372 (Fed. Cir. 2001).   The lack of a waiver is a jurisdictional bar if the United States has not consented to be sued with respect to the particular type of claim brought.   *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461 (Fed. Cir. 1998).   Because Counts II and III are derivative of Count I, we address principally the basis, if any, for plaintiffs' pay claim.

Plaintiffs here rely on the Tucker Act, which grants the Court of Federal Claims jurisdiction to hear claims for money damages against the United States founded upon the United States Constitution, federal statutes, executive regulations, or government contracts.   28 U.S.C. § 1491(a)(1); *United States v. Mitchell*, 463 U.S. 206, 215–18 (1983).   Our jurisdiction over a case may only be exercised, however, when a plaintiff identifies "a separate source of substantive law that creates the right to money damages."

7

*Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc) (citing *Mitchell*, 463 U.S. at 216).   "When a complaint is filed alleging a Tucker Act claim based on a Constitutional provision, statute, or regulation, [we must] at the outset [] determine . . . whether the Constitutional provision, statute, or regulation is one that is money-mandating."   *Id.* at 1173.

A provision of law "is money-mandating for jurisdictional purposes only if it 'can fairly be interpreted as mandating compensation for damages sustained as a result of the breach of the duties [it] imposes.'"   *Id.* at 1172 (quoting *Mitchell*, 463 U.S. at 217).   In meeting this test on a motion to dismiss, plaintiffs need only make a non-frivolous allegation that the statute or regulation may be interpreted as money-mandating. "The non-frivolous allegation satisfies the jurisdictional requirement."   *Fisher*, 402 F.3d at 1172.

Defendant's principal argument is that the Twenty-Seventh Amendment is not money-mandating.   In defendant's view, it is merely a "timing" provision that controls when legislation takes effect; it cannot correctly be construed as a direction to pay money.   Mot. to Dismiss 8.   In response to plaintiffs' argument that the ERA serves as a money-mandating source of law, defendant asserts that plaintiffs may not rely on it alone, but also must prove that the Twenty-Seventh Amendment itself is independently money-mandating.   We disagree.

I.     This Court Has Subject Matter Jurisdiction Over Plaintiffs' Count I Pay Claims

This court and the Federal Circuit have long held that federal pay statutes create substantive entitlements to money that support Tucker Act jurisdiction.   *See, e.g.*, *Beer v. United States*, 696 F.3d 1174, 1186 (Fed. Cir. 2012) (judicial pay); *Fisher*, 402 F.3d at 1174 (military retirement pay); *Bobo v. United States*, 136 F.3d 1465, 1467 (Fed. Cir. 1998) (Fair Labor Standards Act); *Collins v. United States*, 101 Fed. Cl. 435, 455 (2011) (military separation pay).   We have no difficulty concluding that the combined effect of 2 U.S.C. § 4501, the Ethics Reform Act of 1989, and 5 U.S.C. § 5303 is to give specificity to the language of the Constitution that "The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law."   U.S. Const. art. I, § 6, cl. 1.   There is no question that if those were the only applicable statutes, they would constitute "money-mandating" provisions of law.   If, for example, a Congresswoman did not receive her salary, she could bring a claim under the Tucker Act in this court,

8

even if that claim included an asserted non-payment of a COLA.

Those are not the only relevant legal provisions, however. As explained above, Congress has repeatedly passed legislation nullifying the effect of COLAs that would have otherwise automatically gone into effect under the ERA. There is no question that Congress had the legal right to adopt such blocking legislation, and plaintiffs do not argue to the contrary. It is only the relatively recent adoption of the Twenty-Seventh Amendment that gives any traction to plaintiffs' claim that compensation to which they would otherwise be legally entitled has been improperly withheld.

Defendant's principal response is that the Twenty-Seventh Amendment is not money-mandating. But we need not decide whether the Twenty-Seventh Amendment—standing alone—is money-mandating. The direction of payment comes from the ERA. The Amendment furnishes the means for not enforcing the nullification legislation, leaving in place the presumption that the ERA entitles plaintiffs to money.

Defendant further objects that plaintiffs' relief is predicated on first obtaining a declaratory judgment that the COLA-nullifying laws violate the Twenty-Seventh Amendment. And because Congress has not authorized this court to provide declaratory relief, defendant reasons, we must dismiss plaintiffs' claim as their claim for money damages is contingent on first acquiring declaratory relief.

We cannot provide plaintiffs with declaratory relief, but their pay claim does not hinge on obtaining a declaratory judgment. If the alleged constitutional violation forms part of a plaintiff's claim that he has been illegally deprived of money, the claim actually is based on a money-mandating statute, even if the constitutional provision itself does not mandate the payment of money. For example, in *Gentry v. United States*, the Court of Claims held that a provision of the Civil Service Retirement Act ("CSRA") violated equal protection under the Fifth Amendment because it prevented illegitimate children from collecting CSRA benefits. 546 F.2d 343, 354 (1976). The CSRA entitled a deceased annuitant's survivor to benefits unless the survivor did not live with the annuitant "in a regular parent-child relationship." *Id.* at 344 (quoting 5 U.S.C. § 8341(e) (1970)). The plaintiff—the illegitimate child of a Navy welder—sued after he was denied CSRA benefits. *Id.* He argued that he was entitled to damages and a declaratory judgment that the CSRA "live-in" requirement violated the Fifth Amendment. *Id.*

The government objected that the court lacked jurisdiction. It argued that the court would have to issue a declaratory judgment that the "live-in" requirement was unconstitutional before it could rule that the CSRA mandated payments to the plaintiff.   *Id.* at 345–46.   And, because the court had no authority to issue declaratory judgments, the government contended that the plaintiff's case had to be dismissed for lack of jurisdiction.   *Id.* at 346.

The court denied plaintiff's request for a declaratory judgment but clarified that the award of money did not require declaratory relief.   "The money claim is grounded . . . on the statute as it now exists—at least when read in light of the Fifth Amendment—and thus states a claim for money presently due . . . .   This is exactly the kind of claim within our jurisdiction . . . ."   *Id.*   Therefore, the "plaintiff asks us to do no more than the [Supreme] Court in [*United States v.*] *Lovett* said that we could and must do—read the relevant statute and award whatever payment it grants, omitting from our interpretation of its effect any constitutionally void provision contained in it."   *Id.*

The Court of Claims added that its decision did not necessitate equitable relief.   To the contrary, "this court is bound by oath to read and give effect to the statute, but to do so only with regard to that portion that is constitutional. It is well established that an unconstitutional enactment is void *ab initio*."   *Id.* (first citing *Norton v. Shelby Cnty.*, 118 U.S. 425 (1886), then *Younger v. Harris*, 401 U.S. 37, 52 (1971)).   If the court, then, "reads and gives effect to all of a statute that it can without transgressing the oath of loyalty to the Constitution . . . it is not issuing a declaratory judgment at any time, or otherwise acting prior to judgment to create the entitlement upon which the judgment is based."   *Id.*   On that basis, the court held that it had jurisdiction because the CSRA—when read in light of the Fifth Amendment—was money-mandating.   *See id.* at 346–47.

Later decisions by this court have relied on the holding in *Gentry*. For example, in *Bevevino v. United States*, we noted that "[a]s we recognized in *Gentry v. United States* . . . merely because the court must make a ruling of law (in *Gentry*, declaring a statutory provision unconstitutional) in order to arrive at a money judgment does not render this Court's decision a 'declaratory judgment' . . . ."   87 Fed. Cl. 397, 407 (2009) (quoting *Pauley Petroleum, Inc. v. United States*, 591 F.2d 1308, 1315 (Ct. Cl. 1979)).   We concluded that, although the Court could not grant the plaintiffs' request for

declaratory relief, their claim for back pay under the Prevailing Rates System Act "necessarily require[d] a determination of plaintiffs' rights" and was "therefore within this court's jurisdiction."   *Id.* at 406–07 ("This court must necessarily decide the rights of a plaintiff before awarding a monetary judgment in a suit for back pay; the court's declaration of rights in such a dispute, however, does not exceed this court's jurisdiction, because no ultra vires declaratory judgment or equitable relief is thereby granted.").

Other cases are to similar effect.   *See, e.g., Kanemoto v. Reno,* 41 F.3d 641, 644 (Fed. Cir. 1994) (claim for restitution by Japanese internees included argument that failure to pay violated the Equal Protection and Due Process Clauses); *Jackson v. United States,* 428 F.2d 844, 446–48 (Ct. Cl. 1970) (pay claim in which the plaintiff alleged discharge in violation of the First Amendment); *Swaaley v. United States,* 376 F.2d 857, 858 (Ct. Cl. 1967) (plaintiff's involuntary military discharge allegedly was caused by his exercise of First Amendment right to petition for grievances); *Walker v. United States,* 11 Cl. Ct. 77, 79 (1986) ("[The] Federal Circuit . . . . has expressly determined that jurisdiction in *Jackson* and *Swaaley* was based not on constitutional grounds, but rather on a statutory entitlement to pay provided in the basic pay statute.").

The general proposition that this court does not have authority to issue declaratory judgments is therefore not triggered when the court simply applies existing law to claims for money presently due, as we explained in *Lummi Tribe of Lummi Reservation v. United States*.   99 Fed. Cl. 584, 603 (2011), *overruled on other grounds by Lummi Tribe of the Lummi Rsrv. v. United States*, 870 F.3d 1313 (Fed. Cir. 2017).   There, we rejected the argument that this court is always without authority to declare a regulation invalid.   Instead, "[w]here the relief sought is enforcement of a claimed right to money pursuant to a money-mandating statute and the challenge is to a regulation interpreting that statute, our jurisdiction may be invoked." *Id*. at 603; *see also id*. at 601 ("Indeed, in [*Gentry*], this court concluded that the plaintiff had asserted a claim for money presently due . . . despite the fact that the entitlement depended on the court's first finding that a provision of the statute was unconstitutional.").   Ultimately, we concluded that whether the regulation at issue was valid was a question of law that is "tied and subordinate to a monetary award" and falls within our jurisdiction.   *Id*. (quoting *Gentry*, 546 F.2d at 355).

For the same reason, plaintiffs' right to money damages here is not contingent on declaratory relief.   Plaintiffs assert that the ERA and Twenty-

11

Seventh Amendment work in tandem. But for the allegedly unconstitutional effect of the nullifying legislation, the money-mandating source of jurisdiction remains the ERA. We may enforce the ERA COLAs, in other words, and award whatever payment they grant while "omitting" any "constitutionally void" provisions. *Gentry*, 546 F.2d at 346. We therefore conclude that we have jurisdiction under the Tucker Act to enforce a pay claim based on the ERA, even when that involves determining whether the COLA legislation complies with the Twenty-Seventh Amendment.

The District Court of Hawaii had occasion to provide a detailed description of the relationship between a money-mandating statute and non-money-mandating constitutional provision. In *Matsuo v. United States*, a group of federal employees alleged that the Federal Employees Pay Comparability Act of 1990 ("FEPCA") violated the Equal Protection Clause of the Fifth Amendment by providing increased locality pay only to federal employees in the contiguous United States (thereby excluding employees in Alaska and Hawaii) and sought the pay that statute denied them. 416 F. Supp. 2d 982, 985–86. (D. Ha. 2006). That discussion was triggered by a government motion to transfer the case to this court. Defendant argued that the District Court should transfer the case here because we would have exclusive jurisdiction under the Tucker Act to hear money claims in excess of $10,000. *Id.* at 987.

The court recognized that most constitutional provisions—including those that the *Matsuo* plaintiffs invoked—are not money-mandating. *Id.* at 991. The court held, however, that a claim is based on a money-mandating statute if an "alleged constitutional violation forms part of the plaintiff's claim that he has been illegally deprived of money." *Id.* Put simply, if a plaintiff alleges that a money-mandating statute has been unconstitutionally thwarted, the claim is based on the statute, not the Constitution. *See id.* The statute thus acts in concert with the constitutional provision to satisfy the Tucker Act's money-mandating requirement.

The court went on to hold that the Court of Federal Claims would not have jurisdiction over the *Matsuo* plaintiffs' claims because they specifically alleged that the pay comparability statute itself excluded them from the possibility of being paid locality pay. *Id.* at 992. In other words, they were alleging that FEPCA was unconstitutional precisely because it did *not* mandate the payment of money to plaintiffs.

Defendant's further arguments about the Twenty-Seventh

12

Amendment involve consideration of the merits.   For example, it contends that the Amendment cannot "constrain the choices Congress can make with respect to the quantum of its pay."   Mot. to Dismiss 4.   The "quantum" that plaintiffs seek to obtain is furnished by the basic pay legislation, which clearly dictates a COLA.   In effect, defendant seems to be arguing that the decision to nullify a COLA cannot be trumped by the Twenty-Seventh Amendment.   But, in evaluating the effect of the blocking legislation, we must give the Amendment effect according to its terms.   *See Gentry*, 546 F.2d at 346.   Blocking legislation plainly consists of laws "varying the compensation for the services of the Senators and Representatives."   U.S. Const. amend. XXVII.   If the Amendment, for example, provided that legislation affecting the pay of Congress can only be adopted in odd-numbered years, then a COLA nullification adopted in an even-numbered year would itself be a nullity.

The D.C. Circuit appeared to recognize the Amendment's substantive effect when it explored its operation in *Boehner*. There, the court explained:

> [I]n essence [the Amendment] conditions the operation of a law varying congressional compensation upon an election of Representatives and the expiration of the Congress that voted for it.   The law may be enacted at any time; when an election has been held the first condition is fulfilled; when the new Congress is seated the second condition is fulfilled. Therefore, the law, although duly enacted pursuant to Article I, does not "take effect" at the earliest until the new Congress has been seated.   Accordingly, the present Congress could specify the salary of the next Congress or of any Congress after that.   For example, the COLA provision became law in 1989 but the first COLA would not be made until more than a year later, on January 1, 1991—pursuant to the Congress's decision, prior to but in the spirit of the Madison amendment, to defer implementation of the COLA until after the 1990 congressional election.   *See* Ethics Reform Act, § 704(b) (codified at 5 U.S.C. § 5318 note) (COLA provisions "shall take effect on January 1, 1991").

30 F.3d at 161–62.

Defendant also attempts to minimize the import of the Amendment by characterizing it as "merely a timing provision that specifies when certain

compensation laws shall take effect."   Mot. to Dismiss 1.   One might as well say that the precise date of one's birth is "merely a matter of timing," with no substantive import.   As any youth who has unsuccessfully tried to use a fake ID could attest, however, timing can be a matter of great substance. The contention here is that the efforts to preclude COLAs were inconsistent with the Twenty-Seventh Amendment and therefore of no effect precisely because they purported to immediately block the accrual of the pay raises, whereas such laws could only be effective if there had been an intervening election.

Richard B. Bernstein has written a comprehensive and scholarly examination of the Amendment, including the concerns that led to it being proposed.   In *The Sleeper Wakes: The History and Legacy of the Twenty-Seventh Amendment*, he explains that, when the Twenty-Seventh Amendment was proposed, the Constitution's framers were keenly aware of legislative pay issues in England that had been festering for centuries.   61 FORDHAM L. REV. 497, 501 (1992).   The Founders were deeply concerned about how congressional compensation would be fixed, both to prevent self-enrichment and also performative self-impoverishment.   *See id.* at 503–05, 526–27.   The timing of increases or decreases in pay is the mechanism by which the Amendment tests the validity of legislation affecting compensation.   Timing is anything but incidental.

Nevertheless, it is unnecessary to wrestle with precisely how the Amendment operates.   We are content for the moment to say that plaintiffs have advanced a plausible interpretation of the Amendment—that it voids in whole or in part the blocking legislation.[5]

II.    We Have No Jurisdiction Over Count II, Plaintiffs' Retirement Claims, and Count III, Plaintiffs' TSP Claims

Alongside their allegations that Congress has unconstitutionally reduced their salaries, plaintiffs allege that this reduced salary also resulted in diminished TSP and retirement benefits.   Defendant argues that we must dismiss these claims because they are directed by statute to a different review process, precluding jurisdiction here.   Defendant points out that 5 U.S.C. §§ 7703 and 8461 vest the Office of Personnel Management ("OPM"), Merit Systems Protection Board ("MSPB"), and Federal Circuit with exclusive

_____

[5] Plaintiffs contend that the blocking legislation is always a complete nullity. We do not reach that question today.

14

jurisdiction over retirement benefit claims and that 5 U.S.C. § 8477 vests the district courts with exclusive jurisdiction over TSP benefit claims.

While recognizing that retirement and TSP disputes normally should be routed to the statutorily specified review procedures, plaintiffs argue that calculations of retirement benefits and TSP contributions are joined at the hip to plaintiffs' pay claims. If plaintiffs' COLAs were improperly nullified, then their retirement benefits and the government's TSP contributions were also incorrectly calculated. This court has jurisdiction, as we have found above, to make the initial determination that plaintiffs' pay was illegally impacted by the nullification legislation, and, as defendant concedes, "plaintiffs' retirement claims are wholly derivative of their salary claims." Def.'s Reply 5. Plaintiffs therefore urge us to treat as ancillary to that determination the claims for adjusted retirement and TSP benefits. In addition, plaintiffs argue that raising these claims before the agencies would be inherently futile because of the agencies' inability to enforce the Twenty-Seventh Amendment; the agencies would simply apply whatever calculation reflects the nullification legislation.

We agree with defendant. Unlike pay claims, which default to this court because of the Tucker Act, with respect to retirement and TSP claims, we must enforce the clear jurisdictional restriction spelled out in the law. Title Five of the U.S. Code prescribes the review process under FERS. 5 U.S.C. § 5304. And a claim regarding the amount of retirement benefits must first be adjudicated by OPM. 5 U.S.C. § 8461(c). A claimant may then appeal OPM's decision to the MSPB, and that decision may in turn be appealed to the Federal Circuit. *Id.* §§ 8461(e), 7703(b)(1)(A). Even if the agencies involved were unable or unwilling to enforce the Twenty-Seventh Amendment, those cases eventually would be heard by an Article III court that has the authority to declare plaintiffs' rights vis-a-vis that Amendment.

This court's recent decision in *Cummins v. United States* is instructive. In that case, plaintiffs sued for back pay. 171 Fed. Cl. 527, 531 (2024). They alleged that their exclusion from locality pay pursuant to FEPCA violated the Due Process and Equal Protection Clauses of the Fifth Amendment and Article I's Bill of Attainder Clause. Alongside these pay claims, plaintiffs sought the return of retirement benefits under either the CSRA or Federal Employees Retirement System Act ("FERSA"), which they contended had been illegally withheld due to their exclusion from locality pay. *Id.* at 535.

15

The *Cummins* court held that it lacked jurisdiction over plaintiffs' retirement claims because of the statutorily prescribed review procedures. *Id.* at 535–36.   In doing so, it explained that "OPM has statutory authority to adjudicate in the first instance all claims arising under the statutory provisions establishing the CSRS and FERS" even though plaintiffs claimed that the statute underlying the calculation of their retirement benefits was unconstitutional.   *Id.* at 535.   In a claim for retirement benefits under these statutes, the court recognized, "a plaintiff 'must follow the exclusive procedures provided for in the CSRA [and FERSA] in order to obtain the relief they seek.'"   *Id.* (quoting *Ferreiro v. United States*, 72 Fed. Cl. 1, 4–5 (2006)).

*Cummins* is directly related to the claims brought in *Matsuo*, discussed above, and involves the same statutory scheme.   The *Matsuo* plaintiffs also asserted entitlement to additional pay under FEPCA and retirement pay claims under either the CSRA or FERSA, although they attempted to obtain declaratory and injunctive relief from the District Court.   As explained above, with respect to the FEPCA claims, the *Matsuo* court held that the premise behind plaintiffs' claim (that FEPCA was unconstitutional precisely because it did *not* include them) was inconsistent with the assertion that the statute was money-mandating.   416 F. Supp. 2d at 992.   As to their retirement claims, the court held that the employees' claim that the OPM decision not to include COLA payments as "basic pay" for retirement calculations for Alaskan and Hawaiian employees fell within the exclusive jurisdiction of the MSPB.   *Id.* at 998–99 (citing 5 U.S.C. §§ 7701, 8339, 8347(a), 8415, 8461(b)).

The court explained that retirement computation:

[I]s a matter within OPM's administration, and exclusively reserved for appeal to the MSPB, with judicial review available in the Federal Circuit.   This Court does not have jurisdiction over Plaintiffs' claims regarding the Government's failure to include COLA payments in Plaintiffs' retirement calculations because such a question would fall within the computation of retirement, a matter within the CSRA and FERSA's exclusive review procedures.

*Id.*

16

The cases plaintiffs cite to overcome this requirement are inapposite. They point to *Baird v. United States,* 114 Fed. Cl. 580 (2014), for the proposition that we have jurisdiction over cases involving retirement claims involving a constitutional question. But that case concerned the retirement annuities of Article III federal judges, which operate under a separate system not subject to the OPM-MSPB-Federal Circuit review process. *Id.* at 581–82. The CSRA and FERSA systems are applicable to plaintiffs here, but not to the plaintiffs in *Baird*. *See* U.S. OFF. OF PERS. MGMT., CSRS/FERS HANDBOOK, Ch. 10 – *Coverage*, § 10A1.3-5 (last visited Sep. 20, 2024), https://www.opm.gov/retirement-center/publications-forms/csrsfershandbook/c010.pdf.

Likewise, *Mobility Workx, LLC v. Unified Patents, LLC* is of no assistance to plaintiffs. *Mobility Workx* concerned the decisions and structure of the Patent Trial and Appeal Board ("PTAB"). On appeal from the PTAB in that case, the plaintiff, for the first time, raised a constitutional challenge to the structure of the PTAB itself. 15 F.4th 1146, 1150 (Fed. Cir. 2021). Defendant argued that plaintiffs had forfeited the constitutional argument because they had not raised it before the PTAB. *Id.* The Federal Circuit held that plaintiff had not done so because the PTAB had no authority to declare its own authorizing statute unconstitutional. *Id.* Plaintiffs in this case draw from *Mobility Workx* the principle that this court should ignore the clear and exclusive grant of jurisdiction to OPM, the MSPB, and the district courts to hear challenges to retirement pay issues because otherwise plaintiffs are without a remedy. But *Mobility Workx* simply did not concern any question of exclusive jurisdiction or a statutorily prescribed review process. *See id.* at 1152–57. Plaintiffs, moreover, are not without a remedy because the Federal Circuit can adjudicate their constitutional claims after review by the OPM and MSPB.

Finally, plaintiffs cite *Axon Enterprise, Inc. v. FTC.* 598 U.S. 175 (2023). There, the plaintiffs sued in district court to enjoin SEC and FTC administrative proceedings under the rationale that the structure of those proceedings violated the constitutional separation of powers. *Id.* at 183. The government argued that plaintiffs were required to bring their challenge through the administrative review process of the respective administrative body. *See id.* at 192–93. The Supreme Court held that "[t]he statutory review schemes set out in the Securities Exchange Act and Federal Trade Commission Act do not displace a district court's federal-question jurisdiction over claims challenging as unconstitutional the structure or existence of the SEC or FTC." *Id.* at 176. The Court reasoned that the

district court had jurisdiction because depriving the district court of jurisdiction would deprive plaintiffs of meaningful judicial review, and the plaintiffs' claims were collateral to the powers of the administrative bodies and wholly outside their expertise.   *Id*. at 177–78.

*Axon* propounds a three-pronged test to determine "whether particular claims concerning agency action are 'of the type Congress intended to be reviewed within'" a statutorily prescribed administrative review process. *Id.* at 176 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994).   In answering this question, a court must evaluate: (1) whether precluding the court from exercising jurisdiction would deprive plaintiff of "meaningful judicial review," (2) whether plaintiff's claim is "wholly collateral to the statute's review provisions," and (3) whether plaintiff's claim is "outside the agency's expertise."   *Id.* (quoting *Thunder Basin*, 510 U.S. at 212–13) (internal quotation marks omitted).

The *Thunder Basin* factors do not help plaintiffs in this case.   First, the statutorily prescribed review process for retirement benefits begins with administrative proceedings at OPM and the MSPB, but it explicitly includes appellate review by the Federal Circuit.   In other words, an Article III tribunal is part of the review process and affords plaintiffs an opportunity to assert their constitutional argument.   Second, although plaintiffs' claim is undergirded by a constitutional provision, plaintiffs' primary objective is an increase in retirement benefits.[6]   Third, the claim for retirement benefits is within the expertise of the agencies.   We are unwilling to ignore an explicit assignment of jurisdiction to agency review in the first instance.   We therefore may not adjudicate plaintiffs' Count II retirement claims under the CSRA and FERSA.

The same analysis applies to the TSP claims advanced in Count III. 5 U.S. Code Subchapter III outlines the TSP's structure and the benefits available to employees (including members of Congress) under that system. 5 U.S.C. §§ 8431–8440f.   Section 8477 provides that "any participant or beneficiary" may bring suit "to recover benefits of such participant or beneficiary under the provisions of subchapter III of this chapter, to enforce

---

[6] Defendant also makes a relevant related point—if plaintiffs achieve a favorable outcome on the merits of their salary claim in this court, they may be able to use that judgment as the basis of a claim for additional retirement benefits before OPM in the statutorily prescribed process.

any right of such participant or beneficiary under such provisions, or to clarify any such right to future benefits under such provisions."   5 U.S.C. § 8477(e)(3)(C)(i).   Section 8477 goes on to state that the district courts "shall have exclusive jurisdiction to hear civil actions under this subsection." § 8477(e)(7)(A).

Defendant's argument on this point is straightforward: § 8477 provides exclusive jurisdiction over all justiciable TSP benefit claims—including plaintiffs' claim—to the district courts.   Plaintiffs' response is less developed than on the question of retirement benefits.    They assert that § 8477(e)(7)(A) covers only challenges to benefit calculations under the controlling statutes, not claims ascertaining the statutes' constitutionality. Because the basis of their claim for increased retirement benefits is the unconstitutionality of the COLA-abrogating statutes, plaintiffs argue, their claim is not subject to § 8477.   But plaintiffs here sue to increase their benefits under the TSP.   The law could not be clearer: the district courts—Article III tribunals—have exclusive jurisdiction over such suits.   Plaintiffs are not without a remedy.   We thus have no jurisdiction over plaintiffs' TSP claims.   The result is that Counts II and III of the complaint must be dismissed.

III.   Claims Arising Before 2018 Are Barred by the Statute of Limitations

Defendant's final argument is that most of plaintiffs' backpay or retirement claims are barred by this court's six-year statute of limitations. *See* 28 U.S.C § 2501.   Because plaintiffs' case was filed on March 7, 2024, defendant argues that any claims accruing before March 7, 2018, are time barred.   This would include Congress' 1994, 1995, 1996, 1997, 1999, 2007, 2008, 2010, 2012, 2013, 2014, 2015, 2016, and 2017 COLA annulments. Defendant does not question plaintiffs' entitlement, assuming jurisdiction, to pursue salary and retirement benefits with respect to COLAs allegedly improperly nullified after March 7, 2018.

Plaintiffs respond that all of plaintiffs' claims are subject to the "continuing claims doctrine," citing *Beer v. United States*.   In that case, Article III judges were awarded only six years of back pay, but that backpay reflected COLA nullifications that went back more than six years into the past.   696 F.3d at 1186–87.   We presume that plaintiffs do not contend that they are entitled to recoupment of salary and retirement benefits for years prior to 2018.   Plainly, that would go beyond even *Beer* and be inconsistent with 28 U.S.C. § 2501.

We are not persuaded that the continuing claims doctrine has any applicability here. As defendant correctly states, the continuing claims doctrine is merely an application of the six-year statute of limitations, rather than an exception to it. "When a plaintiff pleads 'a series of distinct events—each of which gives rise to a separate cause of action—as a single continuing event,' the continuing claims doctrine operates to save the later-arising claims even if the limitations period lapsed for the earlier-arising claims." *Winnemucca Indian Colony v. United States*, 167 Fed. Cl. 396, 417 (2023) (quoting *Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874, 879 (Fed. Cir. 1998)).

Claims within the six-year limitation period only need to be "saved," therefore, if they are arguably filed too late, i.e., if the defendant's argument is that the underlying delict occurred more than six years in the past and should have been sued on earlier. The continuing claims doctrine then might apply, as explained in the relevant cases. "In order for the continuing claim doctrine to apply, the plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." *Wells v. United States*, 420 F.3d 1343, 1345 (Fed. Cir. 2005) (citing *Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1456 (Fed. Cir. 1997)). "On the other hand, if there was only a single alleged wrong, even though the wrong caused later adverse effects . . . the continuing claim doctrine is not applicable." *Id.* at 1345–46 (citing *Hart v. United States*, 910 F.2d 815 (Fed. Cir. 1990)).

The continuing claims doctrine thus only serves to save *later-arising* claims in a string of multiple, related, but distinct, claims. It is not a lengthening of the statute of limitations. Rather, it allows claims arising within the six-year statute of limitations to continue even if identical in substance to earlier claims that are barred by the statute of limitations. Application of the doctrine was laid out in *Hatter v. United States*, 203 F.3d 795 (Fed. Cir. 2000). The court explained that:

> The [plaintiffs] argue that this case is controlled by what is known as the continuing claim doctrine. Under that doctrine, each time moneys are deducted from the judges' pay and paid into the Treasury of the United States, a new cause of action accrues. Thus, any judge whose salary was or is subject to the unconstitutional imposition can file a claim for each deduction

20

within six years from the time the deduction is made; claims
for deductions made longer ago than six years from the time
suit is filed would be barred.

*Id*. at 797.

It is unnecessary here to be concerned with the continuing claims
doctrine, therefore, because defendant explicitly argues that each time a
COLA was nullified, a new cause of action arose.   *See* Motion to Dismiss
at 15 ("[T]he fate of each prior COLA would need to be substantively
adjudicated separately.")    COLA nullifications within the six years
immediately prior to suit would thus continue to be fair game, even if similar
legislation had been adopted more than six years prior to suit.

So far so good.   The more difficult question posed here is whether
plaintiffs are correct that their lost salary and retirement benefit claims within
the limitations period should reflect what their salaries and benefits would
have been if there had been no nullifying legislation for the entire period they
have been serving in Congress, irrespective of the limitations period.
Plaintiffs rely for support on *Beer*.    Admittedly, that case does direct
calculation of six years of back pay for Article III judges by incorporating
"the base salary increases which should have occurred in prior years had all
the adjustments mandated by the 1989 Act [] actually been made."   *Beer*,
696 F.3d at 1187.   It cites *Hatter* as permitting such an approach based on
the continuing claim doctrine.   *See id.* at 1186.

Defendant apparently recognizes the tension between *Beer* and the
circuit's prior applications of the continuing claim doctrine.   It contends,
however, that the substantive basis for the court's direction to bring the
judges' salary and retirement benefits "up to date," lies within the
compensation clause of Article III.   "In *Beer*, the Federal Circuit held that
the Compensation Clause of Article III prohibited Congress from
withholding COLAs for sitting judges under *all* circumstances."   Mot. to
Dismiss 14–15 (emphasis in original).   The compensation clause, in other
words, is a blanket, comprehensive prohibition against any reduction in
judicial compensation.   The compensation clause of Article I and the
language of the Twenty-Seventh Amendment carry no comparable language.
Indeed, they plainly contemplate that Congress *can*, under the proper
circumstances, increase or decrease its own salary.

In any event, we decline to extend the continuing claims doctrine

beyond the Article III context of *Beer*.   Any claim originating prior to March 7, 2018 is barred and COLAs nullified more than six years earlier are not resurrected for the 2018–2024 period.

CONCLUSION

For the reasons set out, defendant's motion to dismiss Count I is denied.   Its motion to dismiss Counts II and III is granted.   Its motion to dismiss claims stale pursuant to 28 U.S.C. § 2501 is granted as detailed above.   The parties are directed to consult and jointly propose further proceedings in a status report to be filed by October 18, 2024.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge