**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

RODNEY L. DAVIS, THOMAS M. DAVIS, III,   )
EDWIN G. PERLMUTTER,   )
ERIC A. CRAWFORD, MARK S. KIRK,   )
STENY HOYER, JAMES CLYBURN   )
and all others similarly situated,   )
   )
      Plaintiffs,   )
   )
v.   )   No. 24-364 C
   )   Sr. Judge Eric G. Bruggink
UNITED STATES   )
   )
      Defendant.   )

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR
PARTIAL SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

I.    STATEMENT OF MATERIAL FACTS. ................................................................. 8

    A.    The Ethics Reform Act of 1989 Creates Annual Cost of Living Adjustments to Congressional Salaries. ........................................................................ 8

    B.    The Date on Which Congressional Elections Began is Always Before Election Day Varying By State and Year. ........................................................................ 8

    C.    Congress Suppressed the Statutorily Mandated COLAs Through Annual Appropriations Bills in 20 of the Past 33 Calendar Years. .................................................. 9

    D.    Plaintiffs were Underpaid Due to the Failure to Pay the Mandatory Ethics Reform Act COLAs. ................................................................................... 12

II.   SUMMARY JUDGMENT STANDARD. ........................................................... 14

III.  ARGUMENT .................................................................................................. 14

    A.    Introduction & Summary: The Twenty Seventh Amendment Prohibits Congress from Reducing Its Own Pay Without an Election Taking Place Before the Reduction Takes Effect. 14

    B.    Statutory Suppression of COLAs is a Reduction in Compensation that Must Comply with the Terms of the Twenty Seventh Amendment ........................................... 18

    C.    Under the Twenty Seventh Amendment, a Change in Congressional Pay Cannot Take Effect Once Voting Has Begun Anywhere, Until the Congress Three Years Hence is Seated. 21

        1.    The 2018 Election Began Before the 2019 Compensation Suppression. ..................... 23

        2.    The 1998 Election Began Before the 1999 Compensation Suppression. ..................... 24

        3.    The 1994 & 1996 Elections Began Before the 1995 & 1997 Compensation Suppression. .................................................................................... 24

    D.    The COLAs From Every Year Since 1994 Accumulate and Compound to Create the Applicable Congressional Pay Levels to Which Plaintiffs Are Entitled Within the Statute of Limitations Period. ......................................................................... 26

        1.    Legislation Suppressing Mandatory COLAs was Void Ab Initio and Should be Ignored in Calculating Damages ................................................................. 26

        2.    The Annual Suppressions Contained in Appropriations Bills of the ERA-Mandated COLA Increases Were Only for Those Respective Fiscal Years, Leaving the Substantive COLA-Mandating Law in Effect, Meaning that the COLAs Continued to Accumulate Over Time as a Matter of Law. ............................................................... 26

        3.    In the Alternative, the Continuing Claims Doctrine Requires Statutorily-Mandated COLA's to Accumulate and Compound Over Time. ........................................ 28

IV.   DAMAGES ................................................................................................... 32

V.    CONCLUSION. ............................................................................................. 35

## TABLE OF AUTHORITIES

**Statutes**

5 U.S.C. § 5303 ........................................................................................................ 33

Cal. Elec. Code §§ 3001 ............................................................................................. 9

Cal. Elec. Code §§ 3003 ............................................................................................. 9

Cal. Elec. Code §§ 3018 ............................................................................................. 9

Ethics Reform Act of 1989 ........................................................ 8, 15, 16, 32, 35

Minn. Stat. Ann. (2013) § 203B.081 ................................................................ 8, 23

Pub. L. 101-194 ..................................................................................................... 8, 16

Pub. L. 101-194, Title VII, §§ 703-04. ................................................................... 8

Pub. L. 103-329 ..................................................................................... 9, 16, 24, 25

Pub. L. 105-277 ...................................................................................................... 9, 24

Pub. L. 118-158 .......................................................................................................... 12

Pub. L. 118-83 ............................................................................................................ 12

Pub. L. 119-4 .............................................................................................................. 12

Pub. L.104-208 ....................................................................................................... 9, 10

Pub. L.105-277 .......................................................................................................... 10

Pub. L.109-383 .......................................................................................................... 10

Pub. L.110-5 ............................................................................................................... 10

Pub. L.111-322 .......................................................................................................... 10

Pub. L.111-8 ............................................................................................................... 10

Pub. L.112-175 ...........................................................................................................11

Pub. L.112-240 ......................................................................................................11

Pub. L.113-235 ......................................................................................................11

Pub. L.113-46 ........................................................................................................11

Pub. L.114-113 ......................................................................................................11

Pub. L.114-254 ......................................................................................................11

Pub. L.115-120 ......................................................................................................11

Pub. L.115-123 ......................................................................................................11

Pub. L.115-141 ......................................................................................................11

Pub. L.115-224 ......................................................................................................11

Pub. L.115-56 ........................................................................................................11

Pub. L.115-90 ........................................................................................................11

Pub. L.115-96 ........................................................................................................11

Pub. L.116-260 ......................................................................................................12

Pub. L.116-94 ........................................................................................................12

Pub. L.117-103 ......................................................................................................12

Pub. L.117-328 ......................................................................................................12

Pub. L.117-43 ........................................................................................................12

Pub. L.117-70 ........................................................................................................12

Pub. L.118-15 ........................................................................................................12

Pub. L. 115-244 .....................................................................................................25

**Other Authorities**

Arnold Decl. ¶¶ 4 & 6 .............................................................................................8

Bernstein, 61 Fordham L. Rev. 497 .......................................................................16

Childress Decl. ¶¶ 3-5 .................................................................................... 9, 16, 24, 25

Clyburn Decl. ............................................................................................................ 14

Crawford Decl. ......................................................................................................... 13

*Creating the Bill of Rights: The Documentary Record from the First Federal Congress*, 149-50
    (Helen E. Veit et al. eds., 1991) .......................................................................... 15

Debates in the House of Representatives (Aug. 14, 1789), in *The Congressional Register*, Aug.
    14, 1789 ................................................................................................................ 15

Executive Order 13594 on December 19, 2011
    (https://www.federalregister.gov/documents/2011/12/23/2011-33087/adjustments-of-certain-
    rates-of-pay) ........................................................................................................ 10

Executive Order 13641 on April 5, 2013 (https://www.govinfo.gov/content/pkg/DCPD-
    201300221/pdf/DCPD-201300221.pdf) .............................................................. 10

https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-signing-h-r-
    5895/ .................................................................................................................... 23

https://www.govinfo.gov/content/pkg/FR-2024-07-17/pdf/2024-15653.pdf ............................. 33

https://www.sos.mn.gov/about-the-office/news-room/secretary-simon-announces-start-of-
    absentee-and-early-voting-for-2018-general-election. ............................................... 8

Ida A. Brudnick, Cong. Rsch. Serv., 97-1011, Salaries of Members of Congress: Recent Actions
    and Historical Tables (updated December 14, 2023) at 22-25, Table 3 ...................... 9

Perlmutter Decl. .................................................................................................... 13, 34

Richard B. Bernstein, *The Sleeper Wakes: The History and Legacy of the Twenty-Seventh
    Amendment*, 61 Fordham L. Rev. 497, 499-502 (1992) .......................................... 15

Sean M. Stiff, Regular Appropriations Acts: Selected Statutory Interpretation Issues, CRS Report
    R46899 (2021) ..................................................................................................... 27

Seiler Decl. ¶¶ 4-5 ................................................................................................. 9, 24

Wilmoth Decl. ¶¶ 3-5 .................................................................................... 9, 16, 24, 25

## Constitutional Provisions

U.S. CONST., AMEND. XXVII ............................................................................... 16, 22

**Cases**

*Beer v. United States*,
    696 F.3d 1174, 1182-83 (Fed. Cir. 2012) ..................................................... 18, 19, 20, 21, 31, 32

*Bender v. United States*,
    93 F.2d 814, 815-16 (3rd Cir. 1937) ....................................................................... 26

*Boehner v. Anderson*,
    30 F.3d 156 (D.C. Cir. 1994)......................................................................... 8, 15, 18, 20

*Boehner v. Anderson*,
    809 F.Supp. 138, 142 (D.D.C. 1992) ...................................................... 8, 16 ,19, 21

*Brown v. Brown*,
    3 U.S. 365, 367 (1797)......................................................................................... 27

*Davis v. United States*,
    Case 1:24-cv-364-EGB, Dock. # 33 at 8-9, 12 ....................................................... 17

*Gentry v. United States*,
    546 F.2d 343, 346 (Ct. Cl. 1976) ...................................................................... 26

*Granite State Chapter v. Fed. Lab. Rels. Auth.*,
    173 F.3d 25, 28 (1st Cir. 1999) .................................................................... 27

*Hatter v. United States*,
    203 F.3d 795, 797 (Fed. Cir. 2000) ................................................................. 18

*ITServe Alliance, Inc. v. United States*,
    122 F.4th 1364, 1369 (Fed. Cir. 2024) ............................................................. 14

*King v. United States*,
    2025 WL 2382871 at *6 (Fed. Cir. Aug. 18, 2025) ................................................ 14

*Norton v. Shelby Co., State of Tennessee*,
    118 U.S. 425, 441-54 (1886)................................................................................ 26

*Ohio Democratic Party v. Husted*,
    834 F.3d 620, 623-26 (6th Cir. 2016)................................................................. 22

*Thompson Multimedia Inc. v. United States*,
    340 F.3d 1355, 1357 (Fed. Cir. 2003) ................................................................. 14

*United States v. Dickerson*,
    310 U.S. 554, 561 (1940)................................................................................... 27

*United States v. Lovett,*
    328 U.S. 303 (1946) ............................................................................................. 26

*United States v. Will,*
    449 U.S. 200, 225-26 (1980) ........................................................................... 23, 28

*Whatley v. D.C.,*
    447 F.3d 814, 819 (D.C. Cir. 2006) ..................................................................... 27

*Williams v. United States,*
    535 U.S. 911, 914-15 (2002) ................................................................................ 20

I.      **STATEMENT OF MATERIAL FACTS.**

A.      **The Ethics Reform Act of 1989 Creates Annual Cost of Living Adjustments to Congressional Salaries.**

1.  In 1989, Congress passed, and President H.W. Bush signed, the Ethics Reform Act ("Ethics Reform Act" or "ERA"), which, among other things, barred House Members from receiving most outside income, and instead set a formula to apply annual cost of living adjustments ("COLAs") to their salaries. Two years later the law was extended to Senators under the same arrangement. Pub. L. 101-194, Title VII, §§ 703-04. Shortly thereafter, the Ethics Reform Act COLAs were found by the D.C. Circuit Court of Appeals not to violate the Twenty-Seventh Amendment, as the Amendment's requirements had been complied with. *Boehner v. Anderson*, 30 F.3d 156, 162 (D.C. Cir. 1994).

B.      **The Date on Which Congressional Elections Began is Always Before Election Day Varying By State and Year.**

2.  Since 2013, Minnesota has been the first state to commence open voting in federal elections, doing so 46 days prior to what is commonly called "Election Day."[1]  In 2018, 46 days before Election Day was September 21, 2018.  Open voting began in Minnesota on September 21, 2018, at 8:00 a.m., and such open voting was available across the entire state.  Ex. 2 (Arnold Decl. ¶¶ 4 & 6); *see also* https://www.sos.mn.gov/about-the-office/news-room/secretary-simon-announces-start-of-absentee-and-early-voting-for-2018-general-election.

---

[1]  *See* Minn. Stat. Ann. (2013) § 203B.081: Locations for Absentee Voting In Person.  "An eligible voter may vote by absentee ballot in the office of the county auditor and at any other polling place designated by the county auditor during the 46 days before: (1) a regularly scheduled election for federal, state, county, city, or school board office; ..."  Ex. 1.

3. In 1998, open voting in California began October 5, 1998 with walk-in voting, and the sending and return of ballots. Ex. 3 (Cal. Elec. Code §§ 3001, 3003 & 3018 (1998)); Ex. 4 (Seiler Decl. ¶¶ 4-5).

4. In 1998, absentee voting in Virginia began with the sending and return of ballots in mid- to late-September – well before the enactment of Pub. L. 105-277.  Ex. 5 (Childress Decl. ¶¶ 3-5); Ex. 6 (Wilmoth Decl. ¶¶ 3-5).

5. In 1994 and 1996, absentee voting in Virginia began with the sending and return of ballots in mid- to late-September – well before the enactment of both Pub. L. 103-329 in 1994 and Pub. L.104-208 in 1996.  Ex. 3 (Childress Decl. ¶¶ 3-5); Ex. 4 (Wilmoth Decl. ¶¶ 3-5).

   C.   **Congress Suppressed the Statutorily Mandated COLAs Through Annual Appropriations Bills in 20 of the Past 33 Calendar Years.**

6. For 20 of the 33 calendar years since the Twenty-Seventh Amendment's 1992 ratification, Congress and the President have suppressed COLAs that should have been applied to congressional pay. In each case, the suppression of the statutory COLAs was enacted and implemented without an intervening election, as required by the Amendment's plain terms. *See* Ex. 7 (Ida A. Brudnick, Cong. Rsch. Serv., 97-1011, Salaries of Members of Congress: Recent Actions and Historical Tables (updated December 14, 2023) at 22-25, Table 3 (hereafter "Brudnick")).

   a. The 1995 COLA was suppressed in Pub. L.103-329, enacted on September 30, 1994, after the 1994 election had commenced in multiple states, and implemented on January 1, 1995. Thus, the pay suppression occurred without an intervening election.

   b. The 1996 COLA was suppressed in Pub. L.104-52, enacted on November 19, 1995 and implemented on January 1, 1996, without an intervening election.

9

c.  The 1997 COLA was suppressed in Pub. L.104-208, enacted on September 30, 1996, after the 1996 election had commenced in multiple states, and implemented on January 1, 1997. Thus, the pay suppression occurred without an intervening election.

d.  The 1999 COLA was suppressed in Pub. L.105-277, enacted on October 21, 1998, after the 1998 election had commenced in multiple states, and implemented on January 1, 1999. Thus, the pay suppression occurred without an intervening election.

e.  The 2007 COLA was suppressed in Pub. L.109-383, enacted on December 8, 2006, and Pub. L.110-5, enacted on February 15, 2007, and implemented effective on January 1, 2007, without an intervening election.[2]

f.  The 2010 COLA was suppressed in Pub. L.111-8, enacted on March 11, 2009, and implemented on January 1, 2010, without an intervening election.

g.  The 2012 COLA was suppressed in Pub. L.111-322, enacted on December 22, 2010 and implemented on January 1, 2012, without an intervening election.[3]

---

[2] The COLAs for 2007, 2013, 2018, 2022, and 2025 were suppressed by the use of a series of bills over time (typically utilizing continuing resolutions), but the last public law in the series for each of the foregoing years purported to "finally" suppress the COLA for that particular calendar year, in all cases without the required intervening election.  More particularly, the continuing resolutions for all five years, though most significantly for 2007, 2013 and 2025 – because they each followed an even year with an election –continued appropriations for only weeks or months, with the continuing resolutions from September of the prior years all ending by their own terms before the next calendar year. Thus, none of the next or final bills in each chain happened even prior to election day, much less prior to the entire election of the preceding even year.

[3] For calendar years 2012 and 2013, President Obama signed Executive Orders 13594 on December 19, 2011 (https://www.federalregister.gov/documents/2011/12/23/2011-33087/adjustments-of-certain-rates-of-pay) and 13641 on April 5, 2013 (https://www.govinfo.gov/content/pkg/DCPD-201300221/pdf/DCPD-201300221.pdf), respectively, that set GS COLAs to zero for 2012 and 2013; however, because each of those actions

h. The 2013 COLA was unconstitutionally suppressed in Pub. L.112-175, enacted on September 28, 2012 and Pub. L.112-240, enacted on January 2, 2013, and implemented effective on January 1, 2013, without an intervening election.

i. The 2014 COLA was suppressed in Pub. L.113-46, enacted on October 17, 2013, and implemented on January 1, 2014, without an intervening election.

j. The 2015 COLA was suppressed in Pub. L.113-235, enacted on December 16, 2014, and implemented on January 1, 2015, without an intervening election.

k. The 2016 COLA was suppressed in Pub. L.114-113, enacted on December 18, 2015, and implemented on January 1, 2016, without an intervening election.

l. The 2017 COLA was suppressed in Pub. L.114-254, enacted on December 10, 2016, and implemented on January 1, 2017, without an intervening election.

m. The 2018 COLA was suppressed in Pub. L.115-56, enacted on September 8, 2017, and Pub. L.115-90, enacted on December 8, 2017, and Pub. L.115-96, enacted on December 22, 2017, and Pub. L.115-120, enacted on January 22, 2018, and Pub. L.115-123, enacted on February 9, 2018, and Pub. L.115-141, enacted on March 23, 2018, and implemented effective on January 1, 2018, without an intervening election.

n. The 2019 COLA was suppressed in Pub. L.115-224, enacted on September 21, 2018, after the 2018 election had commenced in multiple states, and implemented on January 1, 2019, thus implementation was without an intervening election.

---

occurred without an intervening election, they did not comply with the requirements of the Twenty Seventh Amendment. Plaintiffs thus have used the ECI COLA of the Ethics Reform Act in calculating the appropriate Congressional COLA for 2012 and 2013. *See infra* at III.E.

o.  The 2020 COLA was suppressed in Pub. L.116-94, enacted on December 20, 2019, and implemented on January 1, 2020, without an intervening election.

p.  The 2021 COLA was suppressed in Pub. L.116-260, enacted on December 27, 2020, and implemented on January 1, 2021, without an intervening election.

q.  The 2022 COLA was suppressed in Pub. L.117-43, enacted on September 30, 2021, and Pub. L.117-70, enacted on December 3, 2021, and Pub. L.117-103, enacted on March 15, 2022, and implemented effective on January 1, 2022, without an intervening election.

r.  The 2023 COLA was suppressed in Pub. L.117-328, enacted on December 23, 2022, and implemented on January 1, 2023, without an intervening election.

s.  The 2024 COLA was suppressed in Pub. L.118-15, enacted on September 30, 2023, and implemented on January 1, 2024, without an intervening election.

t.  The 2025 COLA was suppressed in Pub. L. 118-83, enacted on September 26, 2024, and Pub. L. 118-158, enacted on December 21, 2024, and Pub. L. 119-4 on March 15, 2025, and implemented on January 1, 2025, without an intervening election.

7.  As of 2025, the current congressional salary is $174,000/year. *See* Ex. 7.

### D.    Plaintiffs were Underpaid Due to the Failure to Pay the Mandatory Ethics Reform Act COLAs.

8.  Plaintiff Rodney L. Davis represented Illinois' 13th Congressional District as a Republican Member from January 3, 2013 until January 2, 2023.  Representative R. Davis had previous federal service as professional staff in the United States House of Representatives.  During his tenure in Congress, Representative R. Davis was selected by his colleagues to serve as Ranking Member of the Committee on House Administration and as a member of the

Select Committee on the Modernization of Congress. Plaintiff Davis's congressional salary was unconstitutionally underpaid by a total of $563,800. Ex. 8 (Davis Decl.).

9. Plaintiff Edwin G. "Ed" Perlmutter represented Colorado's 7th Congressional District as a Democratic Member from January 3, 2007 to January 3, 2023.  During his tenure in Congress, Representative Perlmutter served on several committees, including the Committee on Financial Services where he chaired the subcommittee on Financial Institutions and Consumer Protection, the Committee on Rules and the Select Committee on the Modernization of Congress. Plaintiff Perlmutter's congressional salary was unconstitutionally underpaid by a total of $753,300. Ex. 9 (Perlmutter Decl.).

10. Plaintiff Eric A. "Rick" Crawford represents Arkansas' 1st Congressional District as a Republican Member, serving from January 3, 2013 until the present.  Representative Crawford had previous federal service in the United States Army.  During his tenure in Congress, Representative Crawford was appointed as the Chairman of the House Permanent Select Committee on Intelligence. Additionally, he serves on the House Committee on Transportation and Infrastructure, on which he serves as Chairman of the Subcommittee on Highways and Transit. Ex. 10 (Crawford Decl.).

11. Plaintiff Steny H. Hoyer represents Maryland's 5th Congressional District as a Democrat Member, serving from May of 1981 until the present.  During his tenure in Congress, Representative Hoyer has served in numerous leadership roles including but not limited to Vice-Chairman and Chairman of the House Democratic Caucus, House Minority Whip, and House Majority Leader, all in addition to his committee assignments.  Ex. 11 (Hoyer Decl.).

12. Plaintiff James E. "Jim" Clyburn represents South Carolina's 6th Congressional District as a Democrat Member, serving from January 3, 1993, until the present.  During his tenure in Congress, Representative Clyburn has served in numerous leadership roles including but not limited to Vice-Chairman and Chairman of the House Democratic Caucus, House Majority Whip, and House Assistant Democratic Leader, all in addition to his committee assignments.  Ex. 12 (Clyburn Decl.).

## II.    SUMMARY JUDGMENT STANDARD.

"Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *King v. United States*, 2025 WL 2382871 at *6 (Fed. Cir. Aug. 18, 2025) (publication pending). Questions of constitutional and statutory interpretation are properly addressed at summary judgment. *See Thompson Multimedia Inc. v. United States*, 340 F.3d 1355, 1357 (Fed. Cir. 2003); *ITServe Alliance, Inc. v. United States*, 122 F.4th 1364, 1369 (Fed. Cir. 2024).

## III.    ARGUMENT.

### A.    Introduction & Summary: The Twenty Seventh Amendment Prohibits Congress from Reducing Its Own Pay Without an Election Taking Place Before the Reduction Takes Effect.

In the summer of 1789, James Madison proposed what later became the Twenty-Seventh Amendment of the United States Constitution. A primary concern expressed by the Members who spoke to the proposal was their concern about the inordinate danger of the suppression (not raising) of Congressional wages, and the resulting damage such suppression would cause to Congress by denying to voters the chance to have the representatives of their choice, regardless of the means of such individuals, and by the use of pay cuts as a way of 'showing off' to voters at the expense of the institution. *See*, Debates in the House of Representatives (Aug. 14, 1789), in *The Congressional*

*Register*, Aug. 14, 1789, reprinted in *Creating the Bill of Rights: The Documentary Record from the First Federal Congress*, 149-50 (Helen E. Veit et al. eds., 1991). The Bill of Rights' Framers had in mind preventing legislators from debasing themselves to voters by reducing their own pay, as has occurred in the British Parliament. The Framers also had in mind the history of state legislatures using their control of congressional compensation during the Continental and Confederation Congresses to influence the decisions of those representatives by withholding pay. *See* Richard B. Bernstein, *The Sleeper Wakes: The History and Legacy of the Twenty-Seventh Amendment*, 61 Fordham L. Rev. 497, 499-502 (1992) (hereafter, "Bernstein").

This case concerns the very subject that the first Congress sought to address in 1789 when it initially proposed what became the Twenty-Seventh Amendment.[4] The periodic suppression of Congressional Representatives'[5] pay from January 1, 1995, to the present day violates the Twenty-Seventh Amendment's plain terms prohibiting laws "varying" congressional compensation without an intervening congressional election.  Almost all of the laws suppressing congressional pay since 1992 have taken effect without an intervening election between the time those laws were enacted and when they took effect, because congressional elections were already underway when the pay-suppression bills became law.

The congressional compensation mechanism in effect today was enacted in 1989. The Ethics Reform Act of 1989 reset congressional pay while eliminating opportunities for outside earnings by Members of Congress, and in exchange, put in place a system of automatic, annual

---

[4] Upon Michigan's ratification of the proposed amendment in 1992, it became what is now known as the Twenty-Seventh Amendment to the U.S. Constitution.
[5] Both "Congressional Representatives" and "Members of Congress" refer to Representatives and Senators collectively.

cost of living adjustments ("COLAs") implemented by an inflation-adjusting formula. Pub. L. 101-194, Title VII, §§ 703-704.

In 1992, the Twenty-Seventh Amendment to the United States Constitution was ratified, thereby setting important restrictions on the manner and timing of laws altering congressional pay. *See generally,* Bernstein, 61 Fordham L. Rev. 497. Later in 1992, the District Court for the District of Columbia held that "pay raises stemming from the Ethics Reform Act of 1989 unquestionably meet the requirements of the 27th Amendment." *Boehner v. Anderson*, 809 F.Supp. 138, 142 (D.D.C. 1992). That conclusion was later "in all respects Affirmed." *Boehner v. Anderson*, 30 F.3d 156, 163 (D.C. Cir. 1994).

On September 30, 1994, Congress and the President enacted their first (of many) one-year suppressions of the Ethics Reform Act COLAs, in violation of the Twenty-Seventh Amendment's requirements. The Treasury and General Government Appropriations Act, Pub. L. 103-329 § 630, purported to suppress Congressional COLAs for calendar year 1995. Because that salary suppression statute was enacted on September 30, 1994, after voting had begun, there was no intervening election before it took effect in 1995. Ex. 3 (Childress Decl.¶¶ 3-5); Ex. 4 (Wilmoth Decl. ¶¶ 3-5). That salary suppression statute thus violated the Twenty-Seventh Amendment, which reads: "No law, varying the compensation for the services of the Senators and Representatives, shall take effect, *until an election of Representatives shall have intervened*." U.S. CONST., amend. XXVII (emphasis added). Section 630 of Pub. L. 103-329 suppressing the pay previously mandated by the Ethics Reform Act COLAs was but one component of a much larger legislative enactment. That 1994 legislation was but the first of 19 instances by which the ERA-mandated COLAs were unconstitutionally suppressed. Plaintiffs challenge those 19 purported suppressions here.

The Ethics Reform Act is a money-mandating statute, and the aforementioned statutory suppressions of pay all violated the Twenty-Seventh Amendment.  Plaintiffs, for themselves and all others similarly situated, have properly invoked this Court's jurisdiction under the Tucker Act to ascertain the proper pay levels for each year – including and since 1995 – for members of Congress for the purpose of providing the proper backpay to current and recent members. *See Davis v. United States*, Case 1:24-cv-364-EGB, Dock. # 33 at 8-9, 12 (Feb. 4, 2025 Order holding this Court has jurisdiction over Plaintiffs' salary claims).

As explained further herein, COLAs are a component of congressional compensation to which the Twenty Seventh Amendment applies, which neither Congress nor the President may suppress for a current Congress once an election has begun. For purposes of the Amendment, an election begins whenever voters anywhere in the U.S. begin voting for their representatives, because all voters have the right to know and express through their vote their view on any change in congressional pay that is to take effect.

Because the ERA is the substantive statute establishing congressional pay, every COLA since 1994 accumulates and compounds to create the congressional pay levels to which plaintiffs are entitled since March 7, 2018 (six years prior to the date of the Complaint's filing). This is because the suppressions were temporary, and the ERA resumed effect once those temporary suppressions expired. The annual suppressions of the ERA-mandated COLA increases were contained in appropriations bills applied only to those respective fiscal years. With the ERA remaining in effect, the COLAs continued to accumulate over time as a matter of law. Indeed, as discussed *infra* at Part D.1., provisions in annual appropriations bills like the suppressions at issue here pertain only to those particular years, and do not repeal other inconsistent substantive law or change baseline compensation commitments, such as those mandated by the ERA. In the alternative, the continuing

17

claims doctrine, as applied in the Federal Circuit's decisions in *Beer* and *Hatter VIII* mandates the same result. *See Beer v. United States*, 696 F.3d 1174, 1182-83 (Fed. Cir. 2012); *Hatter v. United States,* 203 F.3d 795, 797 (Fed. Cir. 2000) The suppression of those COLAs in the 20 of the past 33 years was accomplished contrary to the Twenty Seventh Amendment, meaning those COLAs must be implemented. Doing so would ultimately result in an annual congressional salary of $253,300 for calendar year 2025. *See* Ex. 14.

The Twenty Seventh Amendment is the Constitution's directive to accomplish that end: To ensure that Congress publicly debates and votes on varying its own compensation *before* members of Congress face the public in an *election*, thereby holding them *accountable* for their votes on that constitutionally significant issue. Twenty times in the past 33 years, Congress and the President have evaded that constitutional mandate, necessitating this suit.

**B.    Statutory Suppression of COLAs is a Reduction in Compensation that Must Comply with the Terms of the Twenty Seventh Amendment.**

Congressional compensation is controlled by two provisions of the Constitution, which in turn control the implementation of congressional statutes altering that compensation. Article I, Section 6 of the Constitution begins with the Ascertainment Clause: "The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States." Since 1991, the law setting the compensation of Members of Congress has been the Ethics Reform Act ("ERA"), including its provisions providing for automatic, annual cost of living adjustments ("COLAs").

Since the Twenty Seventh Amendment's ratification in 1992, changes to congressional compensation must be made not only by law (that is, by statute)—as required in Article I, Section 6—but also done consistent with the Twenty Seventh Amendment.

As applied to the ERA, the Twenty Seventh Amendment requires that any change (up or down) to the ERA's specified compensation requires all of the following: 1) the passage of a new law by both houses of Congress that is signed by the President; 2) an effective date of such new law after the next election; and 3) implementation of such new law no earlier than upon the seating of the Congress following the next complete election.  James Madison intended his Amendment to ensure that no Congress could raise or lower its own pay but could set the pay of only future Congresses.[6] Bernstein at 522.

In spite of Madison's intentions and the Amendment's plain language, Congress and/or the President have – on at least 20 different occasions – reduced congressional compensation by blocking COLAs otherwise provided for by law in the ERA, and each of those reductions has been in contravention of the Twenty Seventh Amendment.

The conclusion that the COLAs are part of Congressional pay is mandated by the holdings of the D.C. Circuit in *Boehner*,[7] as well as the Federal Circuit's ruling in *Beer*.  *See Boehner v. Anderson*, 30 F.3d 156 (D.C. Cir. 1994); *Beer*, 696 F.3d at 1182-83.  As the Federal Circuit explained in *Beer,* "the [ERA] COLA provisions were not an increase in judicial pay…. Rather, the statute ensured that real judicial salary would not be reduced in the face of the elimination of outside income and the operation of inflation." *Beer,* 696 F.3d at 1182-83 (emphasis added).  That

---

[6] "[I]n order to comply with the twenty-seventh amendment a law varying congressional compensation must be passed before an election yet the compensation may not be adjusted until after the election." *Boehner v. Anderson*, 30 F.3d 156, 161 (D.C. Cir. 1994).  "Accordingly, the present Congress could specify the salary of the next Congress or of any Congress after that." *Id*. at 162.

[7] In *Boehner*, 30 F.3d at 161-62, the plaintiff argued that each COLA should be treated as a separate law.  The *Boehner* court rejected that notion, stating "[w]e see no reason whatsoever why the Congress cannot, for convenience, instead specify an index or formula with the same effect."  [*See also* Breyer example, *infra*]. The *Boehner* plaintiff asked that each COLA since 1993 be treated separately.  *Boehner* forecloses that fictional division.

principle applied here means that any change from the formula for congressional compensation provided for in the ERA – up or down – is a change in pay that requires Congress to make such change in accordance with the Twenty Seventh Amendment's requirements. The elimination of formulaic COLAs thus constitutes a reduction in pay that must be accomplished by the passage of a law, signed by the President, prior to an election, and that does not go into effect at least until the commencement of the next Congress thereafter.

Furthermore, the conclusion that the ERA COLAs are part of congressional compensation is bolstered by Justice Breyer's dissent from the Supreme Court's denial of certiorari in *Williams v. United States,* 535 U.S. 911, 914-15 (2002) (Breyer, J., dissenting from failure to grant certiorari). (a Federal Circuit decision). His dissent (joined by Justices Scalia and Kennedy) posed three hypothetical statutory pay scenarios as follows: (1) flat pay over five years; (2) pay that grows by $10,000 each year after the first year; (2) and pay that grows by an inflation-based formula each year. *Williams*, 535 U.S. at 914-15 The question posed in *Williams* was whether the first scenario was constitutionally the same as the second and third scenarios for purposes of determining what is judicial pay. Analyzing that question under his three scenarios, Justice Breyer observed that there is no constitutionally distinguishable difference between the second and third options.

Ten years after Breyer's *Williams* dissent, it became the law. In *Beer,* the full Federal Circuit overruled its earlier decision in *Williams*, holding (1) legislation that blocked five years of COLAs for judges constituted an unconstitutional deprivation of judicial compensation in violation of the Compensation Clause; and (2) a 2001 amendment to part of an appropriations act passed in 1981, which barred judges from receiving additional compensation except as Congress specifically authorized in legislation postdating that appropriations bill, did not override the provisions of the

20

1989 ERA promising judges COLAs. *Beer*, 696 F.3d at 1181, 1185. Moreover, *Beer* expressly endorsed Justice Breyer's analysis in *Willams*. *Id.* at 1183.

Consistent with Justice Breyer's third example, the ERA set congressional pay in 1989 using a formula to establish congressional pay going forward. *Supra*. COLAs are part of the ERA's formula for congressional pay – they are not pay increases for constitutional purposes.[8] To change the formula in the ERA requires that another law be passed. The Twenty Seventh Amendment requires that any law changing congressional pay must be passed prior to the commencement of an election and may be written to affect only future Congresses. Thus, the many one-year bills periodically enacted purporting to block congressional COLAs without an intervening election have "varied" congressional pay in violation of the Twenty Seventh Amendment.

C.    **Under the Twenty Seventh Amendment, a Change in Congressional Pay Cannot Take Effect Once Voting Has Begun Anywhere, Until the Congress Three Years Hence is Seated.**

The Twenty Seventh Amendment expressly requires an intervening election before a newly enacted change to congressional pay may take effect. Any change in pay may be implemented – at the earliest – only upon the seating of the next upcoming Congress.[9] *Boehner v. Anderson*, 30 F.3d 156, 161-62 (D.C. Cir. 1994).

---

[8] Concurring in *Beer* and addressing the impact of the *Boehner* decision Judge O'Malley stated: "The court also held that: (1) Congress is free to specify a formula for future and continuing salary increases; and (2) the COLAs under the 1989 Act were designated to occur automatically each year after 1991, with no additional law necessary. All yearly COLAs beyond 1990 thus became operative and "vested" for Members of Congress when the law was first effective in 1991." *Beer*, 696 F.3d at 1196 (O'Malley, J., concur.) (citation omitted).

[9] "[I]n order to comply with the twenty-seventh amendment a law varying congressional compensation must be passed before an election yet the compensation may not be adjusted until after the election." *Boehner v. Anderson*, 30 F.3d 156, 161 (D.C. Cir. 1994). "Accordingly, the

When is the point of "vesting" at which the current pay structure cannot be changed for the next Congress?

The Amendment states: "No law, varying the compensation for the services of the Senators and Representatives, shall take effect, <u>until an election of Representatives shall have intervened</u>." U.S. Const., AMEND. XXVII (emphasis added). The constitutional text controls. Hence, the vesting point is "as election of Representatives"; that is, the commencement of voting for Congress in any state.[10] This holds even though the date when voting opens may be different in different states. Thus, the earliest state in any given federal election to commence congressional voting determines the vesting point at which laws altering compensation may not take effect until the next election. This textual construction comports with the Amendment's core purpose: to provide *all* voters the opportunity to hold Congress accountable for the change in compensation prior to that change entering into effect.

Resolution of this vesting question is particularly relevant to COLA suppression enactments in five different years since the Twenty Seventh Amendment's ratification: 1994, 1996, 1998, 2012 and 2018.

---

present Congress could specify the salary of the next Congress or of any Congress after that." *Id*. at 162.

[10] *See, e.g. Ohio Democratic Party v. Husted,* 834 F.3d 620, 623-26 (6th Cir. 2016) (characterizing entire 29 day voting period prior to Election Day as "the election."). *See also* Blacks Law Dictionary, defining "Election" (in pertinent part) as "3. The *process* of selecting a person to occupy an office (usu. a public office), membership, award, or other title or." (emphasis added). A federal election is a multi-day process, not a one day event, and although it must conclude on "Election Day," it may (where state law so provides) begin much earlier.

1.      **The 2018 Election Began Before the 2019 Compensation Suppression.**

Since 2013, Minnesota has been the first state to commence open voting in federal elections, doing so 46 days prior to what is commonly called "Election Day."[11]  In 2018, 46 days before Election Day was September 21, 2018.  Open voting began in Minnesota on September 21, 2018, at 8:00 a.m., and such open voting was available across the entire state.  SMF ¶ 2 (citing Ex. 2, Arnold Decl. ¶ 4); *see also* https://www.sos.mn.gov/about-the-office/news-room/secretary-simon-announces-start-of-absentee-and-early-voting-for-2018-general-election.

Applying the Twenty Seventh Amendment to the 2018 election, the last moment that the next Congress' pay could be changed (i.e., for calendar years 2019 and 2020) would be by a bill to that effect being signed by the President prior to 8am local time in Minnesota on September 21, 2018.  In fact, on September 21, 2018, President Trump signed Public Law 115-244, which purported to include a COLA suppression for 2019 for Members of Congress,[12] at approximately 1:29pm Minnesota time, 11:29am Nevada time (where the President was located when he signed the bill), and 2:29 p.m. Eastern time.  *See* https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-signing-h-r-5895/.  Although the precise moment when the President enacted the relevant legislation was only hours beyond the vesting point, that is of no moment, because the beginning of the election creates a bright line after which the Twenty Seventh Amendment prohibits a change in pay for the next Congress. The Supreme Court made this very point in *United States v. Will*, 449 U.S. 200, 225-26 (1980), which concerned a decrease in judicial pay that occurred just hours after the pay increase had gone into effect. ("The statute applying to

---

[11]  *See* Minn. Stat. Ann. (2013) § 203B.081**:** Locations for Absentee Voting In Person.  "An eligible voter may vote by absentee ballot in the office of the county auditor and at any other polling place designated by the county auditor during the 46 days before: (1) a regularly scheduled election for federal, state, county, city, or school board office; ..."  Ex. 1.
[12] Public Law 115-244 at 132 Stat. 2946.

Year 1 was signed by the President *during the business day of October 1, 1976. By that time, the [pay increase] had taken effect*, since it was operative with the start of the month-and the new fiscal year-*at the beginning of the day*.") (emphasis added).

        **2.**        **The 1998 Election Began Before the 1999 Compensation Suppression.**

On October 21, 1998, President Clinton signed Public Law 105-277 which purported to include a COLA suppression for congressional pay in 1999.[13]   However, large scale voting had already begun in multiple states, including, but not limited to, California and Virginia.

In Virginia, absentee voting began in 1998 with the sending and return of ballots in mid-to late-September – well before the enactment of Pub. L. 105-277.  SMF ¶ 4 (citing Ex. 5, Childress Decl. ¶¶ 3-5; Ex. 6, Wilmoth Decl. ¶¶ 3-5).

In California, open voting began with walk-in voting and the sending and return of ballots commencing on October 5, 1998. SMF ¶ 3 (citing Ex.3, Cal. Elec. Code §§ 3001, 3003 & 3018 (1998); Ex. 4, Seiler Decl. ¶¶ 4-5).

Because large scale voting had already begun prior to the enactment of Pub. L. 105-277, congressional pay had already vested for calendar years 1999 and 2000 before President Clinton signed Pub. L. 105-277 into law, and the attempt to suppress the congressional COLA was invalid.

        **3.**        **The 1994 & 1996 Elections Began Before the 1995 & 1997 Compensation Suppression.**

On September 30, 1994, President Clinton signed Pub. L. 103-329 into law, after voting had begun, which included a COLA suppression for congressional pay for calendar year 1995.[14]

---

[13] Public Law 105-277 at 112 Stat. 2681-518.
[14] Public Law 103-329 at 108 Stat. 2424.

Similarly, on September 30, 1996, President Clinton signed Pub. L. 104-208 into law, which included a COLA suppression for congressional pay for calendar year 1997.[15] In Virginia, absentee voting for both the 1994 and 1996 elections began with the sending and return of ballots in mid- to late-September – well before the enactment of both Pub. L. 103-329 and 104-208.  SMF ¶ 4 (citing Ex. 5 (Childress Decl. ¶¶3-5); Ex. 6 (Wilmoth Decl. ¶¶ 3-5).

Because large scale voting had already begun prior to the enactment of Pub. L. 103-329 and 104-208, the COLAs had already vested for calendar years 1995 and 1996, and 1997 and 1998, respectively, before President Clinton signed either Pub. L. 103-329 and 104-208 into law. Those attempts to suppress the congressional COLA were unconstitutional.

In all four years referenced above, the laws diminishing congressional pay were enacted after the large-scale commencement of voting. Consequently, those then-ongoing elections could not fulfill the requirement of the Twenty Seventh Amendment that "an election of Representatives shall have intervened."  For example, the September 21, 2018 enactment of Pub. L. 115-244— after voting had already begun in Minnesota—means the next intervening election compliant with the Twenty Seventh Amendment would have been the 2020 election. Thus, the next congressional pay that Pub. L. 115-244 could constitutionally vary – up or down – was the compensation for congressional representatives in 2021 – not 2019.[16] The practice of suppressing congressional COLAs before "Election Day," but after voting for a congressional election had begun in some states is, under the Twenty Seventh Amendment, constitutionally ineffective to reduce compensation for the Congress to be seated the next year.

---

[15] Public Law 104-208 at 110 Stat. 3009-364.

[16] However, as noted in Section III.D.1 herein, the language of the COLA suppression in Pub. L. 115-244 was by its terms operative only *during* calendar year 2019, and thus could have no effect on the COLA in 2021.

**D.    The COLAs From Every Year Since 1994 Accumulate and Compound to Create the Applicable Congressional Pay Levels to Which Plaintiffs Are Entitled Within the Statute of Limitations Period.**

**1.    Legislation Suppressing Mandatory COLAs was Void Ab Initio and Should be Ignored in Calculating Damages**

Each of the 20 COLA suppressions challenged here was enacted in a manner inconsistent with the Twenty Seventh Amendment's requirements and must thus be treated as *void ab initio*. *Norton v. Shelby Co., State of Tennessee*, 118 U.S. 425, 441-54 (1886). For this Court's purposes, such treatment means the COLA suppressions should be ignored for purposes of calculating Plaintiffs' proper salary levels had the Twenty Seventh Amendment been complied with. *Gentry v. United States*, 546 F.2d 343, 346 (Ct. Cl. 1976) (citing *United States v. Lovett*, 328 U.S. 303 (1946)). Nearly 50 years later, *Gentry* reads as if the instant Plaintiffs made the plea: "In the present case, plaintiff asks us to do no more than the Court in *Lovett* said we could and must do — read the relevant statute and award whatever payment it grants, omitting from our interpretation of its effect any constitutionally void provision contained in it." *Id*.

**2.    The Annual Suppressions Contained in Appropriations Bills of the ERA-Mandated COLA Increases Were Only for Those Respective Fiscal Years, Leaving the Substantive COLA-Mandating Law in Effect, Meaning that the COLAs Continued to Accumulate Over Time as a Matter of Law.**

The COLA suppressions challenged here, were, by their terms, temporary, and had no effect on the cumulative increases mandated by the substantive law (the ERA) mandating those congressional pay increases. For each of the suppressions Plaintiffs challenge (1995, 1996, 1997, 1999, 2007, 2010, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022, 2023, 2024, and 2025), Congress and/or the President adopted temporary suppressions via annual appropriations bills that were in force solely for the fiscal years in question, and without permanent effect. *See* SMF ¶ 6.

By statute, appropriations bills are construed to apply only to that particular fiscal year unless there is express language to the contrary: "An appropriation in a regular, annual appropriation law may be construed to be permanent or available continuously" only if the appropriation is for particular objects or "expressly provides that it is available after the fiscal year covered by the law in which it appears." *See* Ex. 13 (Sean M. Stiff, Regular Appropriations Acts: Selected Statutory Interpretation Issues, CRS Report R46899 (2021) at 16 (quoting 31 U.S.C. § 1301(c)) (hereafter, "Stiff")). "[C]ourts presume that whatever effect an appropriations act provision has on substantive law exists only for the fiscal year covered by the act." Stiff at 29 (citing *Whatley v. D.C.*, 447 F.3d 814, 819 (D.C. Cir. 2006) ("The normal presumption is that appropriations acts do not amend substantive law, and that when they do, *the change is only intended for one fiscal year*.") (emphasis added) (cleaned up).

On the occasions when an appropriations bill temporarily alters substantive law, "courts often say that the appropriations act has 'suspended' conflicting provisions of substantive law." Stiff at 29 (citing *United States v. Dickerson*, 310 U.S. 554, 561 (1940); *Granite State Chapter v. Fed. Lab. Rels. Auth.*, 173 F.3d 25, 28 (1st Cir. 1999); *Brown v. Brown*, 3 U.S. 365, 367 (1797); *Bender v. United States*, 93 F.2d 814, 815-16 (3rd Cir. 1937)). "Once that suspension ends, usually after the fiscal year for which the relevant act makes appropriations, the once-suspended requirements of substantive law regain force." Stiff at 29 (emphasis added) (citing, e.g., *Bldg. & Const. Trades Dep't, AFL-CIO v. Martin*, 961 F.2d 269, 274 (D.C. 1992); *Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1557 n. 15 (D.C. Cir. 1984); *United States v. Vulte*, 233 U.S. 509, 515 (1914); *United States v. Mitchell*, 109 U.S. 146, 150 (1883)). Hence, for all the fiscal years in question, the once-suspended COLA pay increase requirements of the ERA regained force. Consequently, because

the ERA has never been repealed, and the COLA suspensions were temporary, the mandated COLAs resumed affect, and cumulatively apply for compounding purposes to all subsequent years.

Indeed, "Congress may also suspend or repeal the substantive law requirements by stating that they "shall not take effect." Stiff at 27 (citing *United States v. Will*, 449 U.S. 200, 222-24 (1980) (explaining that in four successive fiscal years Congress used appropriations acts, including matter phrased only "in terms of limiting funds," to rescind automatic pay adjustments that federal justices and judges would otherwise receive under preexisting substantive law). That is precisely what Congress did for fiscal years 2007, 2010, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022, 2023, 2024, and 2025. *See* SMF ¶ 6(e)-(t). *See, e.g.,* Pub. L. 113-46, October 17, 2013, Continuing Appropriations Act, 2014 ("Notwithstanding any other provision of law, no adjustment shall be made under section 601(a) of the Legislative Reorganization Act of 1946 (2 U.S.C. § 31) (relating to cost of living adjustments for Members of Congress) *during* fiscal year 2014.") (emphasis added). As with the fiscal year suspension inherently applicable to all years, the "shall not take effect" language (or its equivalent) of the years listed above could have resulted in, at most, only the suspension of the ERA-mandated COLAs. Under well-established rules of statutory interpretation, those COLAs thus sprung back into effect the next fiscal year.

3.    **In the Alternative, the Continuing Claims Doctrine Requires Statutorily-Mandated COLA's to Accumulate and Compound Over Time.**

Plaintiffs do not contend that they are entitled to damages beyond the six-year statute of limitations prior to filing this case. However, in addition to the operative legal effect of the salary suppressions contained in appropriations bills that expired of their own force, *see* Argument III.D.1., *supra*, the continuing claims doctrine has exactly the same ultimate effect under this Circuit's continuing claims authority. That is to say, each of the COLAs going back to 1995

accumulates and compounds to establish the controlling salary rates for the pay sought from within the limitations period.[17]

As the Court is aware, the continuing claims doctrine applies when regular payments to be made by the government that are pre-determined, i.e., they do not involve evaluation or agency decision making to determine payment amounts. *Cf. Friedman v. United States*, 310 F.2d 381, 383-84 (Ct. Cl. 1962) (a disability determination case). And when the doctrine applies, the last six years of such payments prior to the filing of a case are recoverable after being corrected, even if such the source of those corrections predates the statute of limitations. The continuing claims doctrine is not an exception to the statute of limitations; rather it is the application of the statute of limitations to determine the correct calculation of damages.

The continuing claims doctrine is applicable to this case because the payments at issue "were made in series or periodically." *Hatter VIII,* 203 F.3d at 797 (citing the unanimous and "seminal" decision in *Friedman*, 310 F.2d 381 (Ct. Cl. 1962)). In other words, the payments were regular salary payments that did not require or involve any subjective judgment or action, such as a disability determination (e.g., as in *Friedman,* 310 F.2d at 383-84). The payments at issue in the case at bar also fit all of the characteristics of a continuing claims case, a.k.a., "pay cases." *Hatter VIII*, 203 F.3d at 797.

In *Hatter VIII*, plaintiff federal judges complained that their pay was unconstitutionally reduced in violation of the Compensation Clause when their paychecks had two specific tax deductions taken out, which deductions were the result of statutes enacted in 1983 and 1984. In

---

[17] Although the Court previously held in *Davis v. United States*, Case 1:24-cv-364-EGB, Dock. # 33 at 21-22 (Feb. 4, 2025 Order) that the COLAs do not accumulate over time, Plaintiffs respectfully ask the Court to revisit this determination in light of the strong Circuit precedent on the issue.

opposition, the government argued that the offense that triggered the six-year statute of limitations was the enactment of each of the aforementioned statutes; however, the Federal Circuit held *en banc* that each periodic salary payment from which the offending deductions were made was a separate offense, and that the plaintiff judges could recoup their underpayments for the six years prior to filing their case. The same is true here, wherein constitutionally inappropriate underpayments of salary have been made to putative class members due to COLA suppressions that did not comport with the Twenty Seventh Amendment.

*Hatter VIII* explicitly addressed "whether the moneys wrongfully withheld from the judges' monthly paychecks constituted a 'continuing claim,' as that term is understood in the jurisprudence of this court." *Id.* at 796. *Hatter VIII*, confirmed the continuing applicability of the seminal case defining 'continuing claims,' *Friedman v. United States*, 310 F.2d 381 (Ct. Cl. 1962). As *Hatter VIII* stated:

> In a 1962 seminal opinion, this court's predecessor, the Court of Claims, addressed the question of how to apply the six year statute of limitations to claims against the Government when the claims involve payments from the Government that were to be made in a series or periodically…. [T]he court identified two basic categories of cases that emerged from its jurisprudence." *Hatter VIII* at 797 (citing *Friedman*). As the [*Friedman*] court saw it, the touchstone between the two categories [i.e., covered or not covered by the continuing claims doctrine] was that 'continuing claims are independent of administrative determination[,] and those other claims [are] dependent on prior administrative evaluation.

*Hatter VIII*, 203 F.3d at 798 (quoting *Friedman*, 310 F.2d at 386). After quoting *Friedman*'s description of what constitutes a continuing claim, the *Hatter VIII* court stated: "The cases the court had in mind were the pay cases … 'claiming greater compensation (under a statue or regulation) than the claimant was receiving. *Hatter VIII* at 797 (quoting *Friedman*, 310 F.2d at 384) (cleaned up).

Importantly, the *Friedman* court was not contending with the constitutional protections afforded to either judicial pay under the compensation clause, nor to congressional pay under the Twenty Seventh Amendment – <u>as those considerations are utterly irrelevant to the determination as to whether the case is a "pay case" that falls under the continuing claims doctrine</u>.  The descriptions of continuing claims cases and scenarios in *Friedman* and *Hatter VIII* could hardly be more squarely on all fours with the facts of this case, leading inexorably to the conclusion that this case is also governed by the continuing claims doctrine.

Over ten years later in the *Beer* case, once again sitting en banc, the Federal Circuit relied on *Friedman* and *Hatter VIII* to hold that "[t]he statute of limitations does not bar these claims [pursuant to the ERA] because, as established in *Friedman v. United States,* 159 Ct.Cl. 1, 7, 310 F.2d 381 (1962) and *Hatter v. United States,* 203 F.3d 795, 799–800 (Fed.Cir. 2000)("*Hatter VIII*"), *aff'd in part, rev'd in part on other grounds,* 532 U.S. 557 (2001), the claims are 'continuing claims.'" *Beer*, 696 F.3d at 1186.  The *Beer* court further noted that the plaintiffs there were entitled to monetary damages based on the pay level they should have received under the ERA – exactly what plaintiffs seek here, and based on exactly the same statute.

It cannot be the case that the plaintiffs in *Beer* – paid a monthly salary with annual COLAs applied in accord with the ERA – were covered by the continuing claims doctrine and that Plaintiffs here – also paid a monthly salary with annual COLAs applied in accord with the ERA, are somehow not covered by the continuing claims doctrine.

The *Beer* court instructed the trial court "[o]n remand, the Court of Federal Claims shall calculate [] damages as the additional compensation to which appellants were entitled [from the beginning of the period of the] statute of limitations. In making this calculation, the Court of Federal Claims <u>shall incorporate the base salary increases which should have occurred in prior</u>

<u>years had all the adjustments mandated by the [ERA] actually been made.</u>" *Id* at 1186-87 (citing *Hatter VIII,* 203 F.3d 795 for the application of the "continuing claim" doctrine to calculating wrongful withholding of pay) (emphasis added).

In determining damages, Plaintiffs may receive backpay only for underpayments from the beginning of the period of the statute of limitations six years prior to the filing of this case, namely, March 7, 2018. However, because this is a continuing claims case, the proper pay levels for the calendar years 2018-present should be determined by factoring in all pre-2018 COLAs that were suppressed in contravention of the Twenty Seventh Amendment. *See Beer*, 696 F.3d at 1186-87. The math to calculate these salary levels is attached hereto as Attachment A and explained below.

## IV.    DAMAGES

### A.    Damages are Properly Calculated Starting With the 1995 COLA to Present, Compounding Over Time.

As previously noted, current congressional pay was codified pursuant to a formula specified in the ERA. Shortly thereafter, the Twenty Seventh Amendment was ratified.  In light of the ERA, that portion of congressional pay consisting of annual cost of living adjustments is governed by 2 U.S.C. § 4501(2)(A), wherein congressional pay is to be adjusted based on the Employment Cost Index ("ECI")[18] on the same schedule as General Schedule federal employees (i.e., for calendar years rather than fiscal years).[19]  However, any COLA increase is capped by 2

---

[18] The Employment Cost Index, or ECI, is a measure of employee wages and benefits on a national scale.  It is reported quarterly by the Bureau of Labor Statistics.  Data can be found at bls.gov/eci/tables.htm in the table entitled "Non-Seasonal Current and Constant Dollar Data (XLSX) 2001 – Present."

[19] In accordance with the Ethics Reform Act, one-half of one percent is subtracted from the raw ECI 12-month rate (non-seasonally adjusted) for the most recently available full calendar year. Ethics Reform Act of 1989, Pub. L. No. 101-194, § 704(a)(1), 103 Stat. 1716, 1769.  When calculating the ECI-based congressional pay adjustment rate for calendar year 2024, the ECI data

U.S.C. § 4501(2)(B) to not exceed the percentage COLA increase of General Schedule ("GS") employees under 5 U.S.C. § 5303. Since the Twenty Seventh Amendment's ratification in 1992, in the twenty calendar years relevant to the case at bar, only in 2024 was the prospective ECI-based COLA increase smaller than the General Schedule increase. Thus, for all years at issue in this case other than 2024, the General Schedule rate of adjustment sets the appropriate rate of COLA increases for congressional pay.[20]  *See* Ex. 7 (Brudnick, at 22-23, Table 2). Those rates appear under the column "GS COLA" in Exhibit 14, attached hereto..

These are the foundations of the damages calculations presented in Exhibit 14. For calendar years 2012, 2013 and 2024, the rates in the GS COLA column are 1.3%, 1.1% and 4.6%, respectively, in the spreadsheet showing as "0.013", "0.011", and "0.046", where 100% = 1.0; and 1% = 0.01. Both the ECI and GS (General Schedule) COLA pay adjustment rates are shown through 2023 on Table 2 of the CRS Report, and the ECI-based rate for 2024 is included in that reference, but not the GS rate for 2024 or 2025.

The GS adjustment rate for 2024 was 4.7% and so was not used in our calculations. *See* https://www.govinfo.gov/content/pkg/FR-2024-07-17/pdf/2024-15653.pdf.

The ECI-based rate determined from Bureau of Labor Statistics date for calendar year 2025 congressional pay was the 4.2% ECI rate for December of 2023, minus 0.5%, for a congressional

---

from December 2022 is used. The December 2022 12 month, non-seasonally adjusted ECI rate was 5.1%. Subtracting 0.5% results in a statutory adjustment rate of 4.6%.

[20]  Two critical exceptions are 2012 and 2013. While there was a statutory freeze on the GS COLA in 2012 enacted on December 22, 2010 in Pub. L. 111-322, without an intervening election, that cap could not be applied to congressional COLAs consistent with the Twenty Seventh Amendment. The 2013 GS COLA freeze was accomplished by Executive Order No. 13,641, executed on April 5, 2013, after the 2012 election had concluded, thus failing to comply with the requirement of the Twenty Seventh Amendment that there be an intervening election prior to changing congressional compensation. Plaintiffs have thus used the ECI COLA rate from the ERA for these two years, resulting in COLAs of 1.3% in 2012 and 1.1% in 2013.

pay adjustment rate of 3.7%. Because this amount exceeded the 1.7% GS pay adjustment, the latter rate was used. *See* https://www.chcoc.gov/sites/default/files/January%202025%20Pay%20Adjustment%20CPM%2 20202-23_0.pdf.

Beginning with actual congressional pay levels under the column "Actual Pay" for 1994, we then apply the COLAs for those years in which the COLAs were suppressed to adjust congressional pay for 1995 and each year thereafter. The results of each such adjustment are found in the column titled "Pay level w/COLA." After applying each constitutionally proper COLA, in the next column we then round off to the nearest $100, as required by 2 U.S.C. § 4501(2)(A). The "Actual Pay" for each year is subtracted from the amount in the column titled "Rounded to nearest $100" to determine the underpayment of congressional salary for that calendar year, which amount is found in the last column on the right, titled "Gap below ERA".

Damages are thus determined by adding up the amounts in the final column, starting on March 7, 2018 – six years prior to the filing of this case. For 2018, the correct congressional salary is $213,000. For 2019, it is $216,000. For 2020, it is $221,600. For 2021, it is $223,800. For 2022, it is $228,700. For 2023, it is $238,100. For 2024, it is $249,100. And for 2025 it is $253,300. Hence, damages for each Member of Congress must be established using these salaries based on their years of service within the limitations period.

As applied to the instant Plaintiffs, these salary calculations would result in the following damages, as of September 4, 2025: For Representatives Clyburn, Crawford, and Hoyer, the calculated damage are $418,796.08 each. For Representatives Perlmutter and Davis, the calculated damages are $226,367.39.

34

V.      **CONCLUSION.**

For the foregoing reasons the Court should grant partial summary judgment and hold:

1)  The Ethics Reform Act of 1989 mandates the application of COLAs to congressional compensation;

2)  Any suppression of a COLA for the next upcoming calendar year that occurred (or began) after an election had begun, including for election years 1994, 1996, 1998 and 2018, fails to meet the Twenty Seventh Amendment's requirements, and the COLAs for 1995, 1997, 1999 and 2019 should be included in determining damages for the Plaintiffs and those similarly situated;

3)  COLA suppressions contained in legislation that is inconsistent with the requirements of the Twenty Seventh Amendment should be ignored when determining appropriate congressional salary levels for 2018 to the present to be used to calculate damages in this case;

4)  Alternatively, COLA suppressions contained in annual appropriations bills are mere suspensions of the COLA for the year in question, without further effect on the compensation mandated by the substantive law controlling congressional compensation, the Ethics Reform Act of 1989;

5)  The purported COLA suppressions for the 20 years at issue have no effect on the cumulative compounding of those salary increases required by the Ethics Reform Act of 1989, with the result that the correct congressional salary for 2018 is $213,000. For 2019, it is $216,000. For 2020, it is $221,600. For 2021, it is $223,800. For 2022, it is $228,700. For 2023, it is $238,100. For 2024, it is

$249,100. And for 2025 it is $253,300, and back pay damages should be ascertained accordingly.

Respectfully submitted,

/s/ *Kenneth T. Cuccinelli, II*
Kenneth T. Cuccinelli, II
KENNETH T. CUCCINELLI, II, ATTORNEY AT LAW, PLLC
Ph: 804-286-2550
E: KTCLaw@proton.me
Attorney of Record

Earl N. "Trey" Mayfield, III
CHALMERS ADAMS BACKER & KAUFMAN, LLC
10521 Judicial Dr., #200
Fairfax, Virginia 22030
Ph: (703) 268-5600
F: (703) 268-5602
E: tmayfield@chalmersadams.com
Of Counsel

*Counsel for Plaintiffs*
Dated: September 4, 2025

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of September, 2025, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court, is available for viewing and downloading from the ECF system, and will be served by operation of the Court's electronic filing system (CM/ECF) upon all counsel of record.

_/s/ Kenneth T. Cuccinelli, II_
Kenneth T. Cuccinelli, II