IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RODNEY L. DAVIS, *et al.*,

                Plaintiffs,

        v.

THE UNITED STATES,

                Defendant.

No. 24-364
(Senior Judge Eric G. Bruggink)

**PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT & PLAINTIFFS' OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

I.     TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     ii

II.    PRELIMINARY ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1

III.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     4

       A. Opposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     4

           1.  The Government's Argument is Contrary to the Twenty-Seventh
               Amendment's Plain Text and Meaning, Which is to Ensure
               Congress is Politically Accountable to the Voters for
               Compensation Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     4

           2.  Equitable Estoppel Cannot Apply in this Case, and the Votes of
               Individual Congressmen Cannot Waive Voters'
               Constitutional Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     9

       B. Reply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     17

           1.  The Challenged Laws "Vary" Congressional Compensation in
               Violation of the Twenty-Seventh Amendment . . . . . . . . . . . . . . . . .     17

           2.  Retroactive Application of the Twenty-Seventh Amendment to
               the COLA-Blocking Laws in this Case Would Vitiate the
               Amendment's Purpose, Namely, that No Congress Should
               be Able to Vary its Own Compensation . . . . . . . . . . . . . . . . . . . . . .     21

           3.  The Court May Not Rewrite COLA-Blocking Laws to Make
               them Enforceable in the Next Congress, as Those Laws are
               Void Ab Initio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     23

           4.  An Election "Intervenes" Once Voting for Representatives has
               Begun in Any State by Any Method . . . . . . . . . . . . . . . . . . . . . . . .     29

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     36

## TABLE OF AUTHORITIES

**Cases**

*A.C. Aukerman Co. v. RL Chaides Constr. Co.*,
  960 F.2d 1020 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

*Beer v. United States*,
  696 F.3d 1174 (Fed. Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3, 19, 20, 25

*Boehner v. Anderson*,
  30 F.3d 156 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    passim

*Boehner v. Anderson*,
  809 F.Supp. 138 (D.D.C. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13

*Bonelli Cattle Co. v. Arizona,*
  414 U.S. 313 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

*Bornstein v. United States,*
  345 F.2d 558 (Ct. Cl. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

*Bowsher v. Synar,*
  478 U.S. 714 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

*Braza v. OPM,*
  598 F.3d 1315 (Fed. Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

*Breed v. Hughes Aircraft Co.,*
  35 Fed.Appx. 864 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

*Brookhart v. Janis,*
  384 U.S. 1 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

*Buckley v. Valeo,*
  424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12

*Cahoo v. SAS Analytics, Inc.,*
  912 F.3d 887 (6th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

*Collins v. Virginia,*
  584 U.S. 586 (2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

*Davis v. Passman,*
  442 U.S. 228 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

*Davis v. United States,*
    Case 1:24-cv-364-EGB . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18

*Fields v. Office of Eddie Bernice Johnson,*
    459 F.3d 1 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Foster v. Love,*
    522 U.S. 67 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 32, 33

*Friedman v. United States,*
    310 F.2d 381 (Ct. Cl. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Hatter v. United States,*
    203 F.3d 795 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Hawke v. Smith,*
    253 U.S. 221 (1920) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Heller v. District of Columbia,*
    554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Henry v. United States,*
    870 F.2d 634 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*INS v. Chadha,*
    462 U.S. 919 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 15

*Knetsch v. United States,*
    172 Ct. Cl. 378 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Lamont v. Postmaster General,*
    381 U.S. 301 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*McGowan v. Sec'y of HHS,*
    31 Fed. Cl. 734 (Fed. Cl. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Messinger v. Anderson,*
    225 U.S. 436 (1912) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Milsaps v. Thompson,*
    259 F.3d 535 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*New Georgia Project v. Raffensperger,*
    976 F.3d 1278 (11th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

*Osei-Afriyie v. Med. Coll. of Pa.*,
    937 F.2d 876 (3rd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

*Perez-Ruiz v. Crespo-Guillen*,
    25 F.3d 40 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

*Pierce v. North Carolina St. Bd. of Elec.*,
    97 F.4th 194 (4th Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

*Phillips-Deoatsch v. Secretary of Health and Human Servs.*,
    2015 WL 1950107 (Fed. Cl. Apr 09, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

*Pressler v. Blumenthal*,
    434 U.S. 1028 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

*Pressler v. Simon*,
    428 F.Supp. 302 (D.D.C.1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

*Republican Party of Minnesota v. White*,
    536 U.S. 765 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

*Russell Corp. v. United States*,
    537 F.2d 474 (Ct. Cl. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

*Salazar v. Buono*,
    559 U.S. 700 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

*Sandes' Sons, Inc. v. United States*,
    199 Ct. Cl. 107 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*,
    580 U.S. 328 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

*Selia Law LLC v. CFPB*,
    591 U.S. 197 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

*Sniadach v. Family Fin. Corp. of Bay View*,
    395 U.S. 337 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

*Stoner v. State of California,*
    376 U.S. 483 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Stuer v. United States,*
    207 Ct. Cl. 282 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Superior Waste Mgmt. v. United States,*
    169 Fed. Cl. 239 (2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*U.S. Term Limits, Inc. v. Thornton,*
    514 U.S. 779 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Helstoski,*
    442 U.S. 477 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Lovett,*
    328 U.S. 303 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Morrison,*
    529 U.S. 528 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Rahimi,*
    602 U.S. 680 (2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Skrmetti,*
    605 U.S. 495 (2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Unites States Smelting Refining & Mining Co.,*
    339 U.S. 186 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Veasey v. Abbott,*
    830 F.3d 216 (5th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Voting Integrity Project v. Keisling,*
    259 F.3d 1169 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Voting Integrity Project v. Bomer,*
    199 F.3d 773 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Williams v. United States,*
    535 U.S. 911 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Wise v. Circosta,*
    978 F.3d 93 (4th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**Constitutional Provisions**

U.S Const. Art. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

U.S Const. Art. I § 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    33

U.S Const. Art. I § 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

U.S Const. Art. I § 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 14, 17

U.S Const. Art. I § 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

U.S Const. Art. I § 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

U.S Const. Art. I § 9, cl. 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

U.S Const. Art. II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

U.S Const. Art. III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3, 20, 21

U.S Const. Art. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

U.S Const. Art. VI, cl. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

U.S. Const., Amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 12, 14

U.S. Const., Amend. II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

U.S. Const., Amend. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14, 15

U.S. Const., Amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

U.S Const., Amend. XXVII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   passim

**Statutes and Rules**

2 U.S.C. § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    30

2 U.S.C. § 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    30, 32

2 U.S.C. § 4501. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18, 23

5 U.S.C. § 5303 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14, 23

Continuing Appropriations and Extensions Act, 2025, Pub. L. 118-83,
    138 Stat. 1524 (Sept. 26, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    35

Ethics Reform Act of 1989, Pub. L. 101-194, 103 Stat. 1716 (Nov. 30, 1989) . . . . .    passim

Executive Salary Cost-of-Living Adjustment Act of 1975, Pub. L. 94-82,
    89 Stat. 419 (Aug. 9, 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

Further Consolidated Appropriations Act, 2020, Pub. L. 116-94,
    133 Stat. 2534 (Dec. 20, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

Pub. L. 112-175 (Sept. 28, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11

Pub. L. 117-328 (Dec. 29, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11

Pub. L. 118-158 (Dec. 21, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    35

Pub. L. 119-4 (Mar. 15, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    35

RCFC 54 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

## Other Authorities

1 Annals of Congress (1789) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

4 The Complete Anti-Federalist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12

Black's Law Dictionary (6th ed. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31

"Essay by Cornelius," Hampshire Chronicle, Dec. 11 & 18, 1787 . . . . . . . . . . . . .    11, 12

N. Webster, An American Dictionary of the English Language
    (C. Goodrich & N. Porter eds. 1869) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    30

Richard B. Bernstein, *The Sleeper Wakes: The History and Legacy of the
    Twenty-Seventh Amendment*, 61 Fordham L. Rev. 497 (1992) . . . . . . . . . . . . . . .    passim

Richard Briffault, *The Single-Subject Rule: A State Constitutional Dilemma*,
    82 Albany L. Rev. (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

## <u>PRELIMINARY ISSUES</u>

Plaintiffs bring two preliminary issues to the attention of the Court: the Government's attempt to obtain a sur-reply without the Court's permission; and the question of addressing the continuing claims doctrine at the summary judgment stage of this case.

### a. The Government is Impermissibly Gaming the Briefing Rules.

Plaintiffs object to the Government treating its brief entitled "Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Partial Summary Judgment" (ECF 51, hereafter "Opposition") – *in its entirety* – as both a brief in opposition and as its own motion for summary judgment. Such treatment would effectively allow the Government a sur-reply to this Plaintiffs' reply brief, with no prior permission of the Court.

Argument sections II (in its entirety) and III.C of the Government's Opposition constitute its Cross-Motion for Summary Judgment; while Argument sections III.A-B and IV constitute the Government's Opposition to Plaintiffs' Motion for Partial Summary Judgment. Plaintiffs request that this Court restrict its consideration of the Government's final reply to addressing only those topics contained in Argument sections II and III.C. of its Opposition, i.e., the Government's substantive cross-motion for summary judgment.[1]

### b. Application of the Continuing Claims Doctrine is a Live Argument to Which the Government has Waived Any Response.

The continuing claims doctrine at the summary judgment stage consists of two sub-issues: first, whether it's procedurally appropriate for the Court to rule on the continuing claims doctrine's application to this case; and second, the merits question of whether this case falls within that doctrine.

---

[1] Counsel for the parties discussed this subject without agreement.

The continuing claims issue is squarely presented, not foreclosed by this Court's prior rulings, and ripe for resolution. Despite Plaintiffs expressly addressing the continuing claims doctrine's applicability to the COLAs at issue in this case, *see* Opening Br. at 22-25, the Government declines to respond in its Opposition. *See* Opp. at 3, n.2, citing *Davis v. United States,* ECF No. 33 at 19-22. The Government rationalizes that because the Court previously addressed the continuing claims doctrine in its Order on the Government's earlier motion to dismiss (which Plaintiffs explicitly acknowledge, *see* Opening Br. at 22 n.17), Plaintiffs are obligated to move for reconsideration in order for the Court to revisit the issue at the summary judgment stage. The Government is incorrect.

In pertinent part, RCFC 54(b) states: "Otherwise, *any order or other decision*, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and *may be revised at any time before the entry of a judgment* adjudicating all the claims and all the parties' rights and liabilities." (emphasis added). Case law reflects this practice. "Prior to a final judgment, a court has discretion to revisit and modify any interlocutory orders." *Phillips-Deoatsch v. Secretary of Health and Human Servs.*, 2015 WL 1950107 at *5 (Fed. Cl. Apr 09, 2015) (citing *McGowan v. Sec'y of HHS*, 31 Fed. Cl. 734, 737 (Fed. Cl. 1994)); *accord, Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994) ("Interlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case.") (citations omitted); *Messinger v. Anderson*, 225 U.S. 436, 444 (1912) ("the phrase, 'law of the case,' as applied to the effect of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally… not a limit on their power.").

Here, there is no final judicial decision on the continuing claims doctrine. *See also, United States v. Unites States Smelting Refining & Mining Co.*, 339 U.S. 186, 198-99 (1950) ("When finally decided, all questions were still open and could be presented…. it requires a final judgment to sustain the application of the rule of the law of the case just as it does for the kindred rule of res judicata.").

Plaintiffs respectfully maintain that the Court's previous brief discussion of the continuing claims doctrine cannot be squared with the Federal Circuit's construal of the doctrine. The Court is free to address the continuing claims question at any time prior to final judgment, whether *sua sponte* or in response to a party's arguments.[2]

Indeed, on the merits of the continuing claims doctrine itself, the Government provides no answer here. As Plaintiffs point out, the Twenty Seventh Amendment constitutional questions in this case—like the Article III constitutional questions in *Beer v. United States*, 696 F.3d 1174 (Fed. Cir. 2012)[3] and *Hatter v. United States,* 203 F.3d 795 (Fed. Cir. 2000) ("*Hatter VIII*")—have no bearing on whether this case properly falls under the continuing claims doctrine. *See* Opening Br. at 23-25. Put simply, only the manner in which Plaintiffs were paid their compensation should appropriately be considered by this Court to determine that the continuing claims doctrine applies to this case. Moreover, given that the Government explicitly elected to ignore this topic in its Opposition, it has thus waived its right to oppose the argument.

---

[2] To the extent a motion for reconsideration of the Court's prior ruling on continuing claims doctrine is required, Plaintiffs so move.

[3] If the *Beer* Court had been relying in any way on the fact that the plaintiffs therein were judges with Article III pay protections in reaching its conclusion that that case was covered by the continuing claims doctrine, one would have expected the Court to say so. Instead, *Beer* relied heavily on both *Hatter VIII* (a case with judges as plaintiffs) and *Friedman v. United States,* 310 F.2d 381 (Ct. Cl. 1962) (a disability case), with no reference to Article III in reaching its continuing claims determination.

*See Superior Waste Mgmt. v. United States*, 169 Fed. Cl. 239, 297 (2024) ("A party's failure to raise an argument in an opening or responsive brief constitutes waiver.") (collecting cases).

## <u>ARGUMENT</u>

**A. Opposition to the Government's Cross-Motion for Summary Judgment.**

    1.  **The Government's Argument is Contrary to the Twenty-Seventh Amendment's Plain Text and Meaning, Which is to Ensure Congress is Politically Accountable to the Voters for Compensation Changes.**

In an argument section remarkably light on law but heavy on the Department of Justice's preference to avoid monetary judgments, the Government asserts that a judgment in Plaintiffs' favor would "undermine the Constitution." *See* Opp. at 6-12.

Understandably, the Government cites heavily from Bernstein,[4] the best available discussion of the Twenty-Seventh Amendment's history. As with the rest of the Bill of Rights (of which the extant-Twenty-Seventh was originally the second proposed amendment), it must be interpreted according to its original plain textual meaning, and, to the extent there is any ambiguity, in keeping with the historical understanding of the amendment's meaning and purpose. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24-26 (2022) (reviewing text and history test for the Bill of Rights amendments).

The Twenty-Seventh Amendment, in total, states:

No law, *varying the compensation* for the services of the Senators and Representatives, shall take effect, until an election of Representatives shall have intervened.

U.S. Const., Amend. XXVII (emphasis added).

---

[4] Richard B. Bernstein, *The Sleeper Wakes: The History and Legacy of the Twenty-Seventh Amendment*, 61 Fordham L. Rev. 497 (1992).

Taking a rather unusual position for the Department of Justice, the Government invites the Court to ignore the Amendment's plain text, and rewrite the Amendment as follows:

> No law, *increasing the compensation* for the services of the Senators and Representatives, shall take effect, until an election of Representatives shall have intervened.

*See* Opp. at 6-9.  For this proposal, the Government cites instances from after the Amendment's drafting in which the public and state legislatures were largely motivated by displeasure at congressional pay increases.  While this was true as far as it goes, it ignores the Founding Period, and is also irrelevant. "The text of the Constitution always controls. So history contrary to clear text is not to be followed."  *United States v. Rahimi,* 602 U.S. 680, 718 n.2 (2024) (Kavanaugh, J., concurring).

Notwithstanding the Government's historical revisionism, experience with the British Parliament and the Revolutionary Era informed the Founders' desire to prevent Congress from lowering its own pay for immediate political gain at the expense of institutional judgment, the public interest, and permitting individuals of modest means to serve.  As Bernstein explains:

> Beginning in the seventeenth century, however, the House of Commons gradually erected barriers that had the effect of excluding men without means from Parliament. The leading student of the House of Commons before the Great Reform Bill of 1832 has shown how some candidates at first bid for their constituents' approval and support by promising to take lower wages, and later raised the stakes by pledging not to accept wages altogether. The demand for seats in the House of Commons became so fierce during the eighteenth century that would-be members even found themselves assuming the cost for municipal improvements, such as new public buildings or repaved streets, in an effort to win the support of their constituents.  Such largesse continued even after the adoption of the two great reform measures of 1832 and 1867.

> Americans in the 1770s and 1780s, fascinated by the apparent and real corruption of the British constitution, were aware that members of the House of Commons often played these artful political games to win and secure their seats-including, ultimately, the purchase and sale of constituents' votes. To the Americans, the ostentatious purchase of Parliamentary seats (including such unpopulated "rotten boroughs" as Old Sarum) and the often blatant vote-buying attending elections,

even in legitimate boroughs containing living-and-breathing constituents, exemplified the extraordinary corruption that tainted the British constitutional system. This corruption, they believed, led members of Parliament to override the Americans' rights under the British constitution.

. . .

Two distinct but related developments, however, interfered with the states' self-assumed responsibility for footing the bills of their delegations. First, state legislatures continued the practice, honored by tradition, of using their control on the pursestrings to punish Congress for ignoring their state's interests, and this fiscal war of nerves extended to the pay of state delegations. Second, as the nation's economy worsened during and after the American Revolution, expenses closer to home assumed a greater importance for tight-fisted state legislators than expenses of a far-off and less relevant Confederation. In either case, the effect was the same: delegates to the Continental and Confederation Congresses had to wait longer and longer to be paid-if they were paid at all. Even those delegates who had independent means, and thus did not rely on the small salaries paid by the states, did not accept this situation lightly. Notable American politicians began to write scathing letters to their home states, demanding to know how long they were to serve their country without being paid for it.

Bernstein, 61 Fordham L. Rev. at 500-02 (citations omitted).

The Government posits that "permitting plaintiffs to recover damages in this case would fundamentally undermine the very political accountability that is the Twenty-Seventh Amendment's sole demand." Opp. at 9. Yet again, the Government's construction is counter-textual. Before the Amendment's ratification in 1992, Congress could alter its pay at any time, and was subject to the "political accountability" the Government references at any time thereafter. The Amendment's alteration of that scheme—the "sole demand" the Government reads right out of the Amendment—is the procedural hurdle of an *intervening election*.

The Government complains that if the instant suit succeeds, Congress will be incentivized to feed the public perception of having denied itself a pay raise by gaming the intervening election requirement, only to recover thereafter by bringing suit. Opp. at 9-10. That is entirely possible; indeed, this suit exists precisely because Congress has for 30 years

periodically denied itself a mandatory pay raise in a fashion that does not comport with the Constitution.[5]

It is no argument for the Government to assert that it shouldn't be held liable for unconstitutional conduct that is repeated. If the Congress passes a law abridging the First Amendment, the Government becomes liable for every violation, even if Congress reenacts the same unconstitutional law every two years. The Twenty-Seventh Amendment is no different. The Framers and Amendment ratifiers have made a policy choice in the Constitution's Twenty-Seventh Amendment as to the method by which Congress may vary its pay, a constitutional choice that takes the Government's countervailing policy preferences off the table. *See Heller v. District of Columbia*, 554 U.S. 570, 636 (2008).

The remainder of the Government's arguments are meritless.[6] If, for example, individual Members decide not to avail themselves of the damages available after this suit, that's an individual choice that does not implicate the Constitution's structural concerns, functionally no different than the President or federal judges donating their salary increases back to the Treasury, or refusing to accept the Government's checks. A judicial judgment enforcing the Constitution's Twenty-Seventh Amendment protects the constitutional interests of both the voters and the Congress, irrespective of whether individual Members decide to avail themselves of the outcome. *Davis v. Passman*, 442 U.S. 228, 242 (1979) (the federal judiciary's function is to enforce constitutional rights).

---

[5] While beyond the scope of this litigation, there will likely be both public and institutional responses to this litigation's outcome.

[6] While never formally set out as an independent argument, the Government repeatedly posits that a later Congress, the COLA for which was blocked by an earlier Congress, must either "acquiesce" or "align" with the earlier action. *See* Opp. at 4 & 9. The Government cites no text or case for this proposition, as none exists.

Likewise, the Government's professed concern for the "power of the purse constitutionally committed to Congress" under Article I, § 9, Clause 7 of the Constitution ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law") is without force here, as the Government ignores that provision's stated limitation: "by Law." No legislation enacted by Congress that does not comport with the Constitution's strictures is "law." Just as any appropriation must have passed through bicameralism and presentment to be a valid law under our Constitution, *see INS v. Chadha*, 462 U.S. 919, 944-58 (1983), so too must any congressional compensation law comply with the Twenty-Seventh Amendment's intervening election requirement. While Congress may enact bills with seemingly worthy policy objectives, such legislation must fall in the face of contrary constitutional mandates. *See, e.g., Selia Law LLC v. CFPB,* 591 U.S. 197, 213-32 (2020) (Congress's attempt to insulate agency head from political influence with "for cause" removal requirement violated President's Article II authority to execute the laws); *accord, Collins v. Virginia*, 584 U.S. 586, 607 (2018) (Thomas, J., concurring) ("'The Supremacy Clause is limited to those 'Laws' of the United States which are passed by Congress pursuant to the Constitution.' By referencing laws 'made in Pursuance' of the Constitution, the Supremacy Clause incorporates the requirements of Article I, which force Congress to stay within its enumerated powers, and follow the cumbersome procedures for enacting federal legislation[.]") (citations omitted).

Federal funds may not be limitless, but Congress is constrained by constitutional limitations as to how those funds may be spent. Congressional legislation, notwithstanding the Government's wishful thinking here, is not a free-for-all in which tradeoffs occur in a vacuum. *See* Opp. at 12. Just as with other constitutional restrictions (such as limited enumerated congressional powers, bicameralism, and quorum requirements) that limit the conditions under

which those tradeoffs occur, so too does the Twenty-Seventh Amendment for legislation varying congressional compensation.  The Government presents a false dilemma: it is not the Court that is second-guessing congressional choices.  It is the Constitution that precludes certain of those choices.  *See, e.g., United States v. Morrison*, 529 U.S. 528, 610 (2000) (it is the judiciary's function to police the outer limits of the Constitution's enumerated powers).

### 2.  Equitable Estoppel Cannot Apply in this Case, and the Votes of Individual Congressmen Cannot Waive Voters' Constitutional Rights.

The Government posits that because the individual Plaintiff members of Congress voted at various times for legislation containing COLA-blocking language, they "caused their own injury [and] cannot now recover for it."  Opp. at 22.  The argument fails in both logic and law.

As an initial matter, the Government's waiver or estoppel argument itself violates yet another protection our Constitution affords to Members of Congress: the Speech and Debate Clause, U.S. Const. Art. I. § 6.[7]  That clause prohibits, among other things, the evidentiary use of legislative votes (or other legislative acts) to a Member's detriment, as the Government seeks to do here in advancing its estoppel argument.  *United States v. Helstoski*, 442 U.S. 477, 488 (1979) (legislative acts cannot be introduced as evidence against a Member in criminal prosecution); *Fields v. Office of Eddie Bernice Johnson,* 459 F.3d 1, 14 (D.C. Cir. 2006) (en banc) (applying *Helstoski* in a civil case: proffering legislative act evidence to a factfinder in litigation violates the Speech and Debate Clause).

Plaintiffs object to the introduction of their past legislative votes as evidence, and to any judicial consideration of those votes.  Their congressional votes are legislative acts protected by

---

[7] The pertinent constitutional language provides that "for any Speech or Debate in either House [of Congress], they [i.e. Senators and Representatives] shall not be questioned in any other place."  As explained, *supra*, "questioned" is broadly interpreted to prohibit introducing evidence of legislative acts in litigation.  Obviously, voting is a quintessential legislative act.

the Speech and Debate Clause.  Those votes cannot be introduced into evidence or used to their

detriment in any way.  That alone is enough to dispose of the Government's waiver or estoppel

argument.

In any event, if the Court decides it should consider the Government's waiver-or-

estoppel-by-legislative-vote argument, that argument is perverse.  The Government essentially

argues that by setting aside their own personal financial interests and the rights protected by the

Constitution, and voting in favor of omnibus spending bills that kept the Government's lights on,

individual legislators waived their rights to litigate their unlawful treatment by Congress as a

whole.  But the equities are with Plaintiffs here, not the Government.

Moreover (and though the Government purposefully avoids mentioning it), none of the

referenced legislation was a stand-alone bill on the COLA-blocking appropriation provision.

Unlike the majority of state legislatures, Congress has no "single subject" limitation on bills, i.e.,

"the requirement that each act of the legislature be limited to a single subject." Richard Briffault,

*The Single-Subject Rule: A State Constitutional Dilemma*, 82 Albany L. Rev. 1629 (2019)

(noting 43 state constitutions in 2019 had some version of a single-subject rule for legislation).

Instead, Congress typically passes omnibus bills containing legislation affecting many disparate

topics, sometimes thousands of such topics.  Taking cognizance of the phenomena, Justice Scalia

observed in an analogous context, "the inference that Congress has exercised its institutional

competence—or even its considered judgment—is significantly weaker . . .  when the legislative

action was buried in a defense appropriations bill."  *Salazar v. Buono*, 559 U.S. 700, 756 (2010)

(Scalia, J., concurring).

The laws the Government references (*see* Opp. at 3-4) were just such bills.[8]  None of the Plaintiffs voted for any of the bills containing the COLA blocking provisions solely based upon the subject of temporarily blocking the COLAs mandated by the Ethics Reform Act of 1989, and any such suggestion by the Government is contrary to fact.[9]  Multiple-subject bills force members of Congress to vote on legislative packages often containing components with which they disagree, or may even believe are unlawful.

The Government's estoppel argument treats a legislator's conscientious performance of his duty to keep the Government funded, in derogation of the Twenty-Seventh Amendment's protections and the Member's own financial interests, as a self-inflicted wound or a waiver of the right to be heard.  Having cast votes that set aside their personal interests for the sake of their country and constituents, these legislators deserve to have their argument heard on the merits.

Nor does the Government even address the undisputed fact that the Twenty-Seventh Amendment is concerned primarily with the right of *voters* to hold their congressmen accountable by forcing Congress to pass compensation-varying bills *before* an election occurs. As Bernstein explains, that concern in the Founding Era was at the Twenty-Seventh Amendment's core:

> Given the public obsession with parsimony that dominated politics in the New England states, it is not surprising that New Englanders seemed most incensed over the compensation clause. On December, 1787, the pseudonymous Massachusetts newspaper essayist "Cornelius" fired a detailed salvo at the compensation clause in a two-part essay published in the *Hampshire Chronicle,* a

---

[8] As a simple matter of length, the shortest of the bills in question was 12 pages long (Pub. L. 112-175, Sept. 28, 2012) and continued a variety of other appropriations bills, thus addressing thousands of disparate subjects.  The longest of the bills in question was 1,653 pages long (Pub. L. 117-328, Dec. 29, 2022), also addressing thousands of disparate subjects.

[9] As the Government's own chart demonstrates, each Plaintiff also voted *against* omnibus legislation containing the relevant COLA-blockers.  *See* Opp. at 3-4.  The Government does not explain why it is that Plaintiffs' votes *for* such legislation—as contrasted with their votes against—somehow have comprehensive estoppel effect.

newspaper appearing in one of the counties where Shays's Rebellion had found its greatest popularity. Noting that federal Representatives and Senators apparently were under no obligation to listen to instructions adopted by their constituents, "Cornelius" demanded:

> Is it altogether certain, that a body of men elected for so long a term,-rendered thus independent, and most of them placed at the distance of some hundreds of miles from their constituents, will pay a more faithful regard to their interest, and set an example of economy, more becoming the circumstances of this country, than they would do, if they were annually elected, subject to some kind of instructions, and liable to be recalled, in case of male administration [sic] [i.e., maladministration].

"Cornelius" also challenged the implication that the clause was necessary to ensure a fair rate of compensation for members of the new Congress:

> Have the several states, in the estimation of the compilers of this Constitution, been hitherto, so parsimonious and unjust in paying their delegates, that they have rendered themselves unfit to contract with their Senators and Representatives, respecting a compensation for their service? If so, what may we suppose will be considered as a just compensation, when this honourable Body shall set their own pay, _and be accountable to none but themselves_?

Bernstein, 61 Fordham L. Rev. at 510-11 (emphasis added) (citing, in relevant part, "Essay by Cornelius," Hampshire Chronicle, Dec. 11 & 18, 1787, _reprinted in_ 4 The Complete Anti-Federalist at 141).

The Twenty-Seventh Amendment's intervening election requirement is the direct mechanism to hold Congress electorally accountable for its compensation decisions, and is of a piece with the First Amendment's objective of facilitating an informed political discourse by the voting public. _See, e.g., Buckley v. Valeo_, 424 U.S. 1, 67 (1976) (campaign finance disclosure requirements "provides the electorate with information . . . in order to aid the voters in evaluating those who seek federal office"); _Republican Party of Minnesota v. White_, 536 U.S. 765 (2002) (striking down law forbidding judges from discussing positions that might come before them in campaigns, because, independent of candidates' own free speech rights, voters have the right to

receive information about public officials' views before casting a ballot); *see also Lamont v. Postmaster General*, 381 U.S. 301, 307-10 (1965) (Brennan, J., concurring) (recognizing the First Amendment's protection of the public's right to receive information).

Not having addressed the Twenty-Seventh Amendment's focus on establishing a defined process for holding congressmen accountable to voters, the Government offers no support for the notion that individual congressmen have the authority to waive a collective constitutional right belonging to the voters. *See Boehner v. Anderson*, 809 F.Supp. 138, 142 (D.D.C. l992) (observing that, consistent with the Twenty-Seventh Amendment, voters had the chance to approve or disapprove the congressional pay increase formula contained in the Ethics Reform Act ("ERA") in both the 1990 and 1992 elections, prior to the full implementation of the pay increases enacted in the ERA); Bernstein, 61 Fordham L. Rev. at 533-36 (chronicling Congress increasing and decreasing its pay, and voter reactions thereto).

The Government's argument that, by voting for COLA suppression, legislators waived the right to assert their Twenty-Seventh Amendment rights also overlooks the fact that the Twenty-Seventh Amendment does not just benefit legislators. It also benefits voters. Even if legislators were estopped from asserting their own rights, Congress cannot, by statute, waive the voting public's right to elected representatives paid in accordance with the Constitution. *See infra* at Section III.B.4.

Strikingly absent from the Government's brief is any authority for the proposition that Congress can nullify provisions of the Constitution simply by voting to do so. The Twenty-Seventh Amendment is designed *precisely to prevent* <u>Congress</u> from varying its compensation

without an intervening election; no one else besides _Congress_ can vary its own pay.[10]  U.S. Const., Art. I, § 6; _see also U.S. Term Limits, Inc. v. Thornton_, 514 U.S. 779, 860 (1995) (Thomas, J., dissenting) (observing the Constitution's framers explicitly gave Congress the power to set its own pay).  If the Government is right that a majority vote of Congress to vary its compensation occurring after an election has begun is sufficient to vary its own pay, then the Twenty-Seventh Amendment is a nullity.  There is no logical end to the Government's counter-constitutional argument.  If a congressional vote is sufficient to nullify the Twenty-Seventh Amendment, then why not every other provision of the Constitution?  If a majority congressional vote can nullify "No law, varying compensation for the services of the Senators and Representatives, shall take effect . . .," then it can just as surely vote to negate, for instance, the First Amendment ("Congress shall make no law . . .), the Second Amendment (" . . .the right of the people to keep and bear Arms, shall not be infringed."), and the Fourth Amendment ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . .").  Presumably, a majority vote of Congress could eliminate every provision of the Constitution, if one credits the Government's theory that the Constitution's strictures must fall in the face of a congressional vote.  This is not _reductio ad absurdum_; nowhere does the Government explain the legal source of its congressional vote negation theory, nor how it is limited strictly to the Twenty-Seventh Amendment.  The question answers itself: No matter the votes, Congress cannot nullify constitutional provisions other than by means of the amendment process specified in Constitution Article V.  _Hawke v. Smith_, 253

---

[10] With an appropriate congressional delegation of this compensation-setting authority, the President can restrict General Schedule COLA adjustments, which in turn caps congressional COLA adjustments, so long as they are implemented consistent with the Twenty-Seventh Amendment.  5 U.S.C. § 5303(b).

U.S. 221, 225-27 (1920) (Article V of the Constitution provides the sole means of its

amendment, which cannot be altered by courts or legislative bodies); *see also, e.g., Bowsher v.

Synar,* 478 U.S. 714, 755 (1986) (Congress cannot legislate beyond constitutional restraints);

*Chadha*, 462 U.S. at 951-59 (same).

The unsustainability of the Government's argument is accentuated by its inability to even

name what legal principle might permit individual congressional votes to overturn a

constitutional provision expressly prohibiting Congress from giving effect to exactly that which

is being voted upon. *See* Opp. at 22. Hoping something will stick, the Government throws out

"contributory negligence in tort, failure to mitigate in contract, or more broadly waiver and

estoppel." *Id.* But the Twenty-Seventh Amendment, like the rest of the Constitution, does not

arise out of tort or contract.

In any event, the Government's argument fails even if considered under the usual rules of

waiver or estoppel. Even assuming, *arguendo,* that individual congressmen might somehow be

able to waive a constitutional right belonging primarily to voters, waiver did not occur here.

Parties are presumed not to have waived their constitutional rights. *See Braza v. OPM*, 598 F.3d

1315, 1320 (Fed. Cir. 2010); *Sandes' Sons, Inc. v. United States*, 199 Ct. Cl. 107, 113 (1972)

(citing *Brookhart v. Janis*, 384 U.S. 1, 4 (1966)). Nor can individuals waive the constitutional

rights of others. *See, e.g., Stoner v. State of California*, 376 U.S. 483, 489 (1964) ("[Fourth

Amendment protection] was a right, therefore, which only the petitioner could waive by word or

deed, either directly or through an agent."); *Osei-Afriyie v. Med. Coll. of Pa.*, 937 F.2d 876, 883

(3rd Cir. 1991) (Alito, J.) ("The right to counsel belongs to the children, and, under the cases

from the Second and Tenth Circuits discussed above, the parent cannot waive this right."). There

was no waiver here.

Estoppel fares no better.  The Government's argument appears to be that Plaintiffs are equitably estopped from seeking to enforce the Twenty-Seventh Amendment because at various points they voted for omnibus appropriations bills containing COLA-blocking language.  That doctrine does not work here (as the Government implicitly concedes by not providing a single citation in support of the notion).  Equitable estoppel may be invoked where "[1] The actor [i.e., the individual plaintiff], who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence. [2] The other relies upon that communication. [3] And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct."  *A.C. Aukerman Co. v. RL Chaides Constr. Co.*, 960 F.2d 1020, 1040 (Fed. Cir. 1992) (citation omitted), abrogated on other grounds at *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328 (2017); *accord Stuer v. United States*, 207 Ct.Cl. 282, 292 (1975). "Detrimental reliance is an essential element of estoppel." *Knetsch v. United States*, 172 Ct. Cl. 378, 390 (1965).  The party seeking to invoke equitable estoppel must show it *detrimentally* changed its position based on the other party's conduct.  *See Bornstein v. United States*, 345 F.2d 558, 563 (Ct. Cl. 1965).  Equitable estoppel cannot exist where the complaining party cannot show it was harmed and induced to act by the opposing party's promise.  *Breed v. Hughes Aircraft Co.,* 35 Fed.Appx. 864, 867 (Fed. Cir. 2002).  And, "that reliance must have been reasonable in that the party claiming the estoppel did not know *nor should it have known* that its adversary's conduct was misleading." *Henry v. United States*, 870 F.2d 634, 636 (Fed. Cir. 1989) (cleaned up) (emphasis in original); *accord, Russell Corp. v. United States*, 537 F.2d 474, 484 (Ct. Cl. 1976) (cleaned up) (the party against whom estoppel is asserted must also have intended for the other party to act upon it, and the recipient party must be ignorant of the true facts).

Equitable estoppel is inapplicable here for multiple reasons: (1) none of the Plaintiffs communicated anything misleading or made any promise to the Government; (2) none of the individual Plaintiffs by their respective votes intended the Government to rely upon it, inasmuch as their votes were on omnibus legislative bills, not solely to alter congressional pay;[11] (3) the Government did not rely on any of Plaintiffs' individual votes; rather, the Government acted in accordance with the legislation created by bicameralism and presentment; (4) the Government has suffered no harm nor detriment from the votes of individual Plaintiffs (nor is it harmed by simply carrying out legislative appropriation directives, which is the executive branch's duty); (5) the Government cannot claim to have acted in ignorance of the true facts, as the Twenty-Seventh Amendment was in full force at all times prior to the COLA-blocking appropriations bills; and (6) the Government actually paid out less money by not paying the COLAs at issue in this case in accordance with the Ethics Reform Act, only a fraction of which underpayments are recoverable, i.e., those after the statute of limitations date of March 7, 2018.  The votes of individual congressmen on omnibus legislative bills cannot waive mandatory constitutional provisions, including the Twenty-Seventh Amendment.

**B. Reply to the Government's Opposition to Plaintiff's Motion for Partial Summary Judgment.**

    **1. The Challenged Laws "Vary" Congressional Compensation in Violation of the Twenty-Seventh Amendment.**

Article I, Section 6 of the Constitution mandates congressional compensation be set "by Law."  The Ethics Reform Act of 1989 is the law that has set congressional compensation since 1991.  Congress was free to set its compensation using a formula instead of using specific dollar

---

[11] And each one of them voted "no" at various times as well, a fact never acknowledged or accounted for by the Government.

amounts, and that is what it did.  *Boehner v. Anderson*, 30 F.3d 156, 162 (D.C. Cir. 1994) ("We

see no reason whatsoever why the Congress cannot, for convenience, instead [of a specific

salary] specify an index or formula").  *See also* Opp. at 1-2 ("Historically, Congress has at times

enacted specific legislation setting rates of Member pay, but since 1992 the amount has been

controlled by the *formula* set forth in 2 U.S.C. § 4501.") (emphasis added).  Thus, changes in pay

that deviate from the ERA's formula function to "vary" congressional compensation.  No legal

authority contravenes that fact.

Despite acknowledging that the Ethics Reform Act compensates Congress based on a

formula, *id*, the Government repeatedly objects to treating congressional pay based on an

inflation-adjusted scale (e.g., the ERA), as opposed to a specific nominal amount (e.g.,

$174,000).  See, e.g., Opp. at 13-14, 16, 18, 19.  But no court has denied Congress' authority to

set its own compensation by formula.  Because Congress has set its compensation by formula in

the ERA, that formula is the constitutional baseline for Member compensation.  Changes from

that formula (up or down) are what constitute 'variances' in congressional compensation that

must comply with the Twenty-Seventh Amendment.

As the Court noted in its February 4, 2025 Order: "Blocking legislation plainly consists

of laws 'varying the compensation for the service of the Senators and Representatives.'  U.S.

Const. amend. XXVII."[12]  *Davis,* ECF 33 at 13.  The D.C. Circuit's *Boehner* decision reinforces

that Conclusion.  *See* 30 F.3d at 161-62.  Rejecting plaintiff Boehner's contention that "each

COLA [is] in effect a new law," the court observed "The provision calling for an annual COLA

---

[12] The Government argues this language of the Court is dicta, and thus not binding.  Opp. at
13 n. 4.  Plaintiffs do not engage on this question, as it is irrelevant because no final order was
entered on this issue.  It can thus be reargued at any point until final judgment – just as the
Government has done here.  *See supra* 1-3.

*is part of that 1989 law* [the Ethics Reform Act]." *Id.* at 161 (emphasis added) (citing *Pressler v. Simon*, 428 F.Supp. 302, 306 (D.D.C.1976) (three-judge court), aff'd sub nom *Pressler v. Blumenthal*, 434 U.S. 1028 (1978) (automatic increases under the Executive Salary Cost-of-Living Adjustment Act of 1975 "fix congressional compensation by law")). Thus, any change from the COLA formula contained in the ERA "varies" compensation vis-à-vis the existing law, and such changes must comply with the Twenty-Seventh Amendment.

Justice Breyer favorably discussed using a formula as the measure of compensation in *Williams v. United States,* 535 U.S. 911, 914-15 (2002) (Breyer, J., dissent from the denial of cert.).[13] *See* Opening Br. at 13-14. Even though the case before him addressed plaintiffs who were judges, Justice Breyer explicitly noted the ERA applied to Members of Congress as well as judges. *Id.* at 912 ("Hence, the Act focused on inflation, assuring federal judges (as well as Members of Congress and high-level Executive Branch officials) that their real salaries, compared to those of the average worker, would decline only slightly, if at all."). Ten years later in *Beer,* the Federal Circuit expressly endorsed Justice Breyer's *Williams* analysis. Opening Br. at 13-14 (discussing *Beer,* 696 F.3d at 1176 (en banc)).[14]

The Government fails to recognize *Boehner*'s and *Beer*'s significant effect on this case. Nowhere is this more starkly displayed than by the Government's assertion that COLA-blocking

---

[13] As early as the Constitutional Convention, James Madison expressed concerns about the unseemliness of Members of Congress setting their own pay. He discussed using some sort of economic benchmark (such as the price of wheat) to set Member pay, stating that "to leave them to regulate their own wages, was an indecent thing, and might in time prove a dangerous one." Bernstein at 503. Two hundred years later, in passing the ERA, Congress used the Employment Cost Index as just such an economic benchmark. *See also, Beer* at 1185. As himself the author of the Twenty-Seventh Amendment, Madison plainly saw no conflict using a benchmark for congressional pay with what became the Twenty-Seventh Amendment.

[14] The *Beer* majority favorably referenced Justice Breyer's opinion four different times, which highlights its importance in the case at bar. *Beer*, 696 F.3d at 1181, 1183 and 1184 (twice).

legislation does not vary congressional compensation, and that the blocking laws are not even covered by the Twenty-Seventh Amendment. The Government asserts, "while Congress passed new laws preventing some of the COLAs from taking effect, these laws are not subject to the Twenty-Seventh Amendment because they *prevented* variation, and did not themselves vary congressional compensation. Neither *Beer* nor *Boehner* compel a different conclusion." Opp. at 19 (emphasis in original). The Government could not be more wrong.

As Plaintiffs have already noted, *Boehner* stated that from its enactment and thenceforth into the future, the ERA constituted a formula-based compensation for Congress. *Supra* at 17-18.

Two aspects of *Beer* are particularly relevant to the case at bar. First, *Beer* concluded the ERA's COLAs are part of – not an increase in – judicial pay.[15] The same holds true here as it relates to congressional pay, i.e., the ERA COLAs are part of – not an increase in – congressional pay. While judicial pay may never be reduced in light of its Article III pay protections, congressional pay can be reduced so long as the Twenty-Seventh Amendment is complied with. But the first *Beer* conclusion is common to both cases, namely, that the ERA COLAs are part of the base pay against which changes are to be judged.

In this case, the Government attempts to treat COLAs as pay increases. *Beer* dictates, however, that COLA-blocking legislation is a reduction in congressional pay. Accordingly, any such reduction may be accomplished only if the Twenty-Seventh Amendment's intervening election requirements are met.

---

[15] *Beer*, 696 F.3d at 1185 ("By enacting blocking legislation in 1995 …, Congress … effected a diminution in judicial compensation.").

Second, as relevant to the continuing claims doctrine, *Beer* clearly treated the ERA as the money-mandating statute that formed the basis of the plaintiff judges' claims to payment, not Article III. Article III protects against any diminishment of sitting judges' compensation forever, but Article III does not dictate any particular level of judicial compensation. Likewise, the ERA is the money-mandating statute that sets the level of congressional compensation. The distinction between judicial and congressional compensation protections for these purposes is primarily temporal: The Twenty-Seventh Amendment protects only against any particular Congress changing (up or down) its own pay during the same term of Congress, whereas reductions in judicial pay are always forbidden. With the ERA being the underlying compensation statute in both situations, both judicial and congressional compensation must be analyzed as continuing claims.

### 2. Retroactive Application of the Twenty-Seventh Amendment to the COLA-Blocking Laws in this Case Would Vitiate the Amendment's Purpose, Namely, that No Congress Should be Able to Vary its Own Compensation.

The Government argues that the COLA-blocking laws at issue in this case can be applied retroactively without running afoul of the Twenty-Seventh Amendment. The Government posits the Twenty-Seventh Amendment permits a Congress to lower its own pay by retroactively applying COLA-blocking laws. *See* Opp. at 20 ("although the 119th Congress cannot vary its own compensation *while it is in session*….") (emphasis added). The Government reasons that a Congress paid the ERA-mandated COLAs in the ordinary course of receiving its compensation may nonetheless pass a law blocking those COLAs. Such a law would take effect only upon the seating of the next Congress, at which time (according to the Government's theory) the Members

of the prior Congress that passed the blocking statute would have to pay back the ERA-mandated COLAs they received.[16]

While creative, the Government's proposition ignores the Twenty-Seventh Amendment's plain language forbidding *any* Congress from changing its *own* pay – ever.[17]  *See Boehner*, 30 F.3d at 162 ("the present Congress could specify the salary of the *next* Congress or of *any Congress after that*.") (emphasis added); *see also* 1 Annals of Congress at 756-57 (1789) (Comments of Mr. Vining) ("There was, to say the least of it, a disagreeable sensation, occasioned by leaving it in the breast of any man to set a value on his own work; … but it might, and ought to be avoided in the future; he therefore hoped [the proposed amendment] would obtain without any difficulty").

The Twenty-Seventh Amendment's explicit text, along with its original public meaning at the time of its drafting and initial ratification by the first six states, precludes any Congress following the Amendment's ratification from varying its own compensation.  The Government's theory that Congress could retroactively vary its pay would vitiate one of the Amendment's clear purposes, and should be rejected.

---

[16] The Government argues that the 119th Congress could vary the compensation of the 118th Congress.  Opp. at 20.  This too, is wrong.  A retroactive reduction in pay, would, among other things, implicate the due process clause by retroactively depriving individuals of earned compensation, *see, e.g. Bonelli Cattle Co. v. Arizona,* 414 U.S. 313, 331 (1973) (Due process clause forbids the retroactive transformation of private property into public property); the takings clause by seizing wages, *see, e.g., Cahoo v. SAS Analytics, Inc.*, 912 F.3d 887, 900 (6th Cir. 2019) (citing *Sniadach v. Family Fin. Corp. of Bay View*, 395 U.S. 337, 342 (1969)) ("Individuals also have constitutionally-protected property interests in their wages."); and potentially the bill of attainder clause by targeting a specific group of employees for punitive treatment on a retroactive basis.  *See, e.g., United States v. Lovett*, 328 U.S. 303, 315-16, 324 (1946).

[17] Courts are not free to ignore the Constitution's plain text.  *See, e.g., United States v. Skrmetti*, 605 U.S. 495, 527 n.2 (2025) (Thomas, J., concurring); *Veasey v. Abbott*, 830 F.3d 216, 253 (5th Cir. 2016).

**3.    The Court May Not Rewrite COLA-Blocking Laws to Make them Enforceable in the Next Congress, as Those Laws are Void Ab Initio.[18]**

The COLA-blocking laws at issue in this case were all temporary one-year enactments; they expired prior to the commencement of the next Congress, and thus could not be given force following the specific year to which each one was directed.[19]

For example, the 116th Congress sat from January 3, 2019 to January 3, 2021.  On December 20, 2019, Public Law 116-94, 133 Stat. 2534, the "Further Consolidated Appropriations Act, 2020," was enacted, which included a provision purporting to block the calendar-year 2020 COLA due to Congress effective January 1, 2020.[20]  Section 7 of that Act read "[n]otwithstanding any other provision of law, no adjustment shall be made under section 601(a) of the Legislative Reorganization Act of 1946 (2 U.S.C. § 4501) (relating to cost of living adjustments for Members of Congress) *during fiscal year 2020.*"  133 Stat. 2536 (emphasis added).  Because there was no intervening election between the enactment and implementation of this COLA-blocking law, it facially violates the Twenty-Seventh Amendment.

Because the foregoing COLA-blocking law violates (i.e., is inconsistent with the requirements of) the Twenty-Seventh Amendment, the four available interpretive options for this legislation are:[21]

---

[18] Plaintiffs apologize in advance for the complexity of this section, but in light of the Government's various and unusual proposed interpretations of the Twenty-Seventh Amendment, such complexity is unavoidable.

[19] By their own terms, each COLA-blocking law was for one specific year; additionally, each COLA-blocking law was itself part of one-year appropriation bills.  *See supra*, Opening Br. at 19-22.

[20] As used in this example, the blocking statute might in other places be referred to as applying to "Fiscal Year 2020."  But under 5 U.S.C. § 5303(a), all adjustments to pay, including congressional pay, are implemented based on the calendar year.

[21] Each interpretation of the example is stated as if the Twenty-Seventh Amendment was complied with, and the 2020 ERA COLA was paid.

(i) Void the COLA-blocking law ab initio in light of its direct contravention of the Twenty-Seventh Amendment, and pay the 2020 ERA COLA. *See* Opening Br. at 19.

(ii) pay the 2020 ERA COLA, but apply the COLA-blocking law retroactively upon the seating of the 117th Congress on January 3, 2021, as per the Government's primary argument. This would result in Members of the 116th Congress having to pay back the 2020 COLA differential in 2021;

(iii) pay the 2020 ERA COLA, but apply the COLA-blocking law upon the seating of the 117th Congress on January 3, 2021, as per the Government's secondary argument. This would result in the 2020 COLA being paid in 2020, but being removed from congressional compensation upon the seating of the 117th Congress, setting its compensation back to the level of congressional compensation as of December 31, 2019. Given the complexity of this option, we will walk through it using hypothetical values. Assuming that congressional pay on December 31, 2019 was $100,000, and a 2% COLA was due to take effect on January 1, 2020. Congressional pay under this example in 2020 would be $102,000 (the same as example two, above). Upon the next Congress's seating on January 3, 2021, congressional pay would then exclude the 2020 COLA, thus dropping congressional pay back down to $100,000 for 2021. For purposes of this explanation, we have ignored the possible effects of a 2021 COLA, in order to make clearer what would happen to the 2020 COLA under the Government's theory of 'retroactive blocking.'

(iv) pay the 2020 ERA COLA, and where the third interpretive option discussed above would otherwise apply, reject the going-forward application of the COLA-blocking law (i.e., continue to pay the COLA in 2021) upon the seating of the 117th Congress on January 3, 2021, on either or both of two bases:

a) the underlying statute of which the COLA-blocking law is a part is a one-year

appropriation bill, no longer available for delayed application.  *Cf. Beer,* 696 F.3d at

1185-86 (discussion of the role of timing in statutory interpretation); and/or

b) the language of the COLA-blocking statute itself explicitly limits its own

application to "during [] 2020," thus being inconsistent with application commencing in

2021.

The Government's proposed alternatives make clear why the COLA-blocking laws are

void ab initio.[22]

Expanding beyond the consideration of just one of the COLA-blocking laws at a time,

and addressing the consequences of each interpretation above across all of the offending

blocking laws, and further dividing the interpretations into two groups based on whether or not

the continuing claims doctrine applies, results in the analysis below.

<u>Interpretations with all COLAs since 2018, but no continuing claims doctrine.</u>

(i) All unconstitutionally blocked COLAs are applied on a cumulative basis in

determining appropriate damages.  Using the base pay of $174,000 in 2017, each COLA would

be added.  If the Court used a base pay of $174,000 in 2018, and only added COLAs following

---

[22] In the event the Court views interpretations (iv.a) and/or (iv.b) as more appropriate, both
alternatives result in similar damages.  Under any of Plaintiffs' suggested alternatives, COLAs
accumulate over time.

Plaintiffs have calculated damages based on their primary case.  Opening Br., Section IV
and Ex. 14.  In the event the Court concludes another formula for damages is appropriate,
Plaintiffs request the opportunity to brief those calculations.  Plaintiffs have not calculated the
myriad damages alternatives described herein.

the commencement of the statute of limitations period, such COLAs would be first applied as of January 3, 2019, and would accumulate annually thereafter to the present day.[23]

(ii) The COLAs for each of the first and second year of each Congress are applied during that Congress, then removed retroactively at the commencement of the next Congress. As a result, upon the commencement of the next Congress, the Members of the former Congress would then have to pay back the COLAs they received as part of their compensation. With each new Congress, this process would repeat itself, from 2018 to the present.

Given that the COLAs are to be repaid under this interpretation, and for the sake of simplicity, we will bypass the 2018 example, and commence our description with the 116th Congress, seated on January 3, 2019.

Under the interpretation that the COLAs are blocked retroactively, Members of the 116th Congress would be paid their baseline pay (presumably $174,000 per annum), plus the 2019 COLA in 2019. In 2020, Members would be paid their baseline pay, plus both the 2019 and 2020 COLAs.

Then, upon the seating of the 117th Congress, the 2019 and 2020 COLAs would be eliminated retroactively, Members of the 116th Congress would then be required to pay back the COLAs they received in 2019 and 2020.[24] Furthermore, the 117th Congress's compensation would proceed similarly, i.e., in 2021 the Members would receive their baseline pay, plus the 2021 COLA. In 2022, the Members would receive their baseline pay plus both the 2021 and 2022 COLAs.

---

[23] Application of the Court's earlier position that this is not a continuing claims case leaves unclear whether the Court would use 2017 or 2018 as the baseline salary year from which COLA applications commence.

[24] The Government does not explain how it would accomplish the collection of salaries already paid.

Next, upon the seating of the 118th Congress, the 2021 and 2022 COLAs would be eliminated retroactively, and the Members of the 117th Congress would then be required to pay back the COLAs they received in 2019 and 2020.  This retroactive collection cycle would be repeated up to the present day.

(iii) The COLAs for each of the first and second year of each Congress are applied during that Congress, then removed at the commencement of the next Congress, at which point the process starts again.

For 2018, this would result in one of three alternatives:

a) 2016 being used as the baseline for adding the 2017 and 2018 COLAs to determine the correct compensation of the 115th Congress (January 3, 2017 – January 3, 2019) during the relevant portion of 2018;

b) 2017 being used as the baseline to add only the 2018 COLA, given that the statute of limitations period opened on March 7, 2018; or

c) add no COLAs given that the statute of limitations period opened on March 7, 2018.

Then, upon the seating of the 116th Congress on January 3, 2019, any COLAs that were applied to the compensation of the 115th Congress are eliminated, making the December 31, 2016 compensation of Congress the baseline.  Added to that baseline would be the 2019 COLA for 2019, and both the 2019 and 2020 COLAs for calendar year 2020 compensation.

Then, upon the seating of the 117th Congress on January 3, 2021, the 2019 and 2020 COLAs would be eliminated, once again making the December 31, 2016 compensation of Congress the baseline, to which would be added the 2021 COLA for 2021, and both the 2021 and 2022 COLAs for calendar year 2022 compensation.  And so on, until the present day.

(iv.a) Because the underlying statute containing each COLA-blocking law was a one-year law, it is therefore unavailable for retroactive application.  Thus, COLAs will accumulate each year in the same manner as the first interpretation, above.

(iv.b) Because the explicit terms of each COLA-blocking law from 2013 to present state that the law's effect was to be applied only "during" the identified calendar year.  By its own terms, each COLA-blocking law had effectively expired prior to the point (i.e., upon the next Congress's seating) when it would otherwise be applied retroactively under the third interpretation, above.  Thus, COLAs since 2013 will accumulate each year in the same manner as the first interpretation, above.

<u>Interpretations with all disputed COLAs since 1995, with application of the continuing claims doctrine.</u>

(i) All unconstitutionally suppressed COLAs are applied on a cumulative basis in determining appropriate damages.  Plaintiffs presented this damages calculation in their original brief.  *See* Opening Br. at Section IV and Ex. 14.

(ii) This interpretation requires all COLAs to be retroactively blocked.  Upon the seating of the next Congress, the COLAs of the preceding Congress would have to be repaid.  With or without the application of the continuing claims doctrine, damages would be the same.

(iii) Because all COLAs are removed upon the seating of the next Congress, the only effect of the application of the continuing claims doctrine under this 'going-forward' removal of COLAs is on the damage amount for 2018.  For 2018 damages, the 2017 and 2018 COLAs would be applied to the baseline for congressional pay, prior to being removed upon the seating of the 116th Congress on January 3, 2019.

Damages under this interpretation for 2019 to the present would be the same whether or not the continuing claims doctrine is applied to this case.

(iv.a) Because the underlying statute containing each COLA-blocking law was a one-year law, the statute is therefore unavailable for retroactive application. Thus, COLAs will accumulate each year in the same manner as the first interpretation, above.

(iv.b) Because the explicit terms of each COLA-blocking law from 2013 to present state that the law's effect was to be applied only "during" the identified calendar year. By its own terms, each COLA-blocking law had effectively expired prior to the point (i.e., upon the next Congress's seating) when it would otherwise be applied retroactively under the third interpretation, above. Thus, COLAs since 2013 will accumulate each year in the same manner as the first interpretation, above, but only for calendar years 2013 to present.

### 4. An Election "Intervenes" Once Voting for Representatives has Begun in Any State by Any Method.

The Twenty-Seventh Amendment's intervening election requirement exists so voters may use their votes *in the intervening election* to hold their Representatives (and the 1/3 of Senators up for election at the same time) accountable for any changes made to congressional compensation. Several COLA-blocking statutes challenged in this case were enacted by Congress *after* voting began (or even concluded) in that year's elections, defying the Amendment's prohibition on when such laws might take effect. The Government seeks to redefine "an election" as being merely "Election Day," which is simply the last day upon which a general federal election may occur. But what constitutes an intervening election is well-established: it's the entire period in which people are voting. The Government's attempt to redefine its meaning is both illogical and contrary to well-established law.

**(i) "Election Day" is More than One Day.**

The Government seeks to redefine "an election" to the single day commonly referred to as "Election Day."  For this proposition, the Government invokes 2 U.S.C. § 7.[25]  But the Government's substitution of terms flies in the face of the Supreme Court's holding on what constitutes "an election."  *See Foster v. Love*, 522 U.S. 67, 71-72 (1997).  While the Government asserts "an election" is the single day denoted "Election Day," *Foster* holds the contrary: "[W]hen the federal statutes speak of 'the election' of a Senator or Representative, they plainly refer to *the combined actions of voters and officials meant to make a final selection of an officeholder*. [] *Accord,* N. Webster, An American Dictionary of the English Language 433 (C. Goodrich & N. Porter eds. 1869) (defining 'election' as '[t]he act of choosing a person to fill an office')."  *Foster,* 522 U.S. at 71 (emphasis added).[26]

*Foster* involved a challenge to Louisiana's October election, wherein any runoff required (if no candidate received a majority of all votes) would take place on the traditional November Election Day.  Rejecting the very argument the Government poses here, *Foster* held that "if an election does take place, it may not be consummated prior to federal election day."  *Id.* at 72 n.4.

---

[25] "The Tuesday next after the first Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the third day of January next thereafter."  2 U.S.C. § 7.  *See also* 2 U.S.C. § 1 (setting the same date for Senators under the Seventeenth Amendment).

[26] The case most sympathetic to the Government's "one day election" position is *Voting Integrity Project v. Keisling*, 259 F.3d 1169 (9th Cir. 2001), wherein plaintiffs argued that Oregon's "state legislation allowing people to vote by mail over an extended period violates [2 U.S.C. § 7] requiring that the election shall be held on a particular day."  *Keisling*, 259 F.3d at 1170.  Nonetheless, after a thorough review, the *Keisling* court's application of *Foster* – combined with its recognition of the federal requirement for the availability of early absentee voting – led it to reject the proposition that the election must be considered to be only the one day designated as 'election day.'  *Id*. at 1175-76.

Such holding clearly contemplates that "an election" is not just one day, otherwise *Foster's* use of the word "consummated" would be superfluous.[27]

Relying on *Foster,* the Fifth Circuit also rejects the Government's claim that Election Day is what defines an election.  In *Voting Integrity Project v. Bomer*, the Fifth Circuit applied *Foster* to the plaintiff's claim "that the federal statutes, by establishing 'the day for the election,' contemplate that the entire election, including all voting, will occur that day."  199 F.3d 773, 775 (5th Cir. 2000).  *Bomer* held, "[W]e conclude that the [*Foster*] Court would not alter its definition of 'election' to require that states begin their federal election on federal election day." *Id.* at 776.  "An election" does not consist only of the one day called 'election day.'  "[T]he plain language of the statute does not require all voting to occur on federal election day." *Id.*  The *Bomer* court further observed, "[w]e read the above language [from *Foster*] as a clear signal that contrary to VIP's argument, some acts associated with the election may be conducted before the federal election day."  *Id. Foster* and its progeny preclude the Government's assertion that an election occurs solely on Election Day.

**(ii) *Boehner* is Dicta Regarding the Definition of 'An Election,' and *Boehner* Supports the Conclusion that an Intervening Election Can be More than One Day.**

Citing *Boehner v. Anderson*, the Government attempts to buttress its argument that "an election" refers only to one day.  *See* Opp. at 24 (citing *Boehner*, 30 F.3d at 162).  But *Boehner* is of no aid in that endeavor, as it did not address what constitutes an intervening election.  The quoted comment in *Boehner* that the latest a variance in the next Congress' compensation may

---

[27] At the time *Foster* was decided, the then-current *Black's Law Dictionary* (6th ed. 1990) defined "consummate" as: "*adj*. Completed; as distinguished from *initiate,* or that which is merely begun." And "*v*. To finish by completing what was intended; bring or carry to utmost point or degree; carry or bring to completion; finish; perfect; fulfill; achieve."

be enacted is "the Monday before an election" was dicta directed to a subject not disputed in that case. *Boehner* did not purport to address the definition of an intervening election for purposes of the Twenty-Seventh Amendment. *Boehner*, 30 F.3d at 162; *See also* Opp. at 13 (observing that a court's remarks on topics not substantively briefed are dicta). The cited quote is taken from the court's analysis of when a law varying compensation might permissibly take effect. *Boehner*, 30 F.3d at 162.

Moreover, when *Boehner* was decided in 1994, there was no widespread practice of early voting prior to Election Day. Hence, the court's assumption that the bar period for compensation-varying legislation began "the Monday before an election [which by statute, is a Tuesday]" simply reflects a factual assumption about then-existing election procedures, not a legal rule or a holding. *Boehner* went on to observe that the "Monday before an election until the new Congress" period was the "minimum" bar period, but that "the interim could be greater, as long as it brackets an election." *Id.* With early voting's increased prevalence in recent years, the period of election has expanded, and thus, so too has the interim period in which Congress is bracketed from altering its own compensation.

### (iii) The Supreme Court Addressed the Government's "Chaos" Arguments in *Foster*.

The Government erroneously suggests that Plaintiffs' proposed interpretation of an "intervening election" would lead to chaos because States could start voting whenever they choose. Opp. at 24. The Government ignores this is already the present state of affairs: States have discretion as to when voting begins, and there is wide variance among States today as to when elections begin. The statute upon which the Government relies – 2 U.S.C. § 7 – was enacted specifically to avoid the very "chaos" about which the Government frets. In *Foster*, the Supreme Court noted that one of the primary problems the statute was drafted to address was

"the distortion of the voting process threatened when *the results* of an early federal election in one State can influence later voting in other States." *Foster*, 522 U.S. at 72 (emphasis added). As *Foster* notes, the fact that the elections for Representatives and Senators in all States are all consummated on Election Day precludes the Government's one-float parade of horrible.

Nor is there any merit to the Government's claim that by permitting early voting, "any state could, at any time, prevent Congress from passing certain legislation by simply moving up its period of early voting. Congress could never count, with certainty, on having a window (or a deadline) by which laws varying their [sic] compensation could be passed." Opp. at 24.  This is a fanciful motive for state legislative behavior.  The timing of passing congressional legislation on virtually every subject is unaffected by when "an election" occurs.  The only "certain legislation" limited by the timing of "an election" is legislation varying congressional compensation.  The Government provides nary an example for why or how any state legislature would alter its federal voting periods to frustrate hypothetical congressional compensation changes. The Constitution also provides a ready answer to the Government's preposterous hypothetical: Congress already has the power to regulate "The Times, Places and Manner of holding Elections for Senators and Representatives . . ."  U.S. Const., Art. I, § 4, cl.1.; *Milsaps v. Thompson,* 259 F.3d 535, 539-43 (6th Cir. 2001). If Congress believes states are commencing voting too early, it can set limits, just as it did in drafting what is now 2 U.S.C. § 7.

**(iv) The Government Manufactures Two Absurd Arguments by Butchering the English Language.**

 Lacking legal authority, the Government proffers naked conclusions and the misleading use of the past tense to elide the plain meaning of "an election."  *See* Opp. at 24.  The Government asserts, "few, if anyone would, on the second day of an early voting period, say that 'an election' *had* taken place." *Id*. (emphasis added).  That's accurate—no grammatically

attuned person would say that an election still ongoing "*had* taken place."   The correct

formulation would be "an election was (or is) taking place."  *See Pierce v. North Carolina St.*

*Bd. of Elec.*, 97 F.4th 194, 227 (4th Cir. 2024) ("The election is not merely 'close[], or even

'imminent[t]' – it is happening right now.") (citing *Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006));

*see also Wise v. Circosta*, 978 F.3d 93, 96 (4th Cir. 2020) (In-person voting began October 15,

2020 and the case was filed October 20, 2020) ("This fast-moving case… involves an ongoing

election.").  In *New Georgia Project v. Raffensperger*, in which plaintiffs contested a "long-

standing Georgia absentee ballot deadline," the court noted, "we are not on the eve of the

election – we are in the middle of it, with absentee ballots already printed and mailed."  976 F.3d

1278, 1280, 1283 (11th Cir. 2020).[28]

The Government goes on to ignore (or trample?) its hypothetical second-day voter by

asserting that "[t]reating the statutorily defined 'Election Day' as 'an election' for purposes of

the amendment also preserves the ability of citizens to hold Members politically accountable for

their actions because voters always have until 'Election Day' to consider Congress's enactments

and vote accordingly in response."  Opp. at 24-25.  Of course, for the Government's second-day

voter who already voted by the time a COLA-blocking law was enacted, there is no opportunity

to "hold Members politically accountable," as the mechanism with which to do so is his vote,

and it has already been cast.  The Government presents no evidence that any state permits voters

a do-over to reconsider their votes based on late-breaking news.

---

[28] In *Raffensperger*, the Eleventh Circuit held the election was underway based on the large-scale printing and delivery of absentee ballots.  That definition of when an election commences is even earlier in the election process than what Plaintiffs posit here as an election's "occurrence": the initiation of actual voting.  In all the election years at issue here (1994, 1996, 1998, 2018 and 2024), the COLA-blocking law was passed in the middle of – not prior to – the relevant election.  Hence, those COLA-blocking laws did not comply with the Twenty-Seventh Amendment.  *See* Opening Br. at 14-18.

It is beyond argument that the purpose of the Twenty-Seventh Amendment's intervening election requirement is so voters — *all voters* — have the opportunity to use their ballots in the next upcoming election to hold their Representatives and Senators accountable for congressional votes that vary congressional compensation.  If a voter has already voted as part of an ongoing election before a COLA-blocking law is enacted, he has no opportunity for accountability … until the 'next intervening election,' which is the next election for Representatives two years later.  Thus, once an election has begun (e.g., once absentee ballots have been mailed out), the next intervening election for purposes of complying with the Twenty-Seventh Amendment would be two years later.

### (v)  The 2025 COLA-Blocking Law is Void Because it was Enacted After the 2024 Election.

The Government's final argument singles out the 2025 COLA.  Opp. at 25.  The Government correctly notes that Pub. L. 118-83, Continuing Appropriations and Extensions Act, 2025, was enacted on September 26, 2024.  And while the Government's position is that this date is *before* the election of 2024, and Plaintiffs' position is that the enactment date is *during* the election of 2024, that dispute is irrelevant.

The reason is that by the terms of Public Law 118-83, its expiration date was December 20, 2024.  *Id.* at §106(3), 138 Stat. 1526.  Neither of the following acts that carried forward and made final the 2025 COLA-blocking law, i.e., neither Pub. L. 118-158 enacted on December 21, 2024, nor Pub. L. 119-4 enacted on March 15, 2025, were enacted prior to the election of Representatives in 2024.  Given that there was no actual blocking of the calendar year 2025 COLA enacted until at least December 21, 2024, such COLA-blocking laws clearly do not comply with the Twenty-Seventh Amendment's "intervening election" requirement.

Uniform Supreme Court and circuit court authority demonstrate that an election consists of *at least* the period from when absentee ballots are being returned, and/or polls are open in at least one state, up through the end of Election Day, when no more general election voting may occur.  Those elections give voters the opportunity to have their say on laws varying congressional compensation enacted *before* those elections.  If a Congress may enact legislation altering its own pay after an election has commenced, the Twenty-Seventh Amendment is entirely vitiated, and that is exactly what the Government proposes here.

## **CONCLUSION**

For the reasons stated herein, and those contained in Plaintiffs' Memorandum of Law in Support of their Motion for Partial Summary Judgment, Plaintiffs respectfully request that their Motion for Partial Summary Judgment be granted and that the Government's Cross-Motion for Summary Judgment be denied.

Respectfully submitted,


/s/ *Kenneth T. Cuccinelli, II*
Kenneth T. Cuccinelli, II
KENNETH T. CUCCINELLI, II, ATTORNEY AT LAW, PLLC
Ph: 804-286-2550
E: KTCLaw@proton.me
Attorney of Record

Earl N. "Trey" Mayfield, III
CHALMERS ADAMS BACKER & KAUFMAN, LLC
10521 Judicial Dr., #200
Fairfax, Virginia 22030
Ph: (703) 268-5600
F: (703) 268-5602
E: tmayfield@chalmersadams.com
Of Counsel

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of December, 2025, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court, is available for viewing and downloading from the ECF system, and will be served by operation of the Court's electronic filing system (CM/ECF) upon all counsel of record.

<u>*/s/ Kenneth T. Cuccinelli, II*</u>
Kenneth T. Cuccinelli, II

## <u>CERTIFICATION OF COMPLIANCE</u>

Pursuant to RCFC 5.4, I certify that this brief complies with the content and length requirements of this Court. According to the page and word count function of Microsoft Word (the word-processing system used to prepare this document), the portion of this brief addressing preliminary and opposition issues encompasses 17 pages and 5,364 words. The portion of this brief in reply encompasses 19 pages and 5,956 words, all excluding the parts exempted by the applicable rule.

Date: December 5, 2025

<u>*/s/ Kenneth T. Cuccinelli, II*</u>
Kenneth T. Cuccinelli, II