**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| RODNEY L. DAVIS, et al., | No. 24-364 |
| Plaintiffs, | |
| | (Senior Judge Eric G. Bruggink) |
| v. | |
| THE UNITED STATES, | |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................................. iii

INTRODUCTION ...............................................................................................................................1

I. THIS IS A CONTINUING CLAIMS PAY CASE, AND DAMAGES WITHIN THE
LIMITATIONS PERIOD MUST BE CALCULATED AT THE SALARY RATES THE
ETHICS REFORM ACT COMMANDS..............................................................................................1

    A. This is a Paradigmatic "Pay Case" Under *Friedman, Hatter*, and *Beer* ...............................2

    B. *Beer* Applied the Continuing Claims Doctrine to the Same Statute and Formula at
Issue Here (And Several of the Same Blocking Laws)—and Ordered Exactly the
Computation Plaintiffs Seek ...........................................................................................................3

    C. The Court's May 20, 2026 Summary Judgment Order Removes the Foundation of its
Prior Ruling in its Order on the Government's Motion to Dismiss..............................................5

    D. Computing Timely Damages at the Statutory Rate Does Not "Resurrect" Stale Claims;
Statutes of Limitations Bar Claims, Not Issues ...........................................................................5

II. AN ELECTION OF REPRESENTATIVES "INTERVENES" ONLY IF THE ENTIRE
ELECTION—FROM THE FIRST BALLOT LAWFULLY CAST TO THE CLOSE OF
THE POLLS—OCCURS AFTER ENACTMENT OF THE LAW VARYING
COMPENSATION ............................................................................................................................7

    A. The Constitutional Text: "Intervened" Requires the Election to Come Between
Enactment and Effect.....................................................................................................................7

    B. The Original Meaning of "An Election" Is the People's Entire Act of Choosing, Not a
Single Day When Voting Ends.......................................................................................................8

    C. The Supreme Court Describes "the Election" as the Entire Voting Period, Which Is
"Consummated," Not Constituted, on Election Day ....................................................................9

    D. The Virginia Supreme Court's Recent *Scott v. McDougle* Decision Construing an
Intervening Election Requirement Holds That When a Legislature Acts After an Election
Is Already Underway There Has Not Been an "Intervening Election." .....................................11

    E. Application Here: No Election Intervened Before the Challenged Laws Operated............13

III. ALL COLA SUPPRESSIONS RAISED IN THIS LITIGATION WERE TEMPORARY
AND INEFFECTIVE UNDER THE TWENTY-SEVENTH AMENDMENT, LEAVING
THE ERA'S ACCUMULATING COLA MANDATES IN EFFECT ...............................................15

    A. The COLA Suppressions at Issue in this Case Were Temporary, One-Year Measures
that Left the ERA's Substantive Mandate Requiring COLA Increases Intact...........................16

    B. Members of Congress Are Paid Monthly..............................................................................18

    C. The COLA-Blocking Appropriations Language for the Years at Issue (1994 Through
2026) that Failed to Comply With the Twenty-Seventh Amendment ........................................20

D. Applying the COLA-Blocking Appropriations Language to the Years at Issue ................23

E. As Applied to Congressional Salaries, the Legal Reach of an Annual Appropriations Act Ends at Midnight on December 31....................................................................................25

F. The General Schedule Statutory COLA Suppressions Are Equally Ineffective as Applied to Members, and Cannot Cap Member COLAs Through 2 U.S.C. § 4501(2)(B) .....27

G. The Presidential COLA Suppressions Under 5 U.S.C. § 5303(b) Took Effect Without an Intervening Election—a Sequence the Twenty-Seventh Amendment Forbids...................29

H. For Every Year at Issue, Member COLAs Are Computed From the Statutory Formulas Alone—the Lesser of the ERA Formula and the § 5303(a) Formula—and Compound Accordingly..................................................................................................................34

CONCLUSION...................................................................................................................35

## TABLE OF AUTHORITIES

**Cases**

*Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874 (Fed. Cir. 1998)...............................3

*Baird v. United States*, 114 Fed. Cl. 580 (2014) ..............................................................................4

*Beer v. United States*, 696 F.3d 1174 (Fed. Cir. 2012) (en banc)............................2, 3, 4, 5, 6, 33

*Bender v. United States*, 93 F.2d 814 (3d Cir. 1937).......................................................................17

*Bldg. & Const. Trades Dep't, AFL-CIO v. Martin*, 961 F.2d 269 (D.C. Cir. 1992)................17, 26

*Boehner v. Anderson*, 30 F.3d 156 (D.C. Cir. 1994) .....................................................8, 13, 29, 33

*Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449 (Fed. Cir. 1997).............6

*Brown v. Barry*, 3 U.S. 365 (1797) ................................................................................................17

*Clinton v. City of New York*, 524 U.S. 417 (1998).........................................................................33

*Davis v. United States*, 174 Fed. Cl. 563 (2024).........................................................................5, 6

*Donovan v. Carolina Stalite Co.*, 734 F.2d 1547 (D.C. Cir. 1984) ...............................................17

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568
    (1988)........................................................................................................................................29

*Foster v. Love*, 522 U.S. 67 (1997)......................................................................................9, 10, 12

*Friedman v. United States*, 310 F.2d 381 (Ct. Cl. 1962) ......................................................2, 3, 4, 6

*Gentry v. United States*, 546 F.2d 343 (Ct. Cl. 1976)......................................................................6

*Granite State Chapter v. Fed. Lab. Rels. Auth.*, 173 F.3d 25 (1st Cir. 1999)................................17

*Hart v. United States*, 910 F.2d 815 (Fed. Cir. 1990).....................................................................6

*Hatter v. United States*, 203 F.3d 795 (Fed. Cir. 2000), *aff'd in part, rev'd in part on other
    grounds*, 532 U.S. 557 (2001)..............................................................................2, 3, 4, 5, 6

*Humphrey v. Baker*, 848 F.2d 211 (D.C. Cir. 1988)......................................................................33

*INS v. Chadha*, 462 U.S. 919 (1983) ............................................................................................32

*Millsaps v. Thompson*, 259 F.3d 535 (6th Cir. 2001) ...................................................................10

*New Ga. Project v. Raffensperger*, 976 F.3d 1278 (11th Cir. 2020) ...........................................10

*Ohio Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016)................................................10

*Scott v. McDougle*, 930 S.E.2d 332 (Va. 2026).........................................................7, 9, 11, 12, 13

*United States v. Classic*, 313 U.S. 299 (1941)................................................................................9

*United States v. Dickerson*, 310 U.S. 554 (1940) .........................................................................17

*United States v. Mitchell*, 109 U.S. 146 (1883) ..............................................................17

*United States v. Vulte*, 233 U.S. 509 (1914) ...................................................................17

*United States v. Will*, 449 U.S. 200 (1980) ...............................................................17, 26

*Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773 (5th Cir. 2000).........................10

*Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169 (9th Cir. 2001) ....................10

*Watson v. Republican Nat'l Comm.*, 609 U.S. ___, 2026 WL 1855462 (June 29, 2026)......7, 9, 10

*Wells v. United States*, 420 F.3d 1343 (Fed. Cir. 2005) ...............................................3, 6

*Whatley v. District of Columbia*, 447 F.3d 814 (D.C. Cir. 2006)...................................16

*Wise v. Circosta*, 978 F.3d 93 (4th Cir. 2020) ...............................................................10

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ....................................32

**Constitutional Provisions**

U.S. Const. art. I, § 6, cl. 1.............................................................................................32

U.S. Const. amend. XX, § 2.............................................................................................23

U.S. Const. amend. XXVII .................................................................................... passim

Va. Const. art. XII, § 1.............................................................................................11, 12

**Statutes**

2 U.S.C. §§ 1, 7.....................................................................................................9, 10, 23

2 U.S.C. § 4501................................................................................................... passim

2 U.S.C. § 4591...............................................................................................................19

2 U.S.C. § 5302...............................................................................................................18

2 U.S.C. § 5303...............................................................................................................19

3 U.S.C. § 1................................................................................................................9, 10

5 U.S.C. § 5303 ................................................................................................... passim

5 U.S.C. § 5504...............................................................................................................20

5 U.S.C. § 5505...............................................................................................................20

31 U.S.C. § 1102.............................................................................................................23

31 U.S.C. § 1301(c) ........................................................................................................16

Ethics Reform Act of 1989, Pub. L. No. 101-194, § 704, 103 Stat. 1716 ............2, 3, 4, 21, 28, 34

Pub. L. No. 103-6, 107 Stat. 33 (1993)................................................................................21

Pub. L. No. 103-329, 108 Stat. 2382 (1994)..................................................................13, 21

Pub. L. No. 104-52, 109 Stat. 468 (1995)...........................................................................21

Pub. L. No. 104-208, 110 Stat. 3009 (1996)...................................................................13, 21

Pub. L. No. 105-277, 112 Stat. 2681 (1998)...................................................................14, 21

Pub. L. No. 109-289, 120 Stat. 1257 (2006)........................................................................21

Pub. L. No. 110-5, 121 Stat. 8 (2007)..................................................................................21

Pub. L. No. 111-8, 123 Stat. 524 (2009)..............................................................................22

Pub. L. No. 111-165, 124 Stat. 570 (2010)......................................................................29, 31

Pub. L. No. 111-242, 124 Stat. 2607 (2010)........................................................................22

Pub. L. No. 111-322, 124 Stat. 3518 (2010)................................................................22, 27, 28

Pub. L. No. 112-240, 126 Stat. 2313 (2013)........................................................................22

Pub. L. No. 113-46, 127 Stat. 558 (2013)............................................................................18

Pub. L. No. 115-244, 132 Stat. 2897 (2018)........................................................................14

Pub. L. No. 116-6, 133 Stat. 13 (2019)................................................................................28

Pub. L. No. 118-47, 138 Stat. 460 (2024)............................................................................23

Pub. L. No. 118-83, 138 Stat. 1524 (2024)......................................................................14, 23

Pub. L. No. 118-158, 138 Stat. 1722 (2024)........................................................................14

Pub. L. No. 119-4 (2025)................................................................................................14, 23

Pub. L. No. 119-37 (2025)..................................................................................................15

## Other Authorities

1 John Ash, *The New and Complete Dictionary of the English Language* (1775).........................8

Richard B. Bernstein, *The Sleeper Wakes: The History and Legacy of the Twenty-Seventh Amendment*, 61 Fordham L. Rev. 497 (1992)..........................................................................8

*Black's Law Dictionary* (12th ed. 2024).........................................................................8, 9

Cong. Globe, 28th Cong., 2d Sess. (1844)...........................................................................9

John J. Dinan, *The American State Constitutional Tradition* (2006) ............................................12

Executive Order 13,635 (Dec. 27, 2012) ................................................................................31

1 Samuel Johnson, *Dictionary of the English Language* (1755) ........................................7, 8, 12

*Principles of the Law of Election Administration* (A.L.I. 2019) ....................................................9

Senate Handbook (Comm. on Rules & Admin.), 2010 ed. .....................................................19, 20

1 Charles Seymour & Donald Paige Frary, *How the World Votes* (1918) ......................................9

Sean M. Stiff, *Regular Appropriations Acts: Selected Statutory Interpretation Issues*, CRS
    Report R46899 (2021) ...............................................................................16, 17, 25, 26

G. Alan Tarr, *Popular Constitutionalism in State and Nation*, 77 Ohio St. L.J. 237 (2016) ........12

1 Noah Webster, *An American Dictionary of the English Language* (1828) ........................7, 8, 12

**Court Filings**

Def.'s Mot. to Dismiss (Dkt. 10) ...............................................................................................3, 4

Op. & Order on Def.'s Mot. to Dismiss (Dkt. 33) ......................................................................5, 6

Pls.' Reply & Resp. (Dkt. 54) ....................................................................................................14

Op. & Order Granting Partial Summ. J. (May 20, 2026) (Dkt. 63)..................................... passim

Pls.' Statement of Material Facts (SMF) ..........................................................................14, 16, 18

**INTRODUCTION**

Plaintiffs address three issues identified by the Court's May 20, 2026 Order: 1) Whether this is a continuing claims case; 2) What is required for an election to "intervene" within the meaning of the Twenty-Seventh Amendment and its application here; and 3) the effect – or lack thereof – of the relevant appropriations bills and COLA blocking statutes upon the ERA after a new Congress is seated following an intervening election, as well as the effect of Presidential action capping General Schedule employees' COLAs ("GS COLAs") under 5 U.S.C. § 5303(b), which in turn capped congressional COLAs under 2 U.S.C. § 4501(2)(B).  Dkt. 63, Op. 39.

In the course of researching these topics, Plaintiffs have uncovered many additional years of COLA suppression via Presidential action under 5 U.S.C. § 5303(b), as well as congressional statutes capping GS COLAs, which also had the subsidiary effect of capping congressional COLAs.  Thus, all three types of unconstitutional COLA suppression mechanisms are addressed herein.

Further, COLAs for 1994 and 1998 are analyzed as the COLAs in those calendar years were reduced by a statute in 1994 blocking GS COLAs and Presidential action in 1998 reducing GS COLAs, both of which in turn reduced congressional COLAs while not complying with the requirements of the Twenty-Seventh Amendment.

## I. THIS IS A CONTINUING CLAIMS PAY CASE, AND DAMAGES WITHIN THE LIMITATIONS PERIOD MUST BE CALCULATED AT THE SALARY RATES THE ETHICS REFORM ACT COMMANDS.

Sixty years of unbroken precedent demonstrates the continuing claims doctrine applies in calculating the damages from within the statute of limitations period. Where the Government owes periodic payments fixed by statute, "each having its own associated damages," every

1

underpayment is an independent wrong, and a plaintiff may recover the six years of underpayments preceding suit—computed at the rate the statute commands. *Friedman v. United States*, 310 F.2d 381, 384–85 (Ct. Cl. 1962); *Hatter v. United States*, 203 F.3d 795, 797–800 (Fed. Cir. 2000) ("*Hatter VIII*"), *aff'd in part, rev'd in part on other grounds*, 532 U.S. 557 (2001); *Beer v. United States*, 696 F.3d 1174, 1186–87 (Fed. Cir. 2012) (en banc). Plaintiffs seek precisely and only that: backpay for paychecks issued on or after March 7, 2018, measured by the salary the Ethics Reform Act ascertained for those years. The Government's contrary argument rests on a single confusion—between which claims are actionable (only the 2018–2026 paychecks) and how the law *ascertains the damages* for those claims (the ERA's cumulative formula). The doctrine answers the first question; the statute answers the second.

### A. This is a Paradigmatic "Pay Case" Under *Friedman, Hatter*, and *Beer*.

*Friedman* divides periodic government payments into two categories: (1) claims "dependent on prior administrative evaluation," which accrue once,[1] and (2) "continuing claims," which are "independent of administrative determination" and accrue anew with each payment. *Hatter VIII*, 203 F.3d at 797–98 (quoting *Friedman*, 310 F.2d at 384–85).

The second category's archetype is "the pay cases:" claims for "greater compensation (under a statute or regulation) than the claimant was receiving." *Hatter VIII*, 203 F.3d at 797 (quoting *Friedman*, 310 F.2d at 384). Congressional salaries are a clean fit: fixed, periodic payments set by a self-executing statutory formula, 2 U.S.C. § 4501. The formula involves no discretion and no administrative evaluation whatsoever. *See* Dkt. 63, Op. 6 ("a congressional

---

[1] An "administrative determination" in this context is a decision Congress has entrusted to an executive officer or tribunal as a precondition of entitlement, namely, "situations where Congress has deliberately given an administrative body the function of deciding all or part of the claimant's entitlement," typically involving "evaluation of the facts by the agency, some degree of administrative discretion, and some measure of conclusiveness." *Friedman*, 310 F.2d at 385.

COLA will take effect every year by operation of law pursuant to a definite formula"). Each congressional paycheck issued after March 7, 2018 at a rate below the rate § 4501 ascertains is "an independent and distinct event[] or wrong[], . . . having its own associated damages." *Wells v. United States*, 420 F.3d 1343, 1345 (Fed. Cir. 2005).

This case presents "a series of distinct events—each of which gives rise to a separate cause of action." *Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874, 879 (Fed. Cir. 1998). The Government agrees with this predicate. It has insisted from the outset "the fate of each prior COLA would need to be substantively adjudicated separately." Dkt. 10, MTD at 15. This is the definition of a continuing-claims case. Having built its limitations defense on the premise that each COLA event is distinct, the Government cannot deny the doctrine that premise entails.

**B. *Beer* Applied the Continuing Claims Doctrine to the Same Statute and Formula at Issue Here (And Several of the Same Blocking Laws)—and Ordered Exactly the Computation Plaintiffs Seek.**

In *Beer*, judges paid under the Ethics Reform Act of 1989 ("ERA") sued in January 2009 over COLAs blocked in 1995, 1996, 1997, and 1999—with each year at issue having transpired more than nine years before suit. Sitting en banc, the Federal Circuit held:

> The statute of limitations does not bar these claims because, as established in *Friedman* and *Hatter*, the claims are "continuing claims." . . . On remand, the Court of Federal Claims shall calculate these damages as the additional compensation to which appellants were entitled since January 13, 2003—the maximum period for which they can seek relief under the applicable statute of limitations. In making this calculation, the Court of Federal Claims shall incorporate the base salary increases which should have occurred in prior years had all the adjustments mandated by the 1989 Act [] actually been made.

*Beer*, 696 F.3d at 1186–87 (citing *Hatter VIII*, 203 F.3d 795) ("applying the 'continuing claim' doctrine to calculating wrongful withholding of judicial pay") (citations omitted). *Beer* thus did both of the things the Government says cannot be done: It (1) adjudicated the validity of blocking

3

laws enacted long before the limitations window, and (2) computed damages within the limitations period by incorporating the COLAs from prior to the starting of the limitations period to the limitations period itself. On remand, the trial court applied those precepts to the damages calculations. This Court later applied the same approach to judges who had retired more than six years before suit. *See Baird v. United States*, 114 Fed. Cl. 580, 583–84 (2014). It cannot be that judges paid a monthly salary with annual COLAs under § 704 of the Ethics Reform Act are covered by the continuing claims doctrine, while Members of Congress paid a monthly salary with annual COLAs under the very same section of the very same Act are not.

The Government asserts *Beer*'s computation flowed from Article III's Compensation Clause rather than from the continuing claims doctrine. *See* Dkt. 10, MTD at 14–15. The *Beer* opinion shows otherwise: the Federal Circuit grounded its statute of limitations holding expressly in *Friedman* and *Hatter*, without reference to Article III's Compensation Clause. *Beer*, 696 F.3d at 1186–87. *Friedman* involved a military disability statute; *Hatter* involved Social Security and Medicare tax withholding. The doctrine's touchstone is the <u>character of the payment stream</u>—periodic, formula-driven, free of administrative discretion—<u>not the constitutional source of the underlying invalidity</u>. The Compensation Clause supplied the reason the blocking laws were invalid as to judges, not how the damages were calculated with respect to the limitations period. *Friedman* and *Hatter* supplied the rule for which paychecks were recoverable, and at what rate. Here, just as the Compensation Clause did for judges, the Twenty-Seventh Amendment supplies the reason for the underlying constitutional invalidity of the COLA-blocking laws. *Friedman* and *Hatter* function identically here as they did in that situation. The constitutional provisions differ; the pay-case framework does not.

**C. The Court's May 20, 2026 Summary Judgment Order Removes the Foundation of its Prior Ruling in its Order on the Government's Motion to Dismiss.**

At the motion to dismiss stage, the Court distinguished *Beer* on the ground that the Compensation Clause is a "blanket, comprehensive prohibition," while Article I and the Twenty-Seventh Amendment "carry no comparable language." Dkt. 33 at 21 (*Davis v. United States*, 174 Fed. Cl. 563, 579 (2024)). The Court's subsequent merits holdings have transformed that analysis. The Court now holds "the ERA, including its COLA provisions, is and has been the law ascertaining congressional compensation since it was enacted in 1989," Dkt. 63, Op. 29; that the ERA's COLAs "are not pay increases" but the maintenance of the compensation set, *id* at 28–29; and that COLA-blocking laws "decrease and therefore 'vary'" that compensation and are ineffective to the extent they purport to operate before an election intervenes. *Id*. at 29, 38. In other words, there is a constitutional rule protecting the ERA-ascertained salary against noncompliant variation—and the salary it protects is, by the statute's own design, cumulative. Section 4501(2)(A) adjusts "each annual rate" against the rate that preceded it. Determining the salary "ascertained by law" for 2018 therefore mathematically requires determining the adjustments the formula commanded in prior years—precisely the computation *Beer* ordered. Hence, the earlier Order's premise—that nothing in Plaintiffs' case parallels the protected, accumulating entitlement in *Beer*—no longer holds.

**D. Computing Timely Damages at the Statutory Rate Does Not "Resurrect" Stale Claims; Statutes of Limitations Bar Claims, Not Issues.**

Plaintiffs do not seek one dollar for any paycheck issued before March 7, 2018. The pre-2018 blocking laws enter this case only as an issue antecedent to the lawful pay rate for the relevant years—exactly as the 1983 and 1984 withholding statutes entered *Hatter* (filed years later), and

5

exactly as the 1995–1999 blocking laws entered *Beer* (filed in 2009). A statute of limitations bars stale claims; it does not immunize old statutes from judicial examination whenever they fix the measure of present rights. This Court's jurisdictional holding in its Order ruling on the Defendant's Motion to Dismiss embodies the same principle: the Court "may enforce the ERA COLAs . . . and award whatever payment they grant while 'omitting' any 'constitutionally void' provisions." Dkt. 33 at 10 (*Davis*, 174 Fed. Cl. at 573 (quoting *Gentry v. United States*, 546 F.2d 343, 346 (Ct. Cl. 1976))). Applying the money-mandating statute correctly—for the years in which damages are sought—is not an award of damages for earlier years. The increment is paid only on timely paychecks, and only for the six statutory years (just as in *Beer*). The Government proposes a contrary rule, by which no federal employee could ever challenge a present underpayment caused by a statute or order more than six years old, even though every new paycheck inflicts a fresh injury. *Friedman* and *Hatter* make the Government's position untenable.

The Government's reliance on *Brown Park*, *Hart*, and *Wells* is misplaced. *See Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449 (Fed. Cir. 1997); *Hart v. United States*, 910 F.2d 815 (Fed. Cir. 1990). Each involved a single discrete government act or decision—a rent-adjustment refusal, an annuity election, a one-time benefits determination—whose later financial consequences the plaintiff tried to recast as new wrongs. Here there is no single act: there are dozens of separate laws and Presidential actions and hundreds of separate statutorily fixed paychecks; moreover, even the Government insists the events are distinct. Nor are underpayments within the limitations period a mere "effect" of old laws. For example, by their own terms, the blocking laws since 2013 purport to operate "during" each successive fiscal year, and every month the Government applies them anew to withhold the rate § 4501 commands. The wrong plaintiffs sue upon is the current underpayment of the current statutory rate.

## II. AN ELECTION OF REPRESENTATIVES "INTERVENES" ONLY IF THE ENTIRE ELECTION—FROM THE FIRST BALLOT LAWFULLY CAST TO THE CLOSE OF THE POLLS—OCCURS AFTER ENACTMENT OF THE LAW VARYING COMPENSATION.

The Court directed further briefing on "when an election 'intervenes' for purposes of the Amendment." Dkt. 63, Op. 39. An election "intervenes" only if all of it occurs after the law is enacted. Four independent reasons demonstrate this straightforward proposition: (1) the Amendment's text; (2) the original meaning of "an election;" (3) the Supreme Court's election-day jurisprudence, most recently in *Watson v. Republican Nat'l Comm.*, 609 U.S. ___, 2026 WL 1855462, No. 24-1260 (June 29, 2026); and (4) the only American judicial decision to ever directly construe as its core holding an intervening-election requirement, *Scott v. McDougle*, 930 S.E.2d 332 (Va. 2026). Both *Watson* and *Scott* were decided after the parties' prior cross-summary judgment motions. All these analyses show that—under the Twenty-Seventh Amendment—a law varying congressional compensation that is enacted after voting has begun cannot take effect until the next election of Representatives has concluded, and the next Congress has been seated.

### A. The Constitutional Text: "Intervened" Requires the Election to Come Between Enactment and Effect.

The Twenty-Seventh Amendment provides: "No law, varying the compensation for the services of the Senators and Representatives, shall take effect, until an election of Representatives shall have intervened." U.S. Const. amend. XXVII. To "intervene" is to come between. 1 Samuel Johnson, Dictionary of the English Language 1133 (1755) (defining "intervene" as "[t]o come between things or persons" (altering archaic spelling)); 1 Noah Webster, An American Dictionary of the English Language 999 (1828) (defining "intervene" as "[t]o come or be between persons or

7

things," and "[t]o come between points of time or events"). For an election to "have intervened" before a law takes effect, the election must come between two fixed points: the law's enactment and the law's operation. An event cannot "come between" two points in time if it began before the first of them, i.e., if an election began before a law's enactment.

The D.C. Circuit's description of the Amendment's operation confirms this sequence: "The law may be enacted at any time; when an election has been held the first condition is fulfilled; when the new Congress is seated the second condition is fulfilled." *Boehner v. Anderson*, 30 F.3d 156, 162 (D.C. Cir. 1994). *Boehner* described the resulting bar as a period that "brackets an election." *Id.* A law enacted in the middle of an election does not "bracket" that election; it interrupts it. Such a law is therefore ineffective, *see* Dkt. 63, Op. 38, at least until the next election of Representatives has run its full course and a new Congress has been seated thereafter.

**B. The Original Meaning of "An Election" Is the People's Entire Act of Choosing, Not a Single Day When Voting Ends.**

When the First Congress proposed the Amendment on June 8, 1789, the word "election" denoted a process, not a date. *See* Richard B. Bernstein, *The Sleeper Wakes: The History and Legacy of the Twenty-Seventh Amendment*, 61 Fordham L. Rev. 497, 498 (1992). Founding-era dictionaries define "election" as "[t]he act of choosing." 1 John Ash, *The New and Complete Dictionary of the English Language* 322 (1775); *accord* 1 Samuel Johnson, *Dictionary of the English Language* 697 (1755); 1 Noah Webster, *An American Dictionary of the English Language* 646 (1828). Law dictionaries from the founding era to today agree. *E.g.*, *Black's Law Dictionary* 653 (12th ed. 2024) ("[t]he process of selecting").

Founding-era practice reflected that definition. Eighteenth-century American elections— most famously Virginia's—routinely spanned days or longer: "[s]o great was the solicitude for the

voter's convenience, that in Virginia the sheriff appeared at the planter's gate and wrote down his vote, without calling him from his plow or his tobacco shed." 1 Charles Seymour & Donald Paige Frary, *How the World Votes* 208 (1918) (quoted in *Scott*, 930 S.E.2d at 342). Polls were adjourned and reopened "from day to day" until the freeholders present had voted. *Scott*, 930 S.E.2d at 342–43 (collecting sources); *see also* Cong. Globe, 28th Cong., 2d Sess. 15 (1844) (in Virginia "it frequently happened that all the votes were not polled in one day"). Madison himself was elected to the First Congress under such practices. A rule confining "an election" to a single twenty-four-hour day would have been unintelligible to the Amendment's author and to the public that read his proposal.

Modern usage is the same. "Election day" is merely "the last day on which voters may cast a ballot in a given election." *Black's Law Dictionary* 654 (12th ed. 2024); *accord Principles of the Law of Election Administration* § 101, at 2–3 (A.L.I. 2019). The election itself is the whole process involved in choosing candidates.

**C. The Supreme Court Describes "the Election" as the Entire Voting Period, Which Is "Consummated," Not Constituted, on Election Day.**

"From time immemorial an election to public office has been in point of substance no more and no less than the expression by qualified electors of their choice of candidates." *United States v. Classic*, 313 U.S. 299, 318 (1941). The federal election-day statutes accordingly "plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder." *Foster v. Love*, 522 U.S. 67, 71 (1997); 2 U.S.C. §§ 1, 7; 3 U.S.C. § 1. Just this past term, the Supreme Court construed those statutes for only the second time in its history—*Foster* being "the first (and until now, the only) time." *Watson*, 2026 WL 1855462, at 5. *Watson* confirms that an "election" is the entire period in which the electorate votes. The issue in *Watson* was whether

federal law foreclosed states from accepting mail-in ballots after election day. "[B]y setting the day for the 'election,' these statutes set the day when the electorate must make its choice," and "[t]he *electorate's choice is made when voting is complete*, not when ballots are received." *Id*. at 6 (emphasis added). The statutes "require the electorate's choice to be made on election day," which "occurs so long as *election day is the deadline* for individuals to vote." *Id.* at 7 (emphasis added). An election is thus a course of voting that must be consummated by election day—not an event existing only on that day. *See id*. at 10 (*Foster* "hold[s]" only that an election "may not be consummated prior to federal election day" (quoting *Foster*, 522 U.S. at 72 n.4)).

Courts applying *Foster* to early and absentee voting have come to the same conclusion: voting may begin well before Election Day because the federal statutes fix only when the election must end. *See Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775–76 (5th Cir. 2000); *Millsaps v. Thompson*, 259 F.3d 535, 546–47 (6th Cir. 2001); *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1175–76 (9th Cir. 2001). *Watson* further grounds that conclusion in statutory text: because Congress defined "election day" with reference to "voting," "voting" is the act governed by the statute, and federal law fixes only "the date by which absentee ballots must be cast," leaving the date of receipt to the States. *Watson*, 2026 WL 1855462, at *5 (cleaned up); 2 U.S.C. §§ 1, 7; 3 U.S.C. § 1.

Courts likewise describe an election in which ballots are being cast as an election that is happening—not one yet to occur. *E.g.*, *Ohio Democratic Party v. Husted*, 834 F.3d 620, 623–26 (6th Cir. 2016) (treating the 29-day early-voting period as part of "the election"); *Wise v. Circosta*, 978 F.3d 93, 96 (4th Cir. 2020) (case filed five days into in-person voting "involves an ongoing election"); *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1283 (11th Cir. 2020) ("we are not on the eve of the election—we are in the middle of it").

10

**D. The Virginia Supreme Court's Recent *Scott v. McDougle* Decision Construing an Intervening Election Requirement Holds That When a Legislature Acts After an Election Is Already Underway There Has Not Been an "Intervening Election."**

Until this year, no American court had addressed as its core holding what it means for an election to "intervene" between a legislative act and its legal effect. The Supreme Court of Virginia did so in *Scott v. McDougle*, 930 S.E.2d 332 (Va. 2026). The provision construed in *Scott* is the Virginia Constitution's analytical twin to the Twenty-Seventh Amendment's "intervening election" requirement: Article XII, Section 1 of the Virginia Constitution provides the procedure for the General Assembly to propose constitutional amendments. Any such proposal must be "referred to the [next] General Assembly at its first regular session held after the next general election of members of the House of Delegates," and approved a second time before submission to the voters. In both constitutional provisions, an election of the people's representatives must come between an act of lawmaking and the consequence of that law, so that the voters may express their views on what their elected representatives have done before the enactment becomes binding law.

In *Scott*, Virginia's General Assembly first approved the proposed amendment at issue—authorizing mid-decade congressional redistricting—on October 31, 2025. But voting in the 2025 House of Delegates general election had already begun on September 19, 2025. By October 31st, over 1.3 million Virginians (roughly forty percent of that election's total turnout) had already voted. *Scott*, 930 S.E.2d at 340. The next General Assembly approved the proposal again in early 2026, and the voters subsequently ratified it at an April 2026 referendum. *Id.* at 336.

The *Scott* court nullified the ratified amendment because no election had "intervened" between the two legislative votes. Its holding could not be more pertinent here:

11

> [W]e hold that the definition of "general election" in Article XII, Section 1 describes the combined actions of voters casting ballots and officers of election receiving those votes and closing the polls on the last day of the election. . . . In this case, the General Assembly passed the proposed constitutional amendment for the first time well after voters had begun casting ballots during the 2025 general election.

*Id.* at 345. "The metes and bounds of an election begin with the point of casting votes and end with the point of receiving votes and closing the polls on the last day of the election. Election Day is the boundary marker for the last act constituting an election." *Id.* at 344. Because the first legislative vote fell during the election rather than before it, the constitutional defect "incurably taint[ed] the resulting referendum vote and nullifie[d] its legal efficacy." *Id.* at 334; *see also id.* at 339.

Three features of *Scott* are compelling here. *First*, it relied on the text, history and tradition methodology of determining meaning. The *Scott* court began with the constitutional text, gave "election" its founding-era dictionary meaning ("the act of choosing," per Johnson (1755), Ash (1775), and Webster (1828)), *id.* at 341–42 & n.20, canvassed historical election practice, *id.* at 342–43, and adopted the *Foster* "combined actions" definition, *id.* at 343. The court also applied the principle that "the Constitution was written to be understood by the voters." *Id.* at 341 (citation omitted).

*Second*, *Scott* identifies the constitutional purpose served by requiring that the election intervene: intervening-election requirements serve the purpose of "permitt[ing] the people to register their approval . . . indirectly, by giving them a chance in an intervening election to unseat legislators who had supported an unpopular amendment," *id.* at 339 n.15 (quoting John J. Dinan, *The American State Constitutional Tradition* 43 (2006)), and "give the people a chance to render a verdict by unseating legislators," *id.* (quoting G. Alan Tarr, *Popular Constitutionalism in State and Nation*, 77 Ohio St. L.J. 237, 270–71 (2016)). That is the Twenty-Seventh Amendment's exact

12

purpose: to ensure no variance in congressional compensation takes effect until "the voters weigh[]

in" through an election. Dkt. 63, Op. 29; *see Boehner*, 30 F.3d at 159. A voter who has already

cast her ballot when a law is enacted cannot render any verdict on it. As *Scott* put it, the contrary

rule would mean such voters "unknowingly forfeited" their constitutionally-protected opportunity

to respond to the legislature's act. *Scott*, 930 S.E.2d at 340.

*Third*, *Scott* confirms that subsequent electoral events cannot remedy a sequencing

violation of a constitutional requirement. In *Scott*, the Commonwealth (advocating for the

amendment to be given legal effect) argued that the people's subsequent "yes" vote validated the

process. The Virginia Supreme Court rejected that notion, holding that "the ultimate vote margin

plays no role in the analytics of our judicial review of the constitutionality of the pre-election"

process. *Scott*, 930 S.E.2d at 338. So too here. The Twenty-Seventh Amendment polices the

sequence of lawmaking; a law purporting to vary compensation before an election intervened is

not retroactively redeemed because elections later occurred. *Cf.* Dkt. 63, Op. 36–38 (rejecting the

Government's full-retroactivity approach because it would let Congress "do retroactively what it

cannot do directly").

**E. Application Here: No Election Intervened Before the Challenged Laws Operated.**

The rule that follows from this analysis is straightforward: an election of Representatives

"intervenes" only if the first ballots of that election are cast after the law's enactment, and the law

then takes effect, at the earliest, upon the seating of the next Congress. *Boehner*, 30 F.3d at 162.

Four of the laws challenged here were enacted after voting in that year's congressional

election had begun, and so were enacted during, not before, the election: Public Law Number 103-

329 (Sept. 30, 1994), blocking the 1995 COLA, and Public Law Number 104-208 (Sept. 30, 1996),

blocking the 1997 COLA, were each enacted after Virginia absentee voting began in mid-to-late

September, Pls.' Statement of Material Facts ("SMF") ¶¶ 5–6. Public Law Number 105-277 (Oct. 21, 1998), blocking the 1999 COLA, was enacted more than two weeks after California's open voting began on October 5, 1998, and after Virginia's absentee voting was underway. SMF ¶¶ 3–6. And, Public Law Number 115-244 (Sept. 21, 2018), blocking the 2019 COLA, was enacted after Minnesota's open voting began at 8:00 a.m. that same day. SMF ¶ 2. For each, the ongoing election could not "intervene;" the first election that could intervene concluded two years later. Because each law, by its terms, operated only on the COLA scheduled for the immediately following January, each purported to vary compensation before any intervening election had occurred. The Twenty-Seventh Amendment thus rendered them without legal effect. Furthermore, each law expired or was spent prior to the seating of a new Congress following the next intervening election.

The same intervening election rule disposes of the remaining years at issue in this case. The COLA-blocking laws for 1994, 1996, 1998,[2] 2007, 2010, 2012–2018, and 2020–2026 were enacted, at the earliest, in the months immediately preceding the January in which each blocked COLA was scheduled to take effect. In every instance, the laws were passed without an election of Representatives beginning and concluding between enactment and that January. SMF ¶ 6.

In 2025, the initial measure, Pub. L. No. 118-83 (Sept. 26, 2024), was enacted after early voting in the 2024 election had commenced, and it expired by its own terms on December 20, 2024; the measures that actually carried the 2025 COLA block forward, Pub. L. No. 118-158 (Dec. 21, 2024) and Pub. L. No. 119-4 (Mar. 15, 2025), were enacted after the 2024 election had concluded. Dkt. 54, Pls.' Reply & Resp. 29–34. Moreover, the law blocking the 2026 COLA, Pub.

---

[2] The COLA reduction for 1998 was the only challenged COLA reduction that was accomplished exclusively by Presidential action under 5 U.S.C. § 5303(b). *See infra* III.G.

L. No. 119-37 (Nov. 12, 2025), was enacted in an odd-numbered year, when, as this Court observed, "no election could have intervened." Dkt. 63, Op. 7 n.7. In every year raised in this case, the compensation ascertained by the ERA was varied before an election of Representatives intervened.

### III. ALL COLA SUPPRESSIONS RAISED IN THIS LITIGATION WERE TEMPORARY AND INEFFECTIVE UNDER THE TWENTY-SEVENTH AMENDMENT, LEAVING THE ERA'S ACCUMULATING COLA MANDATES IN EFFECT.

Three mechanisms have been used to deny Members the COLAs mandated by the ERA. *First*, in every year at issue (except 1998), Congress enacted a Member-directed COLA-blocking statute (*See* Parts III.A through III.E, *infra*). *Second*, in several years, Congress suppressed General Schedule employees' COLA by statute,[3] indirectly capping Member COLAs through the ceiling imposed in 2 U.S.C. § 4501(2)(B) (Part III.F, *infra*). *Third*, the President suppressed the General Schedule COLA under 5 U.S.C. § 5303(b), with the same secondary capping effect (Part III.G, *infra*). Each of these mechanisms independently runs afoul of the Twenty-Seventh Amendment. In the absence of these unconstitutional acts, the ERA-required compensation took effect by operation of law in every year at issue, computed solely from the ERA's statutory formulas (*see* Part III.H, *infra*). *See* Ex. 1 (year-by-year table of formulas, suppressions, and mechanisms used to suppress COLAs).

---

[3] Analogous to Member COLAs which are provided each January 1st under 2 U.S.C. § 4501(2)(A), General Schedule federal employees are also provided a COLA each January under 5 U.S.C. § 5303(a).  The two formulas are similar, but not exactly the same.  In those years when the congressional COLA exceeds the GS COLA, then Members are capped to using the GS COLA under 2 U.S.C. § 4501(2)(B).  Thus, any action that reduces the GS COLA will indirectly (via § 4501(2)(B)) reduce the congressional COLA.

**A. The COLA Suppressions at Issue in this Case Were Temporary, One-Year Measures that Left the ERA's Substantive Mandate Requiring COLA Increases Intact.**

By their express terms, the COLA suppressions challenged here were temporary, and had no effect on the cumulative increases mandated by the ERA.  For each of the suppressions Plaintiffs challenge here (1994-1999, 2007, 2010, and 2012-2026), Congress and/or the President adopted a temporary suppression—usually via an annual appropriations bill (though once by freestanding statute (1994), and once solely by presidential act (1998)). Each of these acts had temporary effect, pausing the mandated COLAs solely for the fiscal year in question. The temporary pauses (regardless of the means by which they were accomplished), were without permanent effect that could reach to the seating of the next upcoming Congress following the next intervening election. *See* SMF ¶ 6.

Annual appropriations bills passed by Congress last only for the year in question. By statute, an appropriations act applies only to its specified fiscal year, unless an included provision expressly provides otherwise: "[A]n appropriation in a regular, annual appropriation law may be construed to be permanent or available continuously" only if the appropriation is for particular objects or "expressly provides that it is available after the fiscal year covered by the law in which it appears." 31 U.S.C. § 1301(c); *see* Ex. 13 (Sean M. Stiff, *Regular Appropriations Acts: Selected Statutory Interpretation Issues*, CRS Report R46899 (2021)) (hereafter "Stiff") at 16. The same one-year boundary governs an appropriations act's effect on substantive law: "[C]ourts presume that whatever effect an appropriations act provision has on substantive law exists <u>only for the fiscal year covered by the act</u>." Stiff at 29 (emphasis added); *see Whatley v. District of Columbia*, 447 F.3d 814, 819 (D.C. Cir. 2006) ("The normal presumption is that appropriations acts do not amend

16

substantive law, and that when they do, the change is <u>only intended for one fiscal year</u>.") (emphasis added) (cleaned up).

On the occasions when an appropriations bill temporarily alters substantive law, "courts often say that the appropriations act has 'suspended' conflicting provisions of substantive law." Stiff at 29 (citing *United States v. Dickerson*, 310 U.S. 554, 561 (1940); *Granite State Chapter v. Fed. Lab. Rels. Auth.*, 173 F.3d 25, 28 (1st Cir. 1999); *Brown v. Barry*, 3 U.S. 365, 367 (1797); *Bender v. United States*, 93 F.2d 814, 815-16 (3d Cir. 1937)). "Once that suspension ends, usually after the fiscal year for which the relevant act makes appropriations, <u>the once-suspended requirements of substantive law regain force</u>." Stiff at 29 (emphasis added) (citing, e.g., *Bldg. & Const. Trades Dep't, AFL-CIO v. Martin*, 961 F.2d 269, 274 (D.C. Cir. 1992) ("[A] provision contained in an appropriations bill operates only in the applicable fiscal year"); *Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1557 n.15 (D.C. Cir. 1984); *United States v. Vulte*, 233 U.S. 509, 515 (1914); *United States v. Mitchell*, 109 U.S. 146, 150 (1883)). Hence, for all the fiscal years in question here, the one-year suspension of COLAs expired prior to the seating of the next Congress, and thus never took effect. And, because the ERA has never been repealed or amended, and the COLA suspensions were never effective as a matter of law, the ERA-mandated COLAs remained in effect. Those COLAs apply cumulatively, for compounding purposes, to all subsequent years.

If it wants to do so, Congress can use appropriations bills to substantively amend existing law. It did not do so with any of the COLA-blocking appropriations bills challenged in this case. "Congress may also suspend or repeal the substantive law requirements by stating that they 'shall not take effect.'" Stiff at 27 (citing *United States v. Will*, 449 U.S. 200, 222-24 (1980) (in four successive fiscal years, Congress used appropriations acts—including matter phrased only "in

17

terms of limiting funds"—to rescind automatic pay adjustments that federal justices and judges would otherwise have received under preexisting substantive law)). That is precisely what Congress did for fiscal years 2007, 2010, and 2012-2026. *See* SMF ¶ 6(e)-(t); *see, e.g.*, Pub. L. No. 113-46, div. A, § 146, 127 Stat. 558, 565 (Oct. 17, 2013) ("Notwithstanding any other provision of law, no adjustment shall be made under section 601(a) of the Legislative Reorganization Act of 1946 (2 U.S.C. § 31) (relating to cost-of-living adjustments for Members of Congress) <u>during fiscal year 2014</u>.") (emphasis added).

Like the one-fiscal-year limit inherent in every annual appropriations act, this "shall not take effect" language (and its equivalents) could work—at most—a temporary suspension of the ERA-mandated COLAs. Under well-established rules of statutory interpretation, the suspended COLAs sprang back into force when the pertinent fiscal year ended.

### B. Members of Congress Are Paid Monthly. [4]

Unlike traditional federal employees—who are paid on the General Schedule's biweekly pay-period cycle—Members of Congress are paid monthly. Thus, the legal authority of one-year statutes addressing congressional salary ends at midnight on December 31st of every year—prior to the January 3rd seating of each new Congress in odd years.

The monthly basis is fixed by separate statutes for each chamber, discussed below.

### 1. The House of Representatives

House Members are paid monthly under 2 U.S.C. § 5302, which provides that "[e]ach Member and Delegate, after he has taken and subscribed the required oath, is entitled to receive his salary at the end of each month." The period of payment is thus the calendar month, and the

---

[4] On July 8, 2026, the parties stipulated that Members of the House and Senate are paid monthly. This section is included for clarity, the pay schedule of Members is related to the fact that their COLAs take effect January 1 of each year at issue.

salary becomes payable "at the end of each month." House Members are not paid at the close of a recurring two-week pay period.

This end-of-month rule is specific to the House: 2 U.S.C. § 5303 provides that § 5302 "shall not be construed as being applicable to a Senator." That carve-out confirms that the House operates under its own monthly-payment statute, while the Senate's monthly compensation is governed by a separate provision, addressed below.

## 2. The Senate

Senators are likewise paid on a monthly basis, under 2 U.S.C. § 4591. That section governs "[t]he compensation of the Vice President, Senators, and officers and employees[] whose compensation is disbursed by the Secretary of the Senate." The law fixes payment by reference to the month: such compensation is "payable on the fifth day of the month following the month in which such compensation accrued." Senate compensation therefore *accrues by the month*, and the statute reinforces the monthly character of the pay by deeming the fifth-of-the-month disbursement to have been "made on the last day of the preceding month" for tax, accounting, and reporting purposes.[5]

The Senate's administrative practice of issuing two disbursements per month does not convert this monthly compensation into biweekly pay. Title 2 U.S.C. § 4591(3) authorizes the Secretary of the Senate (in her discretion), to pay "any part of such compensation accrued for any month" before the statutory fifth-of-the-month payday. It is under that discretionary authority—not any biweekly pay-period statute—that the Secretary advances a portion of the monthly salary mid-month. As the Senate Handbook explains, "Senators and staff are paid at annual rates based

---

[5] 2 U.S.C. § 4591. (disbursements made on the fifth day of a month "shall be considered to have been made on the last day of the preceding month" for tax, accounting, and reporting purposes).

19

on a 30-day month (360-day year)," with paydays "twice a month, on the 20th (for the 1st through the 15th of that month) and on the 5th (for the last half of the preceding month)." Senate Handbook (Comm. on Rules & Admin.), 2010 ed., at IV-21.  The two paydays are simply two disbursements of a single monthly accrual computed on a 30-day-month, 360-day-year basis; they are not the two-workweek pay periods that govern General Schedule employees. *See* 5 U.S.C. § 5504.

The 30-day-month salary payment convention is itself statutory. For anyone in the service of the United States "whose pay is monthly or annual," the pay period "covers one calendar month," a month's pay is one-twelfth of a year's pay, and a day's pay is one-thirtieth of a month's pay. 5 U.S.C. § 5505. Federal law thus supplies a calendar-month—not biweekly—pay structure for monthly-paid officials, and the Senate's 360-day-year computation follows it.

### 3.  Timing of Adjustments to Member Pay

The monthly measure also governs how Member pay adjusts.  A pay adjustment takes effect "at the beginning of the first applicable pay period commencing on or after the first day of the month" in which the corresponding General Schedule adjustment takes effect. 2 U.S.C. § 4501(2)(A). Once again, the statute keys Member compensation to the month. This is in contrast to the January-anchored, biweekly pay-period cycle of the General Schedule for civil servants. Thus, January 1st for all years is the date upon which House and Senate COLAs take effect. By contrast, for General Schedule employees, the first date of their new year for payment purposes could be any day from January 1–13.

### C. The COLA-Blocking Appropriations Language for the Years at Issue (1994 Through 2026) that Failed to Comply With the Twenty-Seventh Amendment.

For the various fiscal years at issue here, Congress used different language to enact temporary COLA-blocking appropriations bills. Only the bills for the years challenged as violating

the Twenty-Seventh Amendment are discussed here. (The 1994 block came by freestanding statute rather than appropriations rider, see Pub. L. No. 103-6, § 7, 107 Stat. 35 (Mar. 4, 1993); the Twenty-Seventh Amendment analysis of Part III.D applies to it identically—enacted March 4, 1993, it purported to block the January 1, 1994 adjustment with no election of Representatives intervening.) For fiscal years 1995, 1996, 1997, and 1999, Congress used the following language in the annual appropriations bills to block the ERA-mandated COLAs from taking effect (the fiscal year noted in the statute changes with each year):

> For purposes of each provision of law amended by section 704(a)(2) of the Ethics Reform Act of 1989 (5 U.S.C. § 5318 note), no adjustment under section 5303 of title 5, United States Code, shall be considered to have taken effect in fiscal year 1995 in the rates of basic pay for the statutory pay systems.

*See* n.6.

For fiscal year 2007, Congress used the following language in the annual appropriations bill in an effort to block the ERA-mandated COLAs from taking effect:

> Notwithstanding any other provisions of this division and notwithstanding section 601(a)(2) of the Legislative Reorganization Act of 1946 (2 U.S.C. § 31), the percentage adjustment to take effect under such section for 2007 shall not take effect.

*See* n.7.

For fiscal year 2010, Congress used the following language in the annual appropriations bill to block the ERA-mandated COLAs from taking effect:

---

[6] (1995) Treasury, Postal Service and General Government Appropriations Act, 1995, Pub. L. No. 103-329, tit. VI, § 630(a)(2), 108 Stat. 2382, 2424 (Sept. 30, 1994); (1996) Treasury, Postal Service, and General Government Appropriations Act, 1996, Pub. L. No. 104-52, tit. VI, § 633, 109 Stat. 468, 507 (Nov. 19, 1995); (1997) Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, div. A, § 101(f) [tit. VI, § 637], 110 Stat. 3009, 3009-364 (Sept. 30, 1996); (1999) Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, div. A, § 101(h) [tit. VI, § 621], 112 Stat. 2681, 2681-518 (Oct. 21, 1998).

[7] (2007) Revised Continuing Appropriations Resolution, 2007, Pub. L. No. 110-5, § 2 [§ 115], 121 Stat. 8, 12 (Feb. 15, 2007) (adding § 115 to div. B of Pub. L. No. 109-289).

> Notwithstanding any provision of section 601(a)(2) of the Legislative Reorganization Act of 1946 (2 U.S.C. § 31(2)), the percentage adjustment scheduled to take effect under such provisions in calendar year 2010 shall not take effect.

*See* n.8.

For fiscal year 2012, Congress used the following language in the annual appropriations bill to block the ERA-mandated COLAs from taking effect:

> Notwithstanding any other provision of law, except as provided in subsection (e), no statutory pay adjustment which (but for this subsection) would otherwise take effect during the period beginning on January 1, 2011 and ending on December 31, 2012, shall be made.

*See* n.9.

For fiscal year 2013, and continuing on for every fiscal year through fiscal year 2024, and again in for fiscal year 2026 (as noted *supra*), Congress used the following language in the annual appropriations bills to block the ERA-mandated COLAs from taking effect (the fiscal year noted in the statute changes with each year):

> Notwithstanding any other provision of law, no adjustment shall be made under section 601(a) of the Legislative Reorganization Act of 1946 (2 U.S.C. § 31) (relating to cost of living adjustments for Members of Congress) during fiscal year 2013.

*See* n.10.

---

[8] (2010) Omnibus Appropriations Act, 2009, Pub. L. No. 111-8, div. J, § 103, 123 Stat. 524, 988 (Mar. 11, 2009).

[9] (2012) Continuing Appropriations and Surface Transportation Extensions Act, 2011, Pub. L. No. 111-322, tit. I, § 1(a)(2), 124 Stat. 3518, 3518-19 (Dec. 22, 2010) (adding § 147 to Pub. L. No. 111-242). This statutory mechanism blocked both the ERA COLA through the § 4501(2)(B) ceiling and the GS COLA via the same mechanism. This is the only instance of such a dual-effect statutory block in all of the challenged years.

[10] (2013) American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, tit. VIII, § 802, 126 Stat. 2313, 2369 (Jan. 2, 2013).

For fiscal year 2025, Congress used the following language in continuing appropriations bills referencing the previous Public Law 118-47 from 2024 to block the ERA-mandated COLAs from taking effect:

> Sec. 101. Such amounts as may be necessary, at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2024 and under the authority and conditions provided in such Acts, for continuing projects or activities . . . that are not otherwise specifically provided for in this Act, that were conducted in fiscal year 2024, and for which appropriations, funds, or other such authority were made available in the following appropriations Acts . . . . (9) the Legislative Branch Appropriations Act, 2024 (division E of Public Law 118-47), . . . and including section 7 in the matter preceding division A of Public Law 118-47.

> *See* n.11. And:

> (9) The Legislative Branch Appropriations Act, 2024 (division E of Public Law 118-47),  . . . . and including section 7 in the matter preceding Division A of Public Law 118-47.

> *See* n.12.

**D. Applying the COLA-Blocking Appropriations Language to the Years at Issue.**

The federal government's fiscal year runs from October 1 through September 30 of the following calendar year. 31 U.S.C. § 1102. Elections for Senators and Representatives are held on the Tuesday following the first Monday in November in every even-numbered year. 2 U.S.C. §§ 1, 7 (as set forth in Part II.B, *supra*, that date is the last day by which voting may occur; the "election" is the period during which votes are cast). The new Congress then convenes on January 3. U.S. Const. amend. XX, § 2.

---

[11] (2025 – first Continuing Resolution) Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, div. A, § 101(a)(9), 138 Stat. 1524, 1525 (Sept. 26, 2024) (continuing division E of Pub. L. No. 118-47, "including section 7 in the matter preceding division A of Public Law 118-47").

[12] (2025 – full-year Continuing Resolution) Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101(a)(9), 139 Stat. 9, 12 (Mar. 15, 2025) (same, continuing division E of Pub. L. No. 118-47 "including section 7 in the matter preceding division A of Public Law 118-47").

As previously explained, a law varying congressional compensation must be enacted before a congressional election commences if it is to take effect when the next Congress convenes on January 3 in accordance with the Twenty-Seventh Amendment. If a law varying congressional pay is enacted after the election has begun, it cannot take effect until another full election of Representatives has intervened—that is, not until the convening of the Congress chosen at the following election two years later.

The challenged COLA-blocking statutes were enacted on varying timetables. Some were passed while a congressional election was already underway (e.g., September 30, 1994; September 28, 2012; September 26, 2024); some were passed in the weeks after an election had concluded (e.g., December 9, 2006; December 27, 2020); and some were passed in odd-numbered years when no election was occurring at all (e.g., March 4, 1993; November 19, 1995; December 20, 2019; November 12, 2025). *See* Ex. 1; *see also* Ex. 2.[13]

The constitutional defect is nonetheless the same in each case. In no instance did a complete election of Representatives intervene between the enactment of a COLA block and the January 1 adjustment the block purported to reach. Whether Congress sought to give a block immediate effect, or effect for a designated fiscal year or calendar year (or two), every COLA block purported to operate on Member compensation without an intervening election. Hence, each of those attempted COLA blocks was ineffective. Dkt. 63, Op. 38.

Under 2 U.S.C. § 4501(2)(A), Member pay adjustments are "effective at the beginning of the first applicable pay period commencing on or after the first day of the month in which an adjustment takes effect under section 5303 of title 5 in the rates of pay under the General

---

[13] Exhibit 2 shows the timeline of all five combinations of COLA blocks that occurred from 1994 – 2026.

Schedule." The same subparagraph's reference to "the first day of the fiscal year" performs a different, and purely computational, function: it fixes the date upon which the ECI percentage change is measured to calculate the *amount* of the adjustment. It has nothing to do with *when* the adjustment takes effect. *See* 2 U.S.C. § 4501(2)(A) (the adjustment equals "the most recent percentage change in the ECI (relative to the date described in the next sentence)"; "[t]he appropriate date under this sentence is the first day of the fiscal year in which such adjustment in the rates of pay under the General Schedule takes effect"). The ERA's effective date for anyone paid under the General Schedule is keyed entirely to the General Schedule adjustment. Pursuant to 5 U.S.C. § 5303, General Schedule adjustments are effective "as of the first day of the first applicable pay period beginning on or after January 1 of each calendar year." Accordingly, pay adjustments for Members of Congress since 1992 have been effective January 1. Stiff at 20 n.43 & tbl.1; *see also id.* at 12 n.17 ("Although this provision refers to fiscal year, since 1992, Member pay adjustments have been effective in January.").

### E. As Applied to Congressional Salaries, the Legal Reach of an Annual Appropriations Act Ends at Midnight on December 31.

The "fiscal year" phrasing of the COLA-blocking riders does not enlarge their reach beyond the year(s) specified in the bill. The federal fiscal year (October 1 through September 30) contains exactly one Member pay-adjustment event: the adjustment effective January 1 of the calendar year in which that fiscal year ends. Hence, when Congress provided that "no adjustment shall be made . . . during fiscal year 2014," the only adjustment within the provision's reach was the one that would otherwise have taken effect on January 1, 2014. Whatever its label, each rider's entire operation was to block a single January 1 event. *Accord* Stiff at 12 n.17.

25

The statutory monthly-pay structure (upon which the parties agree) fixes the outer temporal boundary of each COLA-blocking appropriation bill's effect. Blocking the January 1 adjustment would hold the annual rate at its prior level, and that rate is earned in twelve monthly units—January through December—of the same calendar year. December's salary is the last monthly accrual the blocked adjustment can touch. At midnight on December 31, the salary year closes, and with it the appropriations act's legal reach over congressional compensation, thus foreclosing the continuing existence of any COLA blocking legislation upon the seating of a new Congress on January 3 in odd-numbered years.

The appropriations act itself, of course, expired even earlier—on September 30, with the fiscal year it covered. Stiff at 29; *Martin*, 961 F.2d at 274. Whether one uses the fiscal year or calendar year, no annual appropriations act enacted after an election has commenced can govern a single dollar of Member salary accruing after December 31 of the year whose adjustment it blocked. The January accrual that follows belongs to a new salary year governed by the ERA's formula. Only a new law enacted in compliance with the Twenty-Seventh Amendment before the congressional election can constitutionally be applied to the pay of the newly-seated Congress.

Congress's own conduct confirms this understanding. Year after year,[14] Congress has enacted a fresh COLA-blocking provision. Congress has never relied on an earlier COLA-blocking statute. If any one of those COLA-blocking appropriations provisions reached beyond its own fiscal year, the annual re-enactments would have been pointless. *Cf. Will*, 449 U.S. at 222-24 (each of four successive years' riders operated on its own fiscal year). For congressional pay, each January 1 is thus a fresh statutory salary event, and each blocking rider is a distinct "law, varying

---

[14] More than twenty times since 1992.

the compensation for the services of the Senators and Representatives," which must independently satisfy the Twenty-Seventh Amendment's intervening-election requirement.

Applying the foregoing structure: The applicable pay period for both House and Senate Members begins with the calendar year, on January 1. For every year discussed above in which Congress enacted a temporary COLA-blocking law without an intervening election, that enactment was of no legal force under the Twenty-Seventh Amendment.

Every one-year congressional COLA block—however accomplished—ceased having legal force at midnight on December 31 of the year in question.  No COLA-blocking measure (whether statute or presidential action) thus had any legal existence three days later, on the January 3 following the even-year elections, when the next Congress was seated. Only upon that seating does the Twenty-Seventh Amendment permit Congress to pass a law changing the pay of the next Congress.

**F. The General Schedule Statutory COLA Suppressions Are Equally Ineffective as Applied to Members, and Cannot Cap Member COLAs Through 2 U.S.C. § 4501(2)(B).**

Addressing the statutes blocking § 4501(2)(A) ERA COLAs does not end the inquiry, because the statutory scheme contains a second channel through which Member COLAs can be reduced. Specifically, the ceiling of 2 U.S.C. § 4501(2)(B), under which the Member adjustment taking effect in any calendar year may not exceed "the percentage adjustment taking effect in such calendar year under section 5303 of title 5 in the rates of pay under the General Schedule." In several of the years at issue, Congress reduced or froze the General Schedule adjustment itself— below the § 5303(a) formula—by statute. *See* Ex. 1. The most consequential example is the two-year freeze of Pub. L. No. 111-322, § 1(a), 124 Stat. 3518 (Dec. 22, 2010), which produced a zero

27

GS adjustment for 2011 and 2012; another is Pub. L. No. 116-6, div. D, § 748, 133 Stat. 13, 199 (Feb. 15, 2019), which fixed the 2019 across-the-board adjustment at 1.4% (after a presidential plan of zero), against GS and ERA formulas of 2.1% and 2.3%, respectively. If those General Schedule figures stand as the § 4501(2)(B) ceiling, they suppress Member COLAs even in the absence of any valid Member-side block.

As applied to the compensation the ERA ascertains for Members, each such General Schedule blocking statute is itself a "law, varying the compensation for the services of the Senators and Representatives." This Court has held that "*any* deviation from the adjustment that the ERA's COLA provisions would have otherwise required varies congressional compensation." Dkt. 63, Op. 29. A statute whose operation reduces the § 4501(2)(B) ceiling below the ERA formula works precisely such a deviation; that it does so through the General Schedule rather than by naming Members explicitly changes nothing about its effect—and the Twenty-Seventh Amendment is addressed to effect, not to drafting technique. Indeed, Congress itself has treated General Schedule COLA suppression as the lever on Member pay: the riders for fiscal years 1995 through 1999, quoted *supra* Part III.C, operate by deeming the General Schedule adjustment not to have taken effect "[f]or purposes of each provision of law amended by section 704(a)(2) of the Ethics Reform Act of 1989"—that is, for Member-pay purposes specifically.

The analysis in Parts III.D and III.E therefore applies equally here. The freeze of Pub. L. No. 111-322 illustrates every defect at once: it was enacted on December 22, 2010—after the November 2010 election—purported to operate before the next election of Representatives could intervene, and expired by its own terms on December 31, 2012, three days before the 113th Congress was seated. No complete election of Representatives intervened between its enactment and either of the January 1 adjustments (2011 and 2012) it suppressed. As applied to Member

compensation, it was ineffective for the whole of its operation.[15] Dkt. 63, Op. 38. The same is true of every other General Schedule statutory COLA suppression within the damages period. *See* Ex. 1.

Holding the statutes that suppressed GS COLAs ineffective as to Members does not disable the § 4501(2)(B) ceiling; it simply changes the number the ceiling reads. Where "an otherwise acceptable construction of a statute would raise serious constitutional problems," courts construe the statute to avoid them. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). The statute's text supplies the statutory construction that avoids any Twenty-Seventh Amendment difficulty: Section 5303 itself describes the subsection (a) formula as "the pay adjustment which would otherwise be *required*"—the only component of § 5303 that fixes an adjustment by rule of law. 5 U.S.C. § 5303(b)(1) (emphasis added). Construing the ceiling to refer to the adjustment required by the § 5303(a) formula leaves the ERA operating exactly as *Boehner* contemplated: two interlocking formulas, each an "index or formula" specified by Congress, with no constitutional infirmity.

**G. The Presidential COLA Suppressions Under 5 U.S.C. § 5303(b) Took Effect Without an Intervening Election—a Sequence the Twenty-Seventh Amendment Forbids.**

In addition to Congress's own COLA suppressions using appropriations bills, ERA-mandated congressional COLAs have also been suppressed by unilateral presidential action. In most years within the damages calculation period for this case (1994 to 2026), the GS COLA was reduced below the § 5303(a) formula not by an appropriations blocking bill, but by the President.

---

[15] There is no difficulty whatsoever with Congress voting to block an upcoming COLA for the next Congress. It need only pass the intended COLA-blocking law before the general election begins. Congress did just that for fiscal year 2011, blocking the upcoming COLA in compliance with the Twenty-Seventh Amendment by passing the law before voters started voting in the general election. *See* Pub. L. 111-165 (May 14, 2010).

Title 5 U.S.C. § 5303(b) provides what is known as "alternative plan" authority by which the President can unilaterally reduce GS COLAs that would otherwise automatically go into effect. *See* Ex. 1 (presenting the presidential suppression years at issue: 1996, 1998, 2013 through 2018, 2021, 2025, and 2026).

As applied to Member compensation,[16] each presidential suppression fails for the same reason the congressional blocks fail: Their failure to comply with the Twenty-Seventh Amendment's required sequence for laws varying congressional compensation. A § 5303(b) presidential suppression of congressional COLAs "varies" the compensation the ERA ascertains. Though 2 U.S.C. § 4501(2)(B) provides the statutory ceiling for annual COLAs that are to be automatically implemented, the "alternative plan" authority created by 5 U.S.C. § 5303(b) allows the President to substitute a lower COLA figure for the automatic COLA the statutory formulas command. Dkt. 63, Op. 28-29. And every one of the foregoing presidential COLA suppressions took effect on Member pay without an intervening election.

The sequence for implementing presidential COLA suppressions is fixed by 5 U.S.C. § 5303(b). The President must transmit notice of his alternative COLA plan to Congress before September 1 of the year before the COLA is to take effect. Next, the President issues an executive order implementing his suppressed COLA figure in December. Finally, the suppressed COLA schedules take effect at the first pay period of the immediately following January. *See* 5 U.S.C. § 5303(b). Hence, every exercise of the presidential authority to lower ERA-mandated COLAs begins and takes effect inside the very window the Twenty-Seventh Amendment forecloses for salary variation: No election of Representatives can intervene between a December executive order and its January 1 implementation on Member compensation.

---

[16] Plaintiffs do not challenge the validity of that authority as applied to the federal workforce.

President Obama's Executive Order 13,635 illustrates how § 5303(b) presidential COLA suppressions are carried out. The Executive Order issued on December 27, 2012—after the 2012 election had concluded—and purported to set Member compensation below the ERA formula for 2013. Under this Court's summary judgment holding, even an Act of Congress passed that day could not have varied Member compensation until the seating of the 114th Congress on January 3, 2015, following the November 2014 election. Dkt. 63, Op. 38. *A fortiori*, the Constitution does not permit an executive order to accomplish what an Act of Congress enacted the same day could not.

Unlike a blocking statute, moreover, the § 5303(b) presidential suppression mechanism as currently written is structurally incapable of ever complying with the Twenty-Seventh Amendment. Congress can constitutionally block a future COLA if it legislates before the election begins—as it did for the 2011 ERA-mandated COLA that would otherwise have taken effect. *See* Pub. L. No. 111-165 (May 14, 2010). The § 5303(b) process cannot be accomplished in accordance with the Twenty-Seventh Amendment. By design, it runs annually from the President's September notice to Congress of his intent to lower the COLAs (which notice is without legal effect), to a December order actually implementing the Presidential authority, to a January 1 implementation date Hence, a President's exercise of § 5303(b) authority by its express statutory language begins and ends between elections every time.

Just as is the case with the COLA suppressions in appropriations riders, each year's presidential suppression concerns only the single, specified salary year. The GS Schedules created by the presidential suppressions govern only that year's twelve monthly payments. The presidential suppressions are then superseded by the next year's Executive Order. By the first post-election seating of a new Congress, there is nothing left of the last presidential suppression order

31

to take effect. *Supra* Part III.E. As applied to Member compensation, no presidential suppression has ever operated—or could ever operate—on the far side of an intervening election.

The sequencing defect of § 5303(b) presidential COLA suppressions by itself fails the Twenty-Seventh Amendment's intervening election requirement. But presidential COLA suppressions also fail for another, independent reason: Congressional pay may be altered only by law, and an Executive Order is not "law" for constitutional purposes.

To be clear, Plaintiffs do not challenge the § 5303(b) delegation itself, which remains fully constitutional for the General Schedule workforce it governs. The additional constitutional infirmity here is that unilateral presidential action under § 5303(b) is varying congressional compensation. This is impermissible. The Constitution permits only Congress to ascertain its pay. It may do so only by law. U.S. CONST., Art. I § 6, cl. 1. Unilateral presidential action is not "law" for constitutional purposes, and Congress may not delegate to the President its obligation to set its own pay.

"[C]onsistent with Congress's power of the purse, the responsibility of determining Congress's pay is left in the hands of Congress." Dkt. 63, Op. 3. Under the Constitution's Ascertainment Clause, "The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law . . .[.]." U.S. CONST., Art. I § 6, cl. 1. Hence, congressional pay may be set only by "law." Congressional pay may not be altered by something other than "law," such as presidential caprice. "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). Legislative acts require bicameral passage and presentment, *INS v. Chadha*, 462 U.S. 919, 946-51 (1983). A § 5303(b) determination

32

undergoes neither—it is a unilateral executive judgment, committed by the statute to the President's assessment of what "he considers appropriate." *See* 5 U.S.C. § 5303(b)(1).

Nor is the enabling act's pedigree salvageable by its exercises: in *Clinton v. City of New York*, 524 U.S. 417, 438-40 (1998), despite the fact that the Line Item Veto Act was properly enacted via bicameralism and presentment, that could not make the President's later exercise of individual spending cancellations under the Line Item Veto Act constitutional, because each Presidential cancellation that changed the legal force of the underlying appropriations act was itself required to follow the Constitution's "finely wrought" procedures of bicameralism and presentment.

"Congress must affirmatively set its own salaries, and may not, in conformity with the Ascertainment Clause, delegate this responsibility to the President." *Humphrey v. Baker*, 848 F.2d 211, 216 (D.C. Cir. 1988). In the congressional pay context, *Boehner* demarcates that boundary between Congress deciding what its pay will be by statute, and the President substituting his will for that statute. Congress may "specify an index or formula" for future compensation because a formula produces determinate outputs from objective inputs—the electorate voting in 1990 could know precisely what rule would govern Member pay thereafter. *Boehner v. Anderson*, 30 F.3d 156, 162 (D.C. Cir. 1994); *accord Beer v. United States*, 696 F.3d 1174, 1181 (Fed. Cir. 2012) (en banc) (the ERA's COLAs operate "according to a mechanical, automatic process"). Section 5303(b) is the negation of a formula: An open-ended authority for the President to displace the congressionally-mandated formula's output whenever he disagrees with it. The voters can ratify a legislatively-enacted salary formula. They cannot know, and therefore cannot ratify, the unknowable future exercises of a President's discretion.

Whether the vice is framed as timing (every presidential suppression operates within the very period the Amendment forbids) or as form (no unilateral exercise of presidential discretion is a law), the conclusion is the same: a § 5303(b) suppression cannot vary the compensation the Ethics Reform Act ascertains for Members, directly or through the § 4501(2)(B) ceiling.

**H. For Every Year at Issue, Member COLAs Are Computed From the Statutory Formulas Alone—the Lesser of the ERA Formula and the § 5303(a) Formula—and Compound Accordingly.**

The remedial computation is mechanical. With the Member-side blocks ineffective (Parts III.A through III.E), the General Schedule COLA suppressions ineffective as applied to Members for the same reasons of timing as the ERA COLA blocks (Part III.F), and the presidential suppressions suffering from the same failure to comply with the timing requirements of the Twenty-Seventh Amendment (Part III.G), the Member COLA for each year is the lesser of the ERA § 704(a)(1) formula and the General Schedule § 5303(a) formula—both objective figures computable from published ECI data. *See* Ex. 1 (tabulating, for each year, the ERA formula, the GS formula, the figure actually implemented, the instrument of each suppression, and the resulting COLA due). Nor is this reading a gerrymander in plaintiffs' favor: in years when the § 5303(a) formula runs below the ERA formula—for example, 2015, 2019, and 2022—the lower § 5303(a) figure controls, exactly as § 4501(2)(B) contemplates.

The year 1998 illustrates the framework's evenhandedness. It is the one year at issue with no congressional Member-side block: a Member COLA was paid, but at 2.3%—the presidentially suppressed General Schedule figure—rather than the 2.8% the § 5303(a) formula required. Because a presidential suppression cannot cap Member compensation—at least not without an intervening election—the 1998 COLA should have been computed at the lesser of the two

34

formulas: 2.8%. And because the ERA's COLAs compound—each year's adjustment operates on a base that includes every prior year's—each wrongly suppressed adjustment carries forward into every subsequent year's computation. *See supra* Part III.A. The cumulative difference between the compensation the ERA ascertains and the compensation actually paid is the measure of damages for the years within the limitations period.

## CONCLUSION

The COLA blocks (and reductions) challenged in this case are invalid under the Twenty-Seventh Amendment.  Absent those invalid COLA blocks, the ERA controls the ascertainment of the proper quantum of pay for Members of Congress.  The Court should grant Plaintiffs' Motion for Partial Summary Judgment and order submission of damages calculations based upon the proper application of the ERA from 1994 to the present, with damages limited to the statutory period since March 7, 2018.

Respectfully submitted,

/s/ *Kenneth T. Cuccinelli, II*
Kenneth T. Cuccinelli, II
KENNETH T. CUCCINELLI, II, ATTORNEY AT LAW, PLLC
Ph: 804-286-2550
E: KTCLaw@proton.me
Attorney of Record

Earl N. "Trey" Mayfield, III
CHALMERS ADAMS BACKER & KAUFMAN, LLC
10521 Judicial Dr., #200
Fairfax, Virginia 22030
Ph: (703) 268-5600
F: (703) 268-5602
E: tmayfield@chalmersadams.com
Of Counsel

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of July, 2026, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court, is available for viewing and downloading from the ECF system, and will be served by operation of the Court's electronic filing system (CM/ECF) upon all counsel of record.

/s/ *Kenneth T. Cuccinelli, II*
Kenneth T. Cuccinelli, II


**CERTIFICATION OF COMPLIANCE**

Pursuant to RCFC 5.4, I certify that this brief complies with the content and length requirements of this Court.  According to the page and word count function of Microsoft Word (the word-processing system used to prepare this document), this brief encompasses 35 pages, excluding the parts exempted by the applicable rule.
Date: July 17, 2026

/s/ *Kenneth T. Cuccinelli, II*
Kenneth T. Cuccinelli, II

36